## CALL CENTER MARKETING AGREEMENT

**THIS CALL CENTER MARKETING AGREEMENT** (the "Agreement") is entered into effective as of February___, 2020 by and between SunPath LTD, a Delaware corporation (hereinafter referred to as the "Company"), and ▮▮▮▮▮▮▮▮▮▮▮▮, a ▮▮▮▮▮▮ limited liability company (hereinafter referred to as "CCM").

**WHEREAS**, Company develops and/or administers automobile service contracts for individual automobile consumers ("Customers"), and

**WHEREAS**, CCM desires to market and sell the products identified and defined in Addendum A ("Products") to prospective Customers in the Territory referenced below, and

**WHEREAS**, Company desires to have CCM market the Products to Customers for which CCM will be compensated as set forth below.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein, the parties hereby agree as follows:

### GENERAL PROVISIONS

1) The Company grants CCM authority to lawfully solicit Customers in a legally compliant manner on a non-exclusive basis only in the territory defined in Addendum B hereto (hereinafter referred to as the "Territory") and under the terms of the Agreement. CCM shall market the Products in a manner determined by CCM, but in all instances in compliance with applicable Federal and state law, including but not limited to 47 U.S.C. Section 227 et seq.(the "Telephone Consumer Protection Act" or "TCPA") and its state law equivalents.

2) CCM shall at all times adhere to Company's written Standards of Conduct prescribed by Company from time to time and in its sole discretion. CCM acknowledges receipt of the Standards of Conduct, and has no authority to deviate from, alter or amend same. The Company reserves the right to reject any prospective Customer and to terminate any and all agreements entered into with any Customer in its sole discretion. A copy of the Standards of Conduct is attached hereto as Exhibit 1.

3) The Company agrees to provide CCM with Product forms, promotional materials, rates and other materials (the "Promotional Materials") needed to properly secure and service Customers procured by CCM. CCM shall not alter, substitute or supplement the Promotional Materials without Company's written authorization and approval.

4) CCM shall install, or arrange for the installation, of the Company's Products in accordance with the Company's policies and procedures as changed and/or updated from time to time.

5) CCM agrees to actively market the Products. This Agreement in no way requires CCM to exclusively market the Products offered by Company. CCM recognizes and acknowledges that it has no exclusive rights to market or sell the Products.

6) CCM shall perform such other acts as are necessary for the proper conduct of the business and for the protection and safeguarding of the interests of the Company in accordance with the Company's policies and procedures.

7) CCM shall provide continued maintenance and servicing to Customers in accordance with the Company's policies and procedures.

8) CCM shall provide to the Company, no less than once a month, all information required by Company for each Product marketed to Customers.

9) CCM is at all times acting on its own behalf and as an independent contractor providing services to Company. At no time is CCM an agent of Company, and this Agreement does not authorize CCM at any time to act on behalf of Company. Nothing herein shall be construed to create a relationship of

employer and employee between Company and CCM, nor does this Agreement constitute a partnership or joint venture between Company and CCM.

## REMITTANCE OF PRODUCT NET COST

10) All amounts constituting Product Seller Cost and/or Net Price which are received by CCM (hereafter a "Full Pay") shall be held in trust by CCM for Company's sole benefit. CCM acknowledges that Product Seller Cost and/or Net Price collected by CCM is all times the property of Company, and that neither CCM, nor any third party, may claim to have any rights or interest therein. Unless CCM utilizes the services of an installment pay provider approved by Company in its sole discretion, CCM shall retain the Seller Cost/ Net Price from each Product contract sold and act as a fiduciary for Company. Full Pays collected by CCM in accordance with this section shall be remitted to Company by CCM at times and places designated by Company in its sole discretion.

## COVENANT and WARRANTY to PROVIDE CUSTOMER REFUND

11) When pursuant to the terms and conditions of this Agreement, a Product as defined herein, or applicable state law, CCM is required to provide a refund to a Service Contract Customer, CCM at all times covenants and warrants that it shall make such timely refund payments, without application of fees or other charges, unless such fees or other charges are approved by Company in writing. This provision shall survive termination of this Agreement.

## COVENANT and WARRANTY to RETURN UNEARNED PREMIUM

12) When pursuant to the terms and conditions of CCM's agreement with any installment pay plan provider or finance company, CCM is required to refund unearned premium, CCM at all times covenants and warrants that it shall make such timely refund payments to the installment pay plan provider or finance company, when required and without application of fees or other charges, unless such fees or other charges are approved by Company in writing. This provision shall survive termination of this Agreement.

## COMPENSATION

13) CCM's compensation ("Compensation") shall be defined as an amount realized for each Product contract sold, specifically the difference between the Retail Price charged by CCM and the Net Price as supplied by Company, and at all times inclusive of any down payment, the minimum of which is five percent (5%). For purposes of this Agreement, a "sold" program is defined as a contract that has been executed by the Customer, submitted to the Company for approval and approved by the Company accompanied by full payment or financing approved by the Company.

14) Payment or realization of compensation to CCM is the sole responsibility of CCM and CCM shall indemnify and hold the Company harmless from any loss, cost, damage or expense, including reasonable attorneys' fees, incurred by the Company as a result of any claim asserted by CCM that compensation had not been paid.

15) The compensation paid or realized by CCM constitutes all compensation paid or payable to CCM for services pursuant hereto, including all expenses incurred by CCM in the performance of its duties as detailed herein. In all cases CCM shall be solely responsible for all of its expenses.

## TERM OF AGREEMENT

16) Unless otherwise terminated in accordance with the Termination section below, this Agreement will become effective upon its execution and remain in effect for a period of one (1) year. This Agreement shall automatically renew for successive periods of one (1) year thereafter, unless either party gives written notice to the other in accordance with the Termination section below. Written notice shall be made at least thirty (30) days prior to the end of the current term

## TERMINATION

17) Either party may terminate this Agreement by giving written notice to the other of such termination at least thirty (30) days prior to the end of the current term.  Written notice shall be sent via registered mail; return receipt requested, to the address designated in the Notice section of this Agreement and shall be effective thirty (30) days after date of receipt.

18) This Agreement may be terminated immediately for cause upon written notice from Company to CCM if:

    i)    CCM commences a voluntary case or other proceeding under any bankruptcy or insolvency law, or seeks the appointment of a trustee, receiver, liquidator, custodian or similar official of all or any substantial part of its property or assets;

    ii)    An involuntary case or other proceeding under any bankruptcy or insolvency law, or seeks the appointment of a trustee, receiver, liquidator, custodian or similar official of all or any substantial part of CCM's property or assets, is commenced against the CCM and CCM consents to any relief requested or such proceeding is not stayed or discharged within thirty (30) days;

    iii)    Breach by CCM of any provisions contained herein;

    iv)    CCM makes an assignment of any rights or delegation of any duties under this Agreement without express written consent of the Company; or

    v)    CCM fails to remit any amount due to the Company pursuant to this Agreement and such failure continues for more than ten (10) days after written notice of such failure has been received by CCM.

19) Unless specifically set forth in this Agreement, termination of this Agreement will not impair the right of CCM to receive compensation for Products sold and paid for prior to the effective date of such termination. CCM does not have exclusive rights to any Customer and will only receive compensation on Products sold directly through the efforts of CCM prior to any termination.  Company has no obligation to provide compensation to CCM after the effective date of termination for Products sold after such date.

## CONFIDENTIALITY

20) As used in this Section 20, the term "Confidential Information" shall refer to this Agreement, the Products any and all information and data related to this Agreement or any program made available to CCM, including but not limited to, cost and pricing information, financial data, claims data, claims processing procedures, computer software, reserves, loss experience and other actuarial data of any kind, marketing plans, business strategies, methods of operation, course of dealing, contract terms, policies and procedures concerning regulatory requirements, budgets, projections, accounting and control procedures, and customer, service center and field lists. All Confidential Information provided by one party (the "Providing Party") to the other party (the "Receiving Party") shall be kept confidential by the Receiving Party and shall not be used by the Receiving Party for any purpose other than the performance of its obligations under this Agreement, and the Receiving Party shall not disclose the terms or conditions of any Confidential Information to any third party without the prior written consent of the Providing Party; provided however, that outside legal counsel, consultants or accountants retained by a party to this Agreement are not considered third parties for the purposes of this Section 20.  The prohibitions of the previous sentence do not apply to Confidential Information which is publicly known or which is disclosed pursuant to the subpoena power of any court, tribunal, regulatory authority or other body so empowered, provided the parties shall avail themselves of any rules and regulations of the regulatory authority or other body in order to keep Confidential Information non-disclosed.  Any party to this Agreement which receives any such request from a regulatory authority or other body shall communicate such request to the other parties as soon as possible. Said Confidential Information shall be kept confidential by the parties to this Agreement for a period of three (3) years from the date of termination of this Agreement.

## NOTICE

21) Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by another, or whenever any of the parties desires to give or serve upon another a communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration, or other communication shall be in writing and either shall be delivered in person with receipt acknowledged, or by registered or certified mail, return receipt requested, UPS Overnight or Federal Express, postage prepaid, addressed as follows:

If to the Company:     SunPath, LTD
50 Braintree Hill Office Park – Suite 310
Braintree, MA 02184

If to the CCM:



or at such other address or to such addresses as may be substituted or added by notice given by the party to receive such notice as herein provided. The giving of any notice required pursuant hereto may be waived in writing by the party entitled to receive such notice. Every notice, demand, request, consent, approval, declaration or other communication pursuant hereto shall be deemed to have been duly given or served on the date on which personally delivered or three (3) Business Days after mailing or one (1) Business Day if UPS Overnight or Federal Express is used.

## INDEMNIFICATION

22) The Company hereby agrees to indemnify CCM and hold it harmless from any and all liability, losses, claims, costs, damages, suits, reasonable attorney's fees and expenses of whatever kind or nature which may be sustained or incurred as a result of the performance of the Products, or in connection with any consumer claim for coverage arising thereunder, or the refund concerning the Products by or through the Company, or any expense which CCM may sustain or incur in defending or prosecuting any such action, or the acts or omissions of Company. Notwithstanding the forgoing, the Company shall have no liability or for any loss, damages, or judgment if due to deceptive, misleading, or misrepresentation or the Products by CCM. In no event does the Company agree to indemnify and hold harmless any third parties employed by or contracted by CCM.

CCM shall hold the Company harmless and shall assume Company's defense at CCM's sole expense and provide complete indemnification to Company from any and all liability, losses, claims, costs, damages, suits, reasonable attorney's fees and expenses of whatever kind or nature, including any and all payments due to a third party from CCM, its agents, servants, and contractors, whether punitive, consequential or otherwise, which may be sustained or incurred as a result of or in connection with any claims, including, but not limited to any action, suit, or other proceeding which may be brought in connection therewith, arising out of or related to: (i) CCM's sale of Product; (ii) claims arising or attributable to the negligent acts, omissions or intentional wrongdoing of CCM or its contractors; (iii) allegations concerning the violation by CCM, or any contractor of CCM, of applicable laws including but not limited to 47 U.S.C. Section 227 et seq.(the "Telephone Consumer Protection Act" or "TCPA") and its state law equivalents; or (iv) a breach of this Agreement by CCM; (v) CCM's, or any of their officers, directors, employees negligent acts, omissions, intentional misconduct, or breach of any covenant or warranty contained in this Agreement.

## MISCELLANEOUS PROVISIONS

23) Assignment. This Agreement may not be assigned by CCM without the prior written consent of the Company. The Company may assign this Agreement without CCM's consent. Any assignments hereunder shall not relieve the assigning party from its obligations under this Agreement. The assignee

of this Agreement shall assume, by instrument reasonably acceptable to the other party to this Agreement, the assignor's obligations hereunder.

24) **Property Rights.** Any property, including but not limited to, solicitation materials, rates, contracts and forms utilized under this Agreement are the sole and exclusive property of the Company. This provision shall survive the expiration or termination of this Agreement.

25) **No Benefit to Third Parties.** The rights and privileges afforded by this Agreement are solely for the benefit of the parties hereto and in no circumstances shall any other person have any rights or privileges or be entitled to any benefits under this Agreement.

26) **Changes and Waiver.** This Agreement may be amended or modified, and the terms and conditions of this Agreement may be waived, only by the written consent of the Company and CCM. The failure of any party at any time to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same, and no waiver of any nature by any party, whether by conduct or otherwise, shall be deemed to be a continuing waiver.

27) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby. All prior agreements and understandings between the parties, whether oral or in writing, are superseded.

28) **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

29) **Severability.** If any one or more of the provisions contained in this Agreement or any document executed in connection herewith shall be or become invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired; provided, however, that in such case the parties shall, if possible, achieve the purpose of the invalid provision by agreeing to a new, legally valid provision which shall become part of this Agreement.

30) **Law and License.** Company and CCM each shall use utmost good faith and best efforts to ensure that their respective operations are conducted in connection with the Products are in compliance in all material respects with all applicable laws, rules and regulations of all jurisdictions in which it performs its duties.

31) **Counterparts; Facsimile Signatures.** This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement. Facsimile signatures will be accepted by both parties as execution original signatures.

32) **Announcements.** The parties shall consult and confer with each other prior to making any announcement concerning any of the transactions contemplated in this Agreement.

33) **Jurisdiction.** The parties hereby consent to the non-exclusive jurisdiction of the federal and state courts located in the Commonwealth of Massachusetts in any and all actions between the parties arising under or in connection with this Call Center Marketing Agreement. CCM will not under any circumstance refuse service of process and agrees to promptly make all required responsive to confirm same.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written.

**SUNPATH, LTD.**                                    ██████████████████

X: _____          X: _____

Name: Andrew Garcia – President        Name ████████████

Date: _____        Date: _____

of this Agreement shall assume, by instrument reasonably acceptable to the other party to this Agreement, the assignor's obligations hereunder.

24) Property Rights. Any property, including but not limited to, solicitation materials, rates, contracts and forms utilized under this Agreement are the sole and exclusive property of the Company. This provision shall survive the expiration or termination of this Agreement.

25) No Benefit to Third Parties. The rights and privileges afforded by this Agreement are solely for the benefit of the parties hereto and in no circumstances shall any other person have any rights or privileges or be entitled to any benefits under this Agreement.

26) Changes and Waiver. This Agreement may be amended or modified, and the terms and conditions of this Agreement may be waived, only by the written consent of the Company and CCM. The failure of any party at any time to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same, and no waiver of any nature by any party, whether by conduct or otherwise, shall be deemed to be a continuing waiver.

27) Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby. All prior agreements and understandings between the parties, whether oral or in writing, are superseded.

28) Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts.

29) Severability. If any one or more of the provisions contained in this Agreement or any document executed in connection herewith shall be or become invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein or therein shall not in any way be affected or impaired; provided, however, that in such case the parties shall, if possible, achieve the purpose of the invalid provision by agreeing to a new, legally valid provision which shall become part of this Agreement.

30) Law and License. Company and CCM each shall use utmost good faith and best efforts to ensure that their respective operations are conducted in connection with the Products are in compliance in all material respects with all applicable laws, rules and regulations of all jurisdictions in which it performs its duties.

31) Counterparts; Facsimile Signatures. This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement. Facsimile signatures will be accepted by both parties as execution original signatures.

32) Announcements. The parties shall consult and confer with each other prior to making any announcement concerning any of the transactions contemplated in this Agreement.

33) Jurisdiction. The parties hereby consent to the non-exclusive jurisdiction of the federal and state courts located in the Commonwealth of Massachusetts in any and all actions between the parties arising under or in connection with this Call Center Marketing Agreement. CCM will not under any circumstance refuse service of process and agrees to promptly make all required responsive to confirm same.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SUNPATH, LTD.

X: _____

Name: Andrew Garcia – President

Date: 02/25/20

Name: _____

Date: _____

5

## ADDENDUM A - AUTHORIZED PRODUCTS

1) VSC Product - Horizon
2) VSC Product – Mileage Plus
3) VSC Product – Secure Advantage

## ADDENDUM B - TERRITORY

All states in the continental US, except: TBD

EXHIBIT 1 – STANDARDS of CONDUCT

See attached

*DIRECT MARKETING STANDARDS & GUIDELINES*

| *Standards of Conduct* |
|---|
| *Basic Standards* |
| SunPath Clients shall *operate in accordance with laws and regulations* of the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, the United States Postal Service and all other applicable federal, state, and local  regulations and laws.  SunPath Clients shall conduct sufficient *due diligence* to ensure that the companies with whom they do business are also complying with the law.  Merely relying on a contract provision requiring the parties to comply with all applicable laws, when the member has reason to believe that a business party is not operating consistent with legal requirements, is not sufficient to meet this standard. |
| SunPath Clients shall not use in their company name, advertisements, sales solicitations or any other description of their products, words such as *"warranty," "dealer," "dealership," "manufacturer"* (including actual manufacturer's name; *e.g.* "Ford") or any other words that falsely imply that the company is somehow associated with the manufacturer of the motor vehicle.  SunPath Clients may use these words to describe the coverage the consumer currently has on their vehicle.<br><br>It is the totality of the sales presentation that determines whether the presentation is deceptive or not.  Thus, it is possible to comply with this Standard and still have a script or sales presentation that is deceptive.  SunPath Clients who choose to use these words must, therefore, insure that their scripts in totality are not deceptive and must monitor sales presentations to insure that their sales representatives who use these words do not do so in a deceptive manner. |
| SunPath Clients shall not use in their company name, advertisements, sales solicitations or any other description of their products, words such as *"insurance," "surety," "mutual"* or any other words descriptive of the insurance, casualty or surety business, or a name deceptively similar to the name or description of any insurance or surety corporation. |
| SunPath Clients shall not create a *false and misleading sense of urgency* in their marketing materials.  SunPath Clients must be able to substantiate any claim of urgency *before* they distribute a marketing piece.  For example, a member shall not use language that indicates that a consumer's warranty is expiring unless they possess information that establishes that the consumer's current warranty will expire within a reasonable time in the near future. |
| SunPath Clients shall not make an offer that gives a *false and misleading sense of exclusivity* unless it is true.  For example, a member shall not claim that an offer is "exclusive" or that the consumer was "preselected" unless that is true and the member only makes the offer to a select number of potential customers. |
| SunPath Clients shall not indicate that an *offer is for "a limited time"* or that the offer "will expire" unless the member is prepared to change or refuse to honor the original offer after the stated time period ends and be able to substantiate a reasonable limited time for the offer.<br><br>SunPath Clients may also use this phrase if they have actual knowledge that the consumer's vehicle is within 7500 miles or 6 months of no longer qualifying for exclusionary coverage or if they have actual knowledge of an impending rate increases. |
| SunPath Clients shall not communicate with customers so as to infer that they are agents of the vehicle manufacturer if such is not the case.  If a member *refers to a manufacturer or dealer* in a marketing piece, it must also disclose in the piece in a clear and conspicuous manner that it is not affiliated with those entities or state that it is an independent company selling vehicle service contracts. |
| SunPath Clients shall make a *voice confirmation disclosure* for all phone sales,  that includes all of the information contained in Appendix A of the Association's Standards of Conduct, including but not limited to, the requirement to obtain express consent from the consumer to charge his or her credit or debit card.  Appendix A represents the minimum confirmation disclosure requirements.  SunPath Clients may include additional disclosures not contained therein. |

| *Standards of Conduct* |
|---|
| SunPath Clients shall *record all phone sales* from start to finish, including but not limited to, the voice confirmation disclosure and corresponding consumer consent.  These recordings shall be available on demand to the administrator, finance company and Association.  The equipment used for the recording must be PCI compliant so that the consumer's credit card number or ACH information are not recorded.  The fact that the call is being recorded must be disclosed to the customer at the beginning of the call, and customer representatives must not have the ability to pause the recording other than to avoid recording credit card information. |
| SunPath Clients shall maintain *coverage to adequately fund claims* and cancellations, such that claims and cancellations can be honored. |
| SunPath Clients shall *provide the purchaser with a copy of the contract*.  SunPath Clients must provide the consumer's service contract electronically or mail the contract to the consumer within three (3) business days of when the consumer agrees to purchase the contract.  Product warranty providers must overnight the contract to the product provider.  The product provider must mail the product and the contract within five (5) days of receiving it.  Upon request, a Member must provide a consumer with a copy of the contract prior to purchase.<br><br>The contract shall be dated, clearly written in understandable language and printed or typed in easy to read type.  The form of contract shall contain certain specific information including the price, products and services covered, limitations, exclusions, deductible amounts and other significant information (such as the initial payment) and must comply with all applicable state law requirements.  The Member or its fulfillment company shall maintain evidence that they sent the consumer their contract and when |
| SunPath Clients shall employ an *adequate staff* to promptly respond to customer service inquiries and telephone calls. |
| SunPath Clients shall permit and honor a consumer's request to *opt out* of receiving future marketing pieces and/or telephone solicitations. |
| SunPath Clients shall not knowingly sell a consumer *duplicative coverage* of a warranty or service contract that the consumer already possesses. |
| SunPath Clients shall not sell *personal information* that the consumer has provided during a sale to other companies for marketing purposes without the consumer's knowledge or choice. |
| SunPath Clients shall not use consumers' *personal information obtained from a state department of motor vehicles* for any unauthorized use in violation of 18 U.S.C. 2721 *et seq.* or any similar state laws. |
| SunPath Clients shall appoint a representative of the company to serve at its *compliance officer*.  The compliance officer's duties shall include ensuring that the Member is complying with all state and federal laws and regulations, as well as the guidelines set forth in this Standards of Conduct. |
| SunPath Clients shall meet all s*tate licensing and marketing requirements* applicable to the industry. |
| SunPath Clients shall conduct *criminal background checks* on all newly hired employees. |

## *Advertising*

| |
|---|
| SunPath Clients shall be prepared to *substantiate* any claims or offers made. Advertisements or specific claims that are untrue, misleading, |
| Each member shall ensure that each advertising piece *complies with all applicable consumer protection laws*.  As a safe harbor, SunPath Clients should have these materials reviewed by an attorney experienced in these laws or by the Member's compliance officer. |
| When using the term *"free" or "complimentary"* or other similar terms, advertisers shall ensure proper disclosures are made in proximity to the term, if some form of action is required of the consumer to receive the offer. |

| *Standards of Conduct* |
| --- |
| If a Member makes a specific offer in a marketing piece, it must contain clear and consistent statements or representations of all the *material points of the offer*. The offer shall not be contradicted by individual statements, representations or disclaimers. Representations which, by their size, placement, duration, or other characteristics are unlikely to be noticed or are difficult to understand should not be used if they are material to the offer. |
| If a Member's marketing piece contains *informational material*, such as the fact that a recall exists for the consumer's auto, the Member must clearly and conspicuously disclose that if the consumer calls the Member for information, the Member will be offering for sale an automobile service contract. |
| SunPath Clients shall make reasonable best efforts to ensure that *mailing lists* they purchase contain legally obtained consumer information and comply with federal laws that now require that consumers opt in to their motor vehicle public information being sold or shared. |
| SunPath Clients shall not knowingly make *false statements to consumers*, e.g. "…buy now; your vehicle will be inspected if you re-apply…" |
| Since service contracts are not financed, SunPath Clients shall not represent that the contracts are *financed* and shall make no reference to *interest rates or charges*. For contracts sold that are not paid in full at the time of purchase, SunPath Clients shall only describe the payment as a "no fee payment plan." |
| SunPath Clients shall not use full *vehicle identification numbers (VINs)* in their promotional materials.  If a VIN is used in promotional materials, it shall be limited to the first 12 digits. |
| All marketing shall contain *clear and consistent statements* so as not to be misleading or purposefully confusing. |
| *Offers* |
| All offers shall be disclosed to a prospective customer in a clear, honest, and complete manner. |
| The service contracts that SunPath Clients sell shall be consistent with the product that they represent to the consumer. |
| Where required, SunPath Clients shall have their *contracts approved by or filed with the appropriate State*. |
| SunPath Clients shall clearly and conspicuously *disclose the material terms and conditions* of the offer before obtaining the consumer's consent, including:<br><br>➢  The identity of the marketer and the contract's administrator and contact information for service or cancellation for both<br>➢  A description of the goods or services being offered including:<br><br>    ✓  The type of coverage<br>    ✓  The number of miles and/or years that the contract covers<br>    ✓  If a waiting period exists before the consumer can make a claim under the contract and how that period is determined<br>    ✓  Whether the contract is transferable to a subsequent purchaser<br>    ✓  Whether the contract is refundable and if so, the time frame within which the consumer cancel for a full refund<br>    ✓  Whether the consumer must perform mandatory maintenance<br>    ✓  Any dollar limitation on the total amount of claims<br><br>➢  The price or the range of prices of products or services purchased by the consumer, including whether there are any additional charges including a deposit<br>➢  Whether the consumer will be billed or automatically charged<br>➢  When and how frequently the consumer will be billed or charged<br>➢  The fact that the consumer must take affirmative action to cancel in order to avoid future billing or charges<br>➢  The specific and easy steps that consumers should follow to cancel the plan and avoid the charges, and<br>➢  The time period, if any, within which the consumer must cancel<br>➢  Who will process the consumer's payments |

| Standards of Conduct |
|---|
| In order to obtain the consumer's consent, SunPath Clients must receive an ***affirmative response*** that the consumer accepts the material <br> terms and conditions of the offer as described above.  It is appropriate to group these disclosures together and obtain affirmative consent in that manner. |
| SunPath Clients shall post a ***copy of all contracts*** they currently offer online and direct prospective purchasers to the web address where <br> these contracts are displayed.  SunPath Clients shall also offer to send consumers a copy of the contract being offered to the consumer via electronic mail or by facsimile. |
| ***Outbound Telemarketing*** |
| SunPath Clients shall not conduct any outbound telemarketing unless they have obtained a ***Subscription Account Number (SAN)*** by registering with the Federal Trade Commission, if required. |
| When telemarketing, SunPath Clients shall ***immediately disclose***: <br><br>    o   the identity of the seller providing the goods or services for sale <br>    o   that the purpose of the call is to sell goods or services <br>    o   the nature of the goods or services being offered |
| SunPath Clients shall follow all ***state and federal do not call laws and regulations*** and ***register as a telemarketer*** in states where required. <br> If a Member believes that it is exempted from a law, the burden is on the Member to prove that the exemption applies to their company. |
| SunPath Clients shall always display an accurate ***caller ID*** number when calling consumers.  SunPath Clients shall not "spoof" their caller ID |
| SunPath Clients shall not use prerecorded sales messages. |
| SunPath Clients shall not knowingly make ***telephone solicitations to a wireless device*** unless they have express permission from a person <br> to call the wireless device for that purpose.  SunPath Clients shall scrub their calling lists against a wireless number list unless the calling list only includes wireless numbers where the consumer has given their express consent to receive sales calls. |
| Before a Member ***accepts a transfer call*** from anyone, the Member must conduct reasonable due diligence to ensure that the transfers were obtained legally.  A Member shall not accept a transfer call if it is known, or reasonably could have been determined, that the transferred call originated with an illegal prerecorded message. |
| When the VPA establishes its ***Association-wide do not call list***, all SunPath Clients shall scrub their outbound call lists against this list according to the procedures established by the Board of VPA.  SunPath Clients who receive do not call requests shall provide those numbers to the VPA for inclusion in the Association-wide do not call list according to the procedures established by the Board. |
| If a Member uses a ***third party telemarketing vendor***, even if the vendor is not located in the United States, the Member shall require the vendor to follow these Standards and all applicable laws and regulations of the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, the United States Postal Service and all other applicable federal, state, and local regulations and laws. |
| SunPath Clients shall provide its administrators, payment processing companies and the Association with the ***identity of all third-party*** <br> ***companies*** used to make outbound telephone solicitations and proof that the member has obtained a SAN from the Federal Trade Commission. |

| *Standards of Conduct* |
|---|
| Many other telemarketing laws apply if a Member offer contains a ***negative option or a free to pay conversion***.  If a Member is using these offers, the Member must ensure that it is complying with all applicable laws. |
| *Telemarketing Using a Predictive Dialer or Third Party Vendor* |
| Every sale of every service contract must be recorded start to finish and made available on demand to the administrator, payment processing company and Association.  The equipment used for the recording must be PCI complaint so that the consumer's credit card number or ACH information are not recorded. This fact that the call is being recorded must be disclosed to the customer at the beginning of the call, and customer representatives must not have the ability to pause the record other than to avoid recording credit card information. |
| For each call, the person or entity making the call must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. |
| No telephone call may be initiated using an autodialer:<br><br>• To any paging service, cellular telephone or any other service for which the called party is charged for the call;<br>• To any emergency telephone number; or<br>• To the telephone line of any guest or patient room at a hospital or health care facility.<br><br>If the device cannot eliminate such calls, it may not be used |
| Autodialers should not be used in such a way as to engage two or more telephone lines of a multi-line business simultaneously. |
| Live third party call monitoring must be made available to payment processing companies, administrators and the Association, and such monitoring to assure quality must be disclosed to callers. |
| A Subscription Account Number (SAN) number is required for each individual marketing company in addition to any third party company physically making the phone call in every area code. |
| Teleblock service with insurance must be in place for all calls made to insure that no calls are made to telephone numbers on the national Do-Not-Call list or to wireless phones. |
| Unanswered telemarketing calls may not be disconnected prior to at least fifteen (15) seconds or four (4) rings. |
| Calls must handled by live sales representatives.  A pre-recorded or artificial voice or message may not be used at any point in the sales process.  A live voice cannot be transferred to a pre-recorded message. |
| No more than 3% of telemarketing calls that are answered live by a person, or over a 30-day period, may be abandoned.  A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting. |
| If a sale representative is not available to speak with the person answering the call within two (2) seconds, that person must receive a prerecorded identification message that states *only* the name and telephone number of the business, entity or individual on whose behalf the call was placed and that the call was for "telemarketing purposes."  The telephone number provided must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign. |
| No telephone solicitation calls shall be made to consumers before 8:00 AM or after 9:00 PM local time at the called party's location or in violation of state holidays. |
| Under no circumstances may a telephone number be dialed for the purpose of determining whether the line is a facsimile or voice line or has an answering machine. |

| *Standards of Conduct* |
|---|
| The third party dialer who is conducting predictive dialing in-house must be certified by an independent third-party organization approved by the VPA, such as the American Teleservices Association. The application for such certification must be done immediately and an aggressive timeframe for certification must be set and scheduled. |
| All call centers must agree to an in-house audit at anytime whether it is announced or not. |
| If adopted, SunPath Clients must both contribute to and scrub against the Industry-wide Do-No-Call List (DNC). |
| Call centers and third party services must maintain proof of all federal and state licensing and registration. Call centers and third party services must implement the Association's Standards. |
| If predictive dialing is used, the call centers must register with the Association as center that uses predictive dialing (either in-house or third party). A member must register with the Association prior to starting to use predictive dialing as a marketing method. |
| Every Member that is an administrator, fulfillment company, or payment processing company may perform an in-person compliance review either directly or through an Auditor or attorney at each facility with which they have a contract for marketing. |
| All parties will be required to sign affidavits attesting that the above rules will be followed. |

### *Refund Policies and Procedures*

| |
|---|
| Refund policies shall be ***clearly and conspicuously disclosed*** to consumers prior to the sale of any product of service. |
| SunPath Clients shall ***honor all consumer refund requests made within thirty days*** of the date they sold the contract in full. If the consumer has only paid the initial deposit, SunPath Clients shall provide the refund within five (5) business days, if made by credit card; and within thirty (30) days if made by check or ACH. If the consumer has also made subsequent payments, the Member shall provide the refund within thirty (30) days from the date they receive the completed notice of cancellation with odometer information. |
| SunPath Clients must be aware of and comply with all applicable state laws governing refunds and/or applicable ***3 day right to cancel*** laws. |
| Upon request, SunPath Clients shall provide a ***written cancellation fee calculation*** and state the information upon which they base the calculation. |

### *Security of Customer Information*

| |
|---|
| SunPath Clients shall adequately protect all nonpublic consumer/customer personal information regardless of whether it is handled or maintained in paper or electronic format. |
| In order to adequately protect this information, SunPath Clients shall maintain a written information security program. This program shall contain administrative, technical and physical safeguards that are appropriate to the size, complexity, nature and scope of business and the sensitivity of the information. The program shall:<br>  1) Require the designation of one or more employees to coordinate, monitor and revise the program.<br>  2) Identify reasonably foreseeable internal and external risks to the security, confidentiality and integrity of the customer information.<br>  3) Provide for employee training.<br>  4) Identify the information systems necessary to detect, prevent and respond to attacks, intrusions and other system failures.<br>  5) Set forth regular testing or monitoring of the effectiveness of the program.<br>  6) Provide for the evaluation and adjustment of the program as results of the testing and monitoring dictate or other changes such as a business model change, facility change, etc.<br>  7) Ensure that personal information is adequately and securely disposed of at the end of its useful life.<br>  8) Use Social Security Numbers only when necessary and in compliance with all state restrictions on display and use of social security numbers. |

| *Standards of Conduct* |
|---|
| SunPath Clients shall oversee service providers by taking reasonable steps to select and retain service providers that are capable of maintaining the security standards set forth herein. |
| SunPath Clients shall require service providers by contract to implement and maintain the security standards set forth herein. |

### *Privacy Policy and Data Protection*

| |
|---|
| SunPath Clients shall each have their ***own privacy policy*** and shall clearly and conspicuously post a copy of the policy on-line. |
| The privacy policy shall disclose and outline the practice of data collection, usage, and sharing (***"Data Practices"***). Data Practices should be easy to find, easy to read and easy for consumers to act upon. |
| The privacy policy shall be ***posted in a clear and conspicuous fashion*** when accepting the consumer's personal information. |
| All notice disclosures should appear in or be linked to every consumer data collection site/application and the company's website. |
| Consumers shall be given reasonable and ***adequate notice of any privacy policy change***. SunPath Clients shall have notice on their home page that their privacy policy has been updated and should highlight the updates and list the dates the revisions were made at the top of their privacy policy. SunPath Clients should also strongly consider email notification to all consumers covered by the original privacy policy |
| SunPath Clients shall have both ***technical and management controls*** in place to comply with their respective privacy policy. |
| SunPath Clients shall conduct a regular, ***periodic evaluation*** of their privacy policy and data protection procedures to ensure compliance. |

### *Online Data Collection Practices*

| |
|---|
| On a Member's website, SunPath Clients shall ***not hide consumer input fields*** without consumer disclosure. |
| Hiding fields means the collection of personally identifiable information ("PII") and the transmission of that data to an advertiser without notifying the consumer that the data has been collected or that the data will be shared. PII that is entered on a website prior to the consumer's interaction may be pre-populated, using cookies or otherwise, in an offer form, but shall not be passed without providing the opportunity for the consumer to review that information. |
| For example, if a consumer's email address is known from the registration page, it may be pre-populated on the offer data form in the appropriate field. This allows the consumer to easily review and edit his/her data, if necessary, and make an informed decision on whether he/she wants to share that data with the advertiser. This information shall not be shared with an outside entity without the consumer's knowledge. |
| If a Member chooses not to show one or more fields, it shall either:<br>  o  Include a clear and conspicuous notice prominently on the offer page or via a prominently displayed link indicating which fields will be collected and shared with another, OR<br>  o  Include text next to each offer on the page that specifically lists each field that will be collected and shared with the advertiser(s) |
| SunPath Clients shall include a ***clickable link*** to its privacy policy within each offer. |
| SunPath Clients shall provide reasonably ***adequate security*** to protect consumers' personally identifiable information. |

| Standards of Conduct |
| --- |
| *Consumer Complaint Process* |
| SunPath Clients shall have a ***written consumer complaint process*** in place to address complaints received from consumers or regulatory agencies. |
| SunPath Clients shall address all complaints received in a prompt, courteous and professional manner and share that information with the |
| SunPath Clients who receive a complaint from a third party such as the Better Business Bureau or state attorney general shall respond to the complaint within the timeframe that the third party requests. |
| SunPath Clients shall make a good faith effort to resolve every complaint. |
| SunPath Clients' complaint processes shall be such that patterns of problems or severe problems are identified and addressed.  Senior management shall be kept apprised of all such problems identified by consumer complaints.  SunPath Clients shall create procedures that require the Member to investigate the cause of the problem and to correct the issues identified. |

As indicated above, Company has an implemented detailed data security policies and procedures, which adequately protect consumers' personally identifiable information.

Company has a customer service department, as well as a complaint resolution department headed by its general counsel.  Auditors assisted company with drafting a written consumer complaint policy.

Company has a complaint resolution department headed by its general counsel, which responds to all written complaints in a prompt, courteous and professional manner.

Company's complaint department responds to BBB and regulator complaints within the timeframe requested by such party.

Company has trained its customer service representative and managers to adequately respond to consumer complaints.  Additionally, Company's complaint department makes a good faith effort to resolve every complaint received from the BBB or a state regulator.

Company uses a complaint database to track complaints and spot recurring trends.  Company's complaint management team, customer service department, compliance officer and general counsel are involved in creating and/or modifying policies and procedures to remedy problems identified through complaints.