# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

RUTH SMITH, individually and on
behalf of all others similarly
situated,

                    Plaintiff,            Case No.
                                          1:22-cv-00081-LMB-
vs.                                       WEF

SUNPATH, LTD., a Massachusetts
corporation,

                    Defendant.
_____/

                    DEPOSITION OF
RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                    KOBI CHUKRAN

            (Conducted Via Videoconference)


DATE:              November 1, 2022

TIME:              11:03 a.m. to 2:06 p.m.

PURSUANT TO:       Notice by counsel for Plaintiff
                   for purposes of discovery, use at
                   trial or such other purposes as
                   are permitted under the Federal
                   Rules of Civil Procedure

REPORTED BY:       Aaron T. Perkins, RMR, CRR, CRC
                   Notary Public, State of
                   Florida at Large

                   Pages 1 to 128


                                          Page 1

```
 1              MR. CAFFAS:  Object to form as well.
 2     BY MR. SMITH:
 3         Q.   You can answer.
 4         A.   Can you repeat the question please?
 5         Q.   Yeah.  So you said you received leads
 6     from various websites, from the BBB, from your
 7     website.
 8              How do you utilize the leads?  Do you
 9     use them for telemarketing?  Do you -- I'm trying
10     to understand how you reach out to these people.
11              MR. TANDY:  I'm going to object.
12              MR. CAFFAS:  Yeah.  Object to form.
13         It's become a compound question.
14     BY MR. SMITH:
15         Q.   You can answer.
16         A.   Yes.  The leads -- yes, we call them.
17         Q.   Call them?
18         A.   Yes.
19         Q.   All right.  I want to talk about your
20     relationship with SunPath.
21              Can you tell me when you started working
22     with SunPath?
23         A.   I don't remember the exact date.
24         Q.   Can you give me an approximate date?
25         A.   No.
```

                                                    Page 24

1          Q.   Okay.  You can't guesstimate?  Has it

2     been five years, ten years?

3          A.   Again, I want to make sure that I'm as

4     accurate as possible.  I don't remember exactly.

5          Q.   So you can't tell me at all.

6               Okay.  Have you worked with them within

7     the relevant time period, which, again, is January

8     26th, 2018, to the present?

9          A.   Yes.

10         Q.   How did you hear about them?

11         A.   I don't recall.

12         Q.   When did your relationship with SunPath

13    end?

14         A.   I want to say approximately six months

15    ago.

16         Q.   Why did it end?

17         A.   Moneys owed.

18         Q.   Moneys owed from American Protection to

19    SunPath or the other way around?

20         A.   Yes.

21         Q.   Okay.  How would you describe your

22    relationship with SunPath?

23              MR. TANDY:  Objection.

24              THE WITNESS:  Good.

25    BY MR. SMITH:

                                              Page 25

1          like an appropriate time.  My apologies.

2              MR. SPORN:  And my apologies for not

3          introducing myself properly, but Greg is

4          handling the deposition for us.  I'm merely

5          observing.

6              MR. TANDY:  All good.  Not a problem.

7          Thank you.

8      BY MR. SMITH:

9          Q.   So I will go back to my question and

10     repeat it.

11             Is SunPath involved in

12     American Protection's sales process?

13             MR. TANDY:  Again, note the objection.

14             MR. CAFFAS:  Object to the form.

15     BY MR. SMITH:

16         Q.   You can still answer the question.

17         A.   I'm not sure I understand the question.

18     It's a very general question.

19         Q.   Okay.  Why don't you tell me how

20     American Protection goes about selling vehicle

21     service contracts.

22         A.   Sure.  We receive a lead of an

23     interested prospect.  We contact that client, and

24     we make sure that they are qualified to receive

25     coverage based on the year, make, and model of the

                                             Page 29

1      vehicle, as well as the mileage.  Based on this

2      information, we can determine what is the best

3      coverage we can offer.

4          Q.   And then once you make that

5      determination, what happens next?

6          A.   Then we submit the sale to the -- to be

7      underwritten by SunPath.

8          Q.   And throughout that sales process, you

9      know, you get the lead, you contact the client,

10     you see what they're qualified for, you determine

11     what's best for them, and then you reach out to

12     SunPath.

13              Is that final step, reaching out to

14     SunPath, is that where contacting SunPath would

15     come in to play or would you have contacted them

16     at some point prior?

17              MR. TANDY:  Objection.

18              MR. CAFFAS:  Yeah.  Objection to form as

19         well.  It's a compound question.

20              MR. TANDY:  And I must object.  To the

21         extent that you're attempting to define the

22         term sales pathway, I object to that, or

23         process.  I'm sorry, Mr. Smith, but I do

24         think that's really compound.

25              MR. SMITH:  That's fine.

                                        Page 30

1        Q.    Okay.  So let's walk through this.

2              You obtain leads from various sources;

3    is that correct?

4        A.    Yes.

5        Q.    Okay.  And then you're going to reach

6    out to those leads to potentially sell a vehicle

7    service contract, right?

8        A.    Yes.

9        Q.    Okay.  After you contact the potential

10   client, you're going to find out what they're

11   qualified for; is that fair to say?

12       A.    Well, in some cases, the customer

13   contacts us.

14       Q.    Okay.  Maybe they contact you; you

15   contact them.  Once you're in touch with the

16   potential customer, you determine what they're

17   qualified for?

18       A.    Yes.

19       Q.    Okay.  How do you go about doing that?

20       A.    Based on the customer's vehicle

21   characteristics, the year, make, model, and

22   mileage.

23       Q.    And then what do you do with that

24   information?

25       A.    We enter it into our CRM that allows us

Page 32

1 June 29th, 2017; is that correct?

2  A. Yes.

3   May I ask for a quick five-minute break?

4  MR. SMITH: Of course. Yeah, let's take

5 a break.

6   (A recess was taken.)

7  MR. SMITH: Back on the record.

8 BY MR. SMITH:

9  Q. And let me share my screen again. All

10 right. Kobi, again, I'm showing you what's been

11 marked as Exhibit 2.

12   You previously testified that this is an

13 agreement between SunPath and American Protection,

14 right?

15  A. That seems to be.

16  Q. It looks like it's dated June 29th,

17 2017, right?

18  A. Yes.

19  Q. Would that have been the date that your

20 relationship with SunPath began?

21  A. Yes.

22  Q. All right. I will draw your attention

23 to the third "whereas" paragraph, where it says,

24 "Company desires to have CCM market the products

25 to customers for which CCM will be compensated as

Page 48

1    set forth below."

2            Do you see that?

3        A.    Yes.

4        Q.    Is it fair to say that SunPath entered

5    this agreement to have American Protection sell

6    its vehicle service plans?

7        A.    Yes.

8        Q.    All right.  And then underneath the

9    "general provisions," paragraph 1, it says, "The

10   company grants CCM authority to solicit customers

11   on a nonexclusive basis only in the territory

12   defined in Addendum B hereto."

13           Do you see that?

14       A.    Yes.

15       Q.    And if we scroll down to Addendum B,

16   which is on page 7 of this exhibit, it states,

17   "The geographic territory in which CCM may solicit

18   sales of products offered by the company shall be

19   exclusive and limited to all states in the

20   continental U.S. except TBD."

21           Do you see that?

22       A.    Yes.

23       Q.    So is this provisions just letting

24   American Protection market its products throughout

25   the U.S.?

                                        Page 49

```
 1              "maintenance" refers to.  He's not clear what
 2              "maintenance" refers to in this context.
 3                  THE WITNESS:  I'm not clear as to what
 4              "maintenance" refers to.
 5      BY MR. SMITH:
 6          Q.   Okay.  Once American Protection sells
 7      one of SunPath's vehicle protection plans, is
 8      there a continued relationship with that client
 9      that American Protection has?
10          A.   Yes.
11          Q.   How long would that relationship be?
12          A.   For the lifetime of the agreement.
13          Q.   Okay.  And what would
14      American Protection's responsibilities be through
15      the lifetime of that agreement?
16          A.   The customer might ask us for the
17      numbers to the claims department or might call us
18      to find out if something in particular is covered
19      within the plan.
20          Q.   Okay.  And we previously discussed, when
21      a contract was sold, the division of moneys from
22      American Protection to SunPath, right?
23          A.   Yes.
24          Q.   Now, these contracts, they're on a
25      monthly basis, right?  These customers pay a
```

Page 60

```
 1        certain amount each month?
 2            A.    Yes.
 3            Q.    Okay.  Who do they pay that amount to?
 4            A.    To us.
 5            Q.    And then does a share of that each month
 6        go to SunPath or does -- or how does that work?
 7            A.    No.
 8                  MR. CAFFAS:  Objection.  Asked and
 9            answered.
10        BY MR. SMITH:
11            Q.    Go ahead.
12            A.    No.  SunPath bills us for a policy.
13            Q.    Okay.  So after a policy is sold,
14        American Protection has to pay the cost of the
15        policy to SunPath; is that fair to say?
16            A.    Yes.
17            Q.    How soon do they have to pay that cost?
18            A.    We've at various times have had to pay
19        for the cost.
20            Q.    Can you give me an estimate on the
21        amount of time that you have?
22            A.    Somewhere between some months and --
23        between 30 days and more.
24            Q.    Okay.  And then is it fair to say that
25        it's American Protection's responsibility to
```

Page 61

1    collect each monthly payment from those clients?

2        A.   Yes.

3        Q.   Okay.  What happens if they cancel their

4    contract or stop paying?

5        A.   Then the plan --

6            MR. CAFFAS:  Object to the form.

7            THE WITNESS:  Then the contract is

8        cancelled.

9    BY MR. SMITH:

10       Q.   Does SunPath provide a refund of the

11   cost to American Protection then?

12       A.   Yes.

13       Q.   Okay.  I will scroll to page 2,

14   paragraph 10.  Give me one second.  All right.  So

15   it says, "All amounts constituting product seller

16   cost and/or net price which are received by CCM

17   shall be held in trust by CCM for the company's

18   sole benefit."

19            Do you see that?

20       A.   Yes.

21       Q.   Is product seller costs in this context,

22   is that the cost that you were referring to that

23   gets paid to SunPath?

24       A.   Yes.

25       Q.   And is net price in this context, is

Page 62

```
 1              really sure, Taylor, there was a question.
 2              The last question I heard was, Do you know
 3              the difference between the two entities?
 4              Which I know the answer was no.
 5                   MR. SMITH:  Right.  That --
 6                   MR. TANDY:  Please, ask the question.
 7         BY MR. SMITH:
 8              Q.   Do you know why there's two separate
 9         agreements governing the relationship -- --
10                   MR. CAFFAS:  Objection to --
11         BY MR. SMITH:
12              Q.   -- with SunPath?
13              A.   No, I don't.
14              Q.   Okay.
15                   MR. CAFFAS:  Also, note my objection to
16         speculation to that question as well.
17                   MR. SMITH:  That's all I wanted to ask
18         with this one.
19                   Let's take five-minute break.
20                   (A recess was taken.)
21         BY MR. SMITH:
22              Q.   Kobi, I will jump back to your
23         telemarketing.
24                   So you previously explained your
25         telemarketing process.  My question relates to at
```

Page 73

1      the time you're placing calls.  So at the time

2      American Protection places a call, does it know

3      which company's vehicle service plans it will be

4      pitching on the call?

5           A.   No.

6           Q.   Okay.  Is that information determined

7      later based upon the potential client's vehicle's

8      make, model, and year?

9           A.   Yes.

10          Q.   Okay.  And can you tell me what portion

11     of your business is generated through

12     telemarketing?

13               MR. CAFFAS:  I will object as to vague.

14          I don't believe telemarketing has been

15          established definition-wise.

16               THE WITNESS:  I'm not sure what you mean

17          by "telemarketing," as well.

18     BY MR. SMITH:

19          Q.   When you place calls to potential

20     clients to sell products, that would be

21     telemarketing.  So I need to understand how much

22     of your business comes from telemarketing

23     activities.

24          A.   So if I send out the postcard to a

25     customer and they call us to request information,

Page 74

1    other than what was previously produced?

2        A.   No.

3        Q.   Okay.  Does American Protection ever

4    obtain a listing of numbers registered on the DNC

5    Registry?

6        A.   Yes.

7        Q.   How often does it obtain that list?

8        A.   That is provided to us by any lead

9    providers in this case.  So, in other words, if

10    we -- any kind of leads that we acquire are

11    cleansed and cleaned and suppressed against the

12    National Do Not Call List.

13        Q.   Okay.  After American Protection

14    receives those leads, does it take any steps to

15    ensure that it's not calling numbers that are in

16    those leads that are registered on the National Do

17    Not Call Registry?

18        A.   We run those against our internal DNC

19    lists.

20        Q.   Just your internal DNC list?

21        A.   Yes.

22        Q.   Not the National DNC List?

23        A.   Not -- no.  It's already done by the

24    lead providers.

25        Q.   Okay.  Does American Protection maintain

Page 83

1    records of prior express consent from the

2    individuals that it places calls to?

3       A.   No.

4       Q.   How does American Express [sic] ensure

5    that the individuals that it's placing calls to

6    provided prior express consent?

7          MR. CAFFAS:  I will object to this as

8       vague.  I believe you just asked about

9       American Express.  I assume you're not

10      talking about the credit card company.

11         MR. SMITH:  Did I say American Express?

12         MR. CAFFAS:  Yes.

13         MR. SMITH:  Strike that.

14   BY MR. SMITH:

15      Q.   How does American Protection ensure that

16   individuals that it's placing calls to have

17   provided prior express consent?

18      A.   We review the method of which they

19   request information.

20      Q.   So can you say that again?

21      A.   We review the method of which they have

22   requested information.

23      Q.   What do you mean by that?

24      A.   I mean I review to make sure that the

25   proper opting language is present, that our name

Page 84

1   are you able to figure out the source of that

2   contact information, where it came from?

3        A.   In some cases I could, and in some cases

4   I can't.

5        Q.   Okay.  What about in the plaintiff's

6   situation?

7        A.   What about it?

8        Q.   You previously said that

9   American Protection sent a mailing to her; is that

10  correct?

11       A.   Yes.

12       Q.   Do you know where it got her contact

13  information prior to sending that mailing?

14       A.   I do not, no.

15       Q.   Did you search for that information?

16       A.   Yes.

17       Q.   What repositories were searched?

18       A.   Our CRM.

19       Q.   CRM.

20            Does SunPath ever provide leads to

21  American Protection?

22       A.   No.

23       Q.   All right.  I will pull up my next

24  exhibit.

25            (Exhibit No. 7 was marked for

Page 100

Kobi Chukran (Chukran Management Group), Volume 2 - November 9, 2022

1    record?

2         THE COURT REPORTER:  Back on the record, sir.

3    Thank you.

4         MR. SMITH:  All right.

5    BY MR. SMITH:

6         Q.   I'm going to re-ask that question, Kobi.

7         Does American Protection have any records of

8    the actual inbound or outbound calls to Plaintiff?

9         A.   No.

10        Q.   Okay.  Does American Protection have any other

11   documents in its possession related to Plaintiff that

12   have not been produced?

13        A.   No.

14        Q.   Does American Protection have any record of

15   Plaintiff providing any prior express written consent?

16        A.   I'm sorry.  What -- what was the question

17   again?

18        Q.   Yeah.  Does American Protection have any record

19   of Plaintiff providing any prior express written

20   consent?

21        MR. CAFFAS:  I'm going to object to the

22   vagueness of that question.  Prior express written

23   consent, to what?

24        MR. TANDY:  I will join.

25   BY MR. SMITH:

Page 155

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    Q.    You can answer.

2    A.    No.

3    Q.    Does American Protection have any policies or

4    procedures to ensure compliance with the Virginia

5    Telephone Privacy (sic) Act?

6    A.    Everything has been provided to you.

7    Q.    Okay.  Other than the documents that have been

8    provided, does American Protection have any policies or

9    procedures to ensure compliance with the Virginia

10   Telephone Privacy Act?

11   A.    No.

12   Q.    Okay.  And does American Protection have any

13   specific policies or procedures that relate to

14   compliance with the Virginia Telephone Privacy Act?

15   A.    No.

16   Q.    Prior to this lawsuit, did you have -- were you

17   aware of the Virginia Telephone Privacy Act?

18   A.    No.

19   Q.    Okay.  I want to go through calls to Plaintiff

20   briefly and ask you questions about them.

21         So Plaintiff alleges, on May 26th, 2020, that

22   she received two calls, and the caller ID was a

23   410-844-6327.

24         Do you know if American Protection has ever

25   utilized that number to place calls?

Page 156

1          MR. SMITH:  Objection.  Asked and answered.

2          THE WITNESS:  No.

3    BY MR. CAFFAS:

4      Q.   Have you ever inquired about those types of

5    sales and -- to SunPath and been told you weren't

6    permitted to sell those types of products?

7      A.   I don't recall.

8      Q.   I am now clicking over to the "Services" tab of

9    American Protection Corp's website.

10         Do you see where it says "Our Partners" on the

11   left side of the screen?

12     A.   Yes.

13     Q.   Okay.  And can you describe the -- the names of

14   the partners that are listed?

15     A.   Yes.

16     Q.   Can you read them off for me?

17     A.   Royal, Marathon, SunPath, Interstate.

18     Q.   Okay.  And are all those --

19         Are those all separate companies?

20     A.   Yes.

21     Q.   Do you know what kind of products or services

22   those companies are -- or provide?

23     A.   Vehicle service contracts and home service

24   contracts.

25     Q.   Okay.  And have you sold those companies'

                                                Page 213

Kobi Chukran (Chukran Management Group), Volume 2 - November 9, 2022

1    based on what the consumer's needs would be, correct?

2        A.    Correct.

3        Q.    Okay.  So, for example, there would have been a

4    time when you were able to offer a con -- a consumer a

5    SunPath product or a Marathon product, for example,

6    based on whatever that consumer's vehicle was?

7            MR. SMITH:  Objection.  Asked and answered.

8            THE WITNESS:  Since we haven't talked with

9        Marathon or Interstate in many years, the answer is

10       no.  Because when we worked with SunPath, we mostly

11       sold SunPath products.  Royal is just a recent

12       addition to our -- to our products.

13           So the -- that's why I'm saying -- that's why

14       I'm saying no.

15           (Pause in the proceedings.)

16   BY MR. CAFFAS:

17       Q.    Okay.  I am going to go back to something you

18   had discussed on the first day of your deposition

19   testimony.  You were describing the process of how

20   American Protection subcontractors would be connected to

21   potential customers.

22           And I believe you said they would be connected

23   to the customer, and then the first step is that the

24   American Protection subcontractor would introduce

25   themselves to the potential customer, correct?

Page 215

```
1              MR. SMITH:  Objection.

2              THE WITNESS:  Yes.

3              MR. SMITH:  Misstates the witness's testimony.

4         Calls for speculation.

5    BY MR. CAFFAS:

6         Q.    You can answer, Mr. Chukran.

7         A.    Yes.

8         Q.    And then under the next steps, in Discovery, is

9    it correct that American Protection then asks for the

10   year, make, and model of the potential customer's

11   vehicle?

12        A.    Yes.

13        Q.    And then asks for how many miles, if they're

14   the original owner, and the year -- excuse me -- how

15   many miles they drive in a year, correct?

16        A.    Yes.

17        Q.    And what is the purpose for them asking that

18   information?

19        A.    To determine what's the best type of coverage

20   that's available based on the mileage and to make sure

21   the car actually -- the vehicle actually qualifies for

22   coverage.

23        Q.    So is it accurate then that, when an

24   American Protection subcontractor begins the call, and

25   before he or she learns that information from the
```

Page 217

1   customer, that they aren't aware what product they're

2   going to be offering to the customer?

3       A.   Yes.

4       Q.   And that -- the product that they're going to

5   be offering the customer, that is determined by entering

6   that information in to the Inline Customer Relation

7   Management System, correct?

8       A.   Yes.

9       Q.   So it's determined automatically, without any

10  input from the subcontractor?

11      A.   I'm sorry.  What is your question?

12      Q.   So the subcontractor doesn't pick and choose;

13  the system might spit out whatever company's products

14  just works best with the customer's vehicle, right?

15      A.   The subcontractor has access to a number of

16  different plans.  So, for example, SunPath might offer a

17  higher level of coverage versus a lower level of

18  coverage.

19      Q.   Okay.  So it could be a SunPath plan versus

20  another company's plan, if another company's plan

21  offered better coverage?

22      A.   Potentially.

23      Q.   And, again, the subcontractor on the call

24  wouldn't know that prior to the customer providing their

25  information for their vehicle on the call, right?

Page 218

1   American Protection has never spoofed any telephone

2   number associated with First Citizens Bank, to your

3   knowledge?

4         A.   Yes.

5         Q.   Does -- strike that.

6              Does American Protection subscribe to the

7   reg- -- the Federal Do Not Call Registry?

8         A.   Not at this time, no.

9         Q.   Why?  Why not?

10        A.   Our subscription expired.

11        Q.   And does AP --

12             Or at what time did it subscribe to the Do Not

13   Call Registry?

14        A.   I don't have the exact dates.

15        Q.   Would it be --

16             Would it have been within the past year that

17   your subscription expired?

18        A.   No.

19        Q.   Can you give me a ballpark of when the

20   subscription would have expired?

21        A.   I believe a couple of years.

22        Q.   Okay.  And in that time, did AP intentionally

23   make calls to consumers --

24        A.   No.

25        Q.   -- on the Do Not Call Registry?

Page 231