```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          ALEXANDRIA DIVISION
 3
        RUTH SMITH, individually and on
 4      behalf of all others similarly
        situated,
 5
                            Plaintiff,        Case No.
 6                                            1:22-cv-00081-LMB-
        vs.                                   WEF
 7
        SUNPATH, LTD., a Massachusetts
 8      corporation,
 9                          Defendant.
        _____/
10
11                          DEPOSITION OF
        RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
12      d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                            KOBI CHUKRAN
13
                   (Conducted Via Videoconference)
14
15
        DATE:              November 1, 2022
16
17      TIME:              11:03 a.m. to 2:06 p.m.
18
        PURSUANT TO:       Notice by counsel for Plaintiff
19                         for purposes of discovery, use at
                           trial or such other purposes as
20                         are permitted under the Federal
                           Rules of Civil Procedure
21
22      REPORTED BY:       Aaron T. Perkins, RMR, CRR, CRC
                           Notary Public, State of
23                         Florida at Large
24
                           Pages 1 to 128
25
```

Page 1

```
 1       sell a contract that SunPath would have an
 2       obligation to perform under; is that correct?
 3            A.   Yes.
 4            Q.   Okay.  Is SunPath the only company that
 5       American Protection works with?
 6            A.   No.
 7            Q.   Okay.  Can you tell me all the companies
 8       that American Protection does work with?
 9                 MR. TANDY:  Objection.
10       BY MR. SMITH:
11            Q.   You can answer.
12                 MR. TANDY:  To the extent --
13                 THE WITNESS:  Well --
14                 MR. TANDY:  Wait, let me finish.  To the
15            extent that your contracts allow you to
16            disclose the names of the parties of whom you
17            contracted with, you can answer the question.
18            If the contracts have confidentiality
19            provision, then I will instruct you not to
20            answer until we have a chance to look at
21            those contracts, so that you don't violate
22            those agreements.
23                 Sorry, Mr. Smith, but I needed to make
24            sure about that.
25                 THE WITNESS:  Mr. Tandy, I'm going to --
```

Page 21

1           Q.    That's a bit of a compound question, so

2     let me ask that again.

3                 Are those the current companies that

4     you're working with?

5           A.    Yes.   With the exception of SunPath.

6           Q.    With the exception of SunPath.

7                 Okay.   Have you worked with all three of

8     those companies dating all the way back to 2012?

9           A.    No.

10          Q.    Okay.   Did you ever work exclusively

11    with just SunPath?

12          A.    I don't believe so.

13          Q.    How so does American Protection market

14    its vehicle protection contracts?

15          A.    We market by a few different methods,

16    including lead generation through websites,

17    through the Internet, via mail, and some other

18    methods.   We receive -- we receive sales leads

19    from various sources, such as our Better Business

20    Bureau profile, a listing of a website, and...

21          Q.    That's about it?

22          A.    Yeah.

23          Q.    Okay.   And when you say you receive

24    these leads, how do you utilize those leads?

25                MR. TANDY:   Objection.

Page 23

1          Q.   Throughout the time you worked with
2     SunPath, were you in regular contact with them?
3          A.   No.
4          Q.   Did you have an individual that you
5     could contact if you needed to discuss something?
6          A.   Yes.
7          Q.   Was it just one person or were there
8     multiple people?
9          A.   Mostly one.
10         Q.   Can you --
11         A.   I apologize.  There were a few different
12    persons.
13         Q.   Okay.  Was there one primary and then a
14    few additional?
15         A.   Yes.
16         Q.   Okay.  Can you tell me who your primary
17    contact was?
18         A.   Mr. Joe Abrahms.
19         Q.   Can you spell that?
20         A.   J-o-e; Abrahms, A-b-r-a-h-m-s.
21         Q.   And who were the other individuals that
22    you would communicate with from SunPath?
23         A.   Mr. Larry Lowe.
24         Q.   Can you spell that?
25         A.   L-a-r-r-y, L-o-w-e.

Page 26

```
 1              Q.   Okay.  So let's walk through this.
 2              You obtain leads from various sources;
 3     is that correct?
 4         A.   Yes.
 5         Q.   Okay.  And then you're going to reach
 6     out to those leads to potentially sell a vehicle
 7     service contract, right?
 8         A.   Yes.
 9         Q.   Okay.  After you contact the potential
10     client, you're going to find out what they're
11     qualified for; is that fair to say?
12         A.   Well, in some cases, the customer
13     contacts us.
14         Q.   Okay.  Maybe they contact you; you
15     contact them.  Once you're in touch with the
16     potential customer, you determine what they're
17     qualified for?
18         A.   Yes.
19         Q.   Okay.  How do you go about doing that?
20         A.   Based on the customer's vehicle
21     characteristics, the year, make, model, and
22     mileage.
23         Q.   And then what do you do with that
24     information?
25         A.   We enter it into our CRM that allows us
```

Page 32

```
 1        to determine what coverage the particular customer
 2        qualifies for.
 3             Q.   Okay.  And how does your CRM know which
 4        product is best for the customer?  Let me rephrase
 5        that question.  Sorry.  I will strike that
 6        question.
 7             What do you input into your CRM to
 8        determine what customers will be best qualified
 9        for?
10             A.   The year, make, model, and mileage
11        information of the vehicle.
12             Q.   All right.  From, let's say, SunPath, if
13        you're selling a SunPath product, what information
14        would be in your CRM to determine if they qualify
15        for that product?
16             A.   A product availability.
17             Q.   Okay.  While you're determining whether
18        o not they qualify for a product, do you ever
19        reach out to those service companies?
20                  MR. TANDY:  Objection.
21                  THE WITNESS:  I don't understand the
22        question.
23        BY MR. SMITH:
24             Q.   Okay.  Is it fair to say, if I say a
25        vehicle service company, I'm referring to SunPath
```

Page 33

```
 1              Q.    How would SunPath receive that
 2        information?
 3              A.    They would receive a feed from the CRM
 4        system.
 5              Q.    A feed.
 6                    Okay.  So would that -- do you know if
 7        that would communicate with one of SunPath's
 8        systems?
 9              A.    I assume.  I don't know.
10              Q.    Okay.
11              A.    I have never seen the operation.
12              Q.    Is the CRM -- did SunPath recommend that
13        you use this specific CRM?
14              A.    No.
15              Q.    Do you know the name of the CRM?
16              A.    Yes.
17              Q.    What is it?
18              A.    Inline CRM.
19              Q.    And when did you start using that?
20              A.    I believe around 2018.
21              Q.    Did you provide SunPath with access to
22        that CRM?
23              A.    No.
24              Q.    When you say they would receive a fee,
25        can you elaborate on that, what you mean by that?
```

Page 38

1          A.    I'm not sure of the technical process in

2     place, so I would -- I don't want to provide

3     inaccurate information.   I would assume that it's

4     some kind of feed that goes from the CRM to

5     SunPath's office.

6          Q.    Okay.

7          A.    It depends on what language or how it's

8     done.   I'm not sure.

9          Q.    Does SunPath have any systems that they

10    provided American Protection with access to?

11         A.    No.

12         Q.    Does SunPath provide any resources to

13    American Protection?

14         A.    No.

15         Q.    Okay.   Do they provide any oversight

16    over your business?

17         A.    We are appointed by SunPath in Florida

18    in terms of the agent of record.

19         Q.    What does that mean?

20         A.    That means that SunPath appoints us as

21    an agent of record in Florida in terms of

22    licensing or in terms of the ability to sell this

23    product.

24         Q.    Okay.   And when you say "appoints," is

25    this through a government database, or is this

```
1              would be highlighted in the Seller Agreement
2              between American Protection and SunPath.
3    BY MR. SMITH:
4         Q.   Okay.  Did SunPath ever provide any
5    guidance on telemarketing?
6         A.   Whatever is listed within the Seller
7    Agreement with SunPath.
8         Q.   Okay.  Nothing else?
9         A.   From time to time we would receive an
10   e-mail from Mr. Sporn with specific numbers that
11   have to be added to our internal DNC list.
12        Q.   How frequently would you receive those?
13        A.   I don't know if there was a particular
14   way to quantify that.
15        Q.   Okay.  Any other guidance?
16        A.   No.
17        Q.   Okay.  Did SunPath ever provide any
18   training to American Protection?
19        A.   No.
20        Q.   Does SunPath ever have any seminars,
21   gatherings, or meetings that they would invite
22   American Protection to?
23        A.   No.
24        Q.   Does SunPath provide any training on the
25   Telephone Consumer Protection Act?
```

Page 43

1     territorial scope?

2          A.    It is limited to the states SunPath

3     operates in.

4          Q.    And do you know those states?

5          A.    Not offhand.

6          Q.    Okay.  Does SunPath put any pressure on

7     American Protection to make a certain number of

8     sales each month?

9          A.    No.

10          Q.    Does SunPath require American Protection

11     to maintain a do-not-call list?

12          A.    No.

13          Q.    Does SunPath have a do-not-call list

14     that American Protection is required to adhere to?

15          A.    No.

16          Q.    Does SunPath permit American Protection

17     to use its name in marketing materials?

18          A.    I believe so, yes.

19          Q.    Does SunPath restrict how

20     American Protection can market?

21          A.    Everything would be highlighted in the

22     Seller Agreement.

23          Q.    But nothing beyond a Seller Agreement?

24          A.    Not to my knowledge.

25          Q.    Okay.  Can you tell me how SunPath would

Veritext Legal Solutions
303-988-8470

1       compensate American Protection for the sale of one

2       of its vehicle service contracts?

3               MR. TANDY:  I'm going to object to the

4           extent of relevance, but I will leave that --

5           I don't know that it's protected by the

6           contract.

7               MR. CAFFAS:  I will also object to the

8           form in that it's leading, suggesting that

9           SunPath does pay American Protection at all,

10          which I don't believe that's in the

11          testimony, so I will object, again, to

12          leading, as I believe that's your testimony,

13          Mr. Smith.

14      BY MR. SMITH:

15          Q.   You can answer, Kobi.

16          A.   SunPath does not compensate us for the

17      sales.  We are -- we pay SunPath a cost for the

18      policy, and we then collect the payments from the

19      customer.

20          Q.   Okay.  So American Protection, would

21      they set the price of the vehicle service

22      contracts?

23          A.   Yes.

24          Q.   Okay.  And, then, a portion of that is

25      the cost of the contract.  Is that fair to say?

Page 46

1          A.    Yes.

2          Q.    And that's the portion that

3     American Protection has to provide to SunPath?

4          A.    Yes.

5          Q.    Okay.  And then whatever amount above

6     that cost portion American Protection keeps

7     themselves?

8          A.    Yes.

9          Q.    Got it.

10              All right.  Let me put up my next

11    exhibit.  Give me a second.

12              (Exhibit No. 2 was marked for

13              identification.)

14    BY MR. TANDY:

15         Q.    All right.  I'm showing you what has

16    been marked as Exhibit 2.

17              Do you recognize this document?

18         A.    Yes.

19         Q.    Can you tell me what it is?

20         A.    I believe this is the Call Center

21    Marketing Agreement.

22         Q.    And that agreement is between SunPath

23    and American Protection; is that correct?

24         A.    Yes.

25         Q.    It looks like it was entered into on

Page 47

```
 1              "maintenance" refers to.  He's not clear what
 2              "maintenance" refers to in this context.
 3                   THE WITNESS:  I'm not clear as to what
 4              "maintenance" refers to.
 5         BY MR. SMITH:
 6              Q.   Okay.  Once American Protection sells
 7         one of SunPath's vehicle protection plans, is
 8         there a continued relationship with that client
 9         that American Protection has?
10              A.   Yes.
11              Q.   How long would that relationship be?
12              A.   For the lifetime of the agreement.
13              Q.   Okay.  And what would
14         American Protection's responsibilities be through
15         the lifetime of that agreement?
16              A.   The customer might ask us for the
17         numbers to the claims department or might call us
18         to find out if something in particular is covered
19         within the plan.
20              Q.   Okay.  And we previously discussed, when
21         a contract was sold, the division of moneys from
22         American Protection to SunPath, right?
23              A.   Yes.
24              Q.   Now, these contracts, they're on a
25         monthly basis, right?  These customers pay a
```

Page 60

1      certain amount each month?

2          A.   Yes.

3          Q.   Okay.  Who do they pay that amount to?

4          A.   To us.

5          Q.   And then does a share of that each month

6      go to SunPath or does -- or how does that work?

7          A.   No.

8               MR. CAFFAS:  Objection.  Asked and

9          answered.

10     BY MR. SMITH:

11         Q.   Go ahead.

12         A.   No.  SunPath bills us for a policy.

13         Q.   Okay.  So after a policy is sold,

14     American Protection has to pay the cost of the

15     policy to SunPath; is that fair to say?

16         A.   Yes.

17         Q.   How soon do they have to pay that cost?

18         A.   We've at various times have had to pay

19     for the cost.

20         Q.   Can you give me an estimate on the

21     amount of time that you have?

22         A.   Somewhere between some months and --

23     between 30 days and more.

24         Q.   Okay.  And then is it fair to say that

25     it's American Protection's responsibility to

Page 61

1       the time you're placing calls.  So at the time

2       American Protection places a call, does it know

3       which company's vehicle service plans it will be

4       pitching on the call?

5            A.    No.

6            Q.    Okay.  Is that information determined

7       later based upon the potential client's vehicle's

8       make, model, and year?

9            A.    Yes.

10           Q.    Okay.  And can you tell me what portion

11      of your business is generated through

12      telemarketing?

13               MR. CAFFAS:  I will object as to vague.

14           I don't believe telemarketing has been

15           established definition-wise.

16               THE WITNESS:  I'm not sure what you mean

17           by "telemarketing," as well.

18      BY MR. SMITH:

19           Q.    When you place calls to potential

20      clients to sell products, that would be

21      telemarketing.  So I need to understand how much

22      of your business comes from telemarketing

23      activities.

24           A.    So if I send out the postcard to a

25      customer and they call us to request information,

Page 74

1       American Protection to inquire about products or

2       services?

3            A.   Yes.

4            Q.   Okay.  And does -- sorry.  Strike that.

5                 After those consumers call in, does

6       SunPath -- sorry.  Strike that.

7                 After those consumers call in, does

8       American Protection sometimes place additional

9       calls to that individual to sell vehicle service

10      plans?

11           A.   Yes.

12           Q.   Okay.  Does American Protection ever

13      just place calls to consumers that they haven't

14      previously sent a mailer to?

15           A.   I'm sorry, repeat the question.

16           Q.   Yeah.

17                Does American Protection ever place

18      telemarketing calls to consumers that it hasn't

19      previously sent a mailer to?

20           A.   We only contact prospects that have

21      requested information about those services.  I

22      don't know if -- if you define that as

23      telemarketing or not, but that's the only -- we

24      have no interest in just contacting folks that

25      have no interest in our products.

Veritext Legal Solutions
303-988-8470

```
 1                  THE WITNESS:  Very rarely.
 2        BY MR. SMITH:
 3             Q.    Can you give me an estimate?
 4             A.    Maybe a few times a year.
 5             Q.    Okay.  Who places telephone calls on
 6        behalf of American Protection?
 7                  MR. CAFFAS:  Objection.  I'm going to
 8             note that this calls for an improper lay
 9             opinion and speculation.
10                  THE WITNESS:  I don't understand the
11             question.
12        BY MR. SMITH:
13             Q.    Okay.  You previously testified that
14        American Protection does not have employees,
15        correct?
16             A.    Correct.
17             Q.    How does American Protection place
18        telephone calls to potential clients?
19             A.    You mean the system that we use or --
20             Q.    I mean, who specifically?
21             A.    Who?  We work with some subcontractors
22        that are -- that are speaking to the consumers.
23             Q.    Okay.  And how many subcontractors does
24        American Protection utilize?
25             A.    From time to time, one or two.
```

Page 79

```
 1              misleads Mr. Chukran's testimony about calls.
 2         That's it.
 3              THE WITNESS:  Yes, we do.
 4    BY MR. SMITH:
 5         Q.   Are they written?
 6         A.   Yes.
 7         Q.   Where are they maintained?
 8         A.   On my hard drive.
 9         Q.   Can you tell me how many policies you
10    have?
11         A.   You were provided with the policies we
12    have.
13         Q.   Everything you've produced, that's all
14    your policies related to telephone calls; is that
15    fair?
16         A.   Yes.
17         Q.   Okay.  You don't have any other policies
18    and procedures to ensure compliance with the TCPA?
19              MR. TANDY:  Objection, to the extent
20         that you are making a supposition about
21         compliance with the TCPA and only those
22         policies and not something else, you can
23         answer the question.
24              THE WITNESS:  As it relates to this
25         particular case that we are gathered here
```

Page 81

```
 1              today to discuss, this was a consumer that
 2              received a mailer from us and called us to
 3              receive information.  So there was no
 4              telemarketing in this case and there was no
 5              TCPA involved here.  The consumer requested
 6              the information, so that not would not
 7              fall --
 8    BY MR. SMITH:
 9         Q.   That's not what I'm asking.  I'm trying
10    to understand, other than the documents that you
11    have already produced, if you have any additional
12    policies that are in place to ensure compliance
13    with the TCPA.
14         A.   You were provided with everything we
15    have.
16         Q.   Okay.  So you also don't have any
17    additional policies and procedures in place to
18    ensure compliance with the Virginia Telephone
19    Privacy Act other than what was produced?
20         A.   Correct.
21         Q.   Okay.  And do you have any other --
22    sorry.  Strike that.
23              Do you have any other policies and
24    procedures in place to ensure compliance with the
25    federal National Do Not Call Registry rulings
```

Page 82

1    records of prior express consent from the

2    individuals that it places calls to?

3         A.   No.

4         Q.   How does American Express [sic] ensure

5    that the individuals that it's placing calls to

6    provided prior express consent?

7              MR. CAFFAS:  I will object to this as

8         vague.  I believe you just asked about

9         American Express.  I assume you're not

10        talking about the credit card company.

11             MR. SMITH:  Did I say American Express?

12             MR. CAFFAS:  Yes.

13             MR. SMITH:  Strike that.

14   BY MR. SMITH:

15        Q.   How does American Protection ensure that

16   individuals that it's placing calls to have

17   provided prior express consent?

18        A.   We review the method of which they

19   request information.

20        Q.   So can you say that again?

21        A.   We review the method of which they have

22   requested information.

23        Q.   What do you mean by that?

24        A.   I mean I review to make sure that the

25   proper opting language is present, that our name

Veritext Legal Solutions
303-988-8470

1      is clearly stated, that the consumer understands

2      they will receive a call from us, and that it

3      authorizes us, to receive a call from us, from me

4      within the means we would be using.

5          Q.   Okay.  And do you review that for each

6      potential client?

7          A.   I don't understand the question when you

8      say "potential client."

9          Q.   You said you reviewed to ensure that the

10     disclosures are proper, right?

11         A.   Yes, I do, yes.

12         Q.   Okay.  Do you review that with each

13     potential lead that you receive?

14         A.   Yes.

15         Q.   Okay.  Do you ever have individuals that

16     request to no longer receive calls from

17     American Protection?

18         A.   Yes.

19         Q.   How frequently would you say that

20     happens?

21         A.   Multiple times per week.

22         Q.   What does American Protection do when

23     someone requests not to receive calls?

24         A.   They are marked as a do-not-call record

25     and then moved from any further contact.

Veritext Legal Solutions
303-988-8470

```
 1      are you able to figure out the source of that

 2      contact information, where it came from?

 3          A.   In some cases I could, and in some cases

 4      I can't.

 5          Q.   Okay.  What about in the plaintiff's

 6      situation?

 7          A.   What about it?

 8          Q.   You previously said that

 9      American Protection sent a mailing to her; is that

10      correct?

11          A.   Yes.

12          Q.   Do you know where it got her contact

13      information prior to sending that mailing?

14          A.   I do not, no.

15          Q.   Did you search for that information?

16          A.   Yes.

17          Q.   What repositories were searched?

18          A.   Our CRM.

19          Q.   CRM.

20               Does SunPath ever provide leads to

21      American Protection?

22          A.   No.

23          Q.   All right.  I will pull up my next

24      exhibit.

25               (Exhibit No. 7 was marked for
```

Page 100

```
 1        Q.   So other than talking to your attorney and
 2    producing the documents, nothing else you did to prepare
 3    for this deposition?
 4        A.   No.
 5        Q.   Okay.  All right.  I want to talk about
 6    American Protection's calling practices and the calls
 7    made to Plaintiff.
 8             So, first, during your prior deposition, I was
 9    reviewing the transcript, and you testified that
10    American Protection uses subcontractors to place
11    telemarketing calls; is that correct?
12             MR. TANDY:  Objection to the word
13        telemarketing.
14             You can answer.
15             THE WITNESS:  American Protection uses
16        subcontractors to -- to communicate with potential
17        clients and clients.
18    BY MR. SMITH:
19        Q.   Okay.  And you previously told me that you
20    worked with one or two subcontractors at any particular
21    time; is that accurate?
22        A.   Yes.
23        Q.   Okay.  Is it a fair character --
24    characterization to say that the subcontractors place
25    calls on behalf of American Protection to solicit sales
```

```
 1    of vehicle service contracts?

 2        A.   No, we don't --

 3             MR. CAFFAS:  Objection.  Speculation.

 4             I'm sorry.

 5             THE WITNESS:  I'm sorry.

 6             MR. CAFFAS:  I --

 7             MR. TANDY:  Greg was --

 8             I'll do this, Greg, just so it's clear.

 9             Greg is lodging an objection to Taylor's

10        question with regard to the form of the question.

11        You're still required to answer it.  You were about

12        to answer it, and thank you for waiting for Greg to

13        finish his objection before you started so the court

14        reporter can't -- can't take us all down at once.

15             So can you answer Taylor's question?

16             THE WITNESS:  Yes.

17             MR. TANDY:  Okay.  Please do.

18             THE WITNESS:  We return requests for contacts

19        from potential customers.  We don't just solicit

20        and -- and -- and call.  We have folks that are

21        calling and requesting information, and in some

22        cases, we reach out to people with requested

23        information.

24    BY MR. SMITH:

25        Q.   Okay.  I understand you're reaching out to
```

Page 139

```
 1              THE COURT REPORTER:  Yes, sir.  Thank you.
 2      BY MR. SMITH:
 3         Q.   Kobi, I'm going to play a recording that's been
 4      produced in this litigation.
 5              MR. SMITH:  It's going to be marked as
 6         Exhibit 13 to this deposition.
 7              (Deposition Exhibit 13 was marked.)
 8              MR. SMITH:  For the record, this is a recording
 9         produced by Plaintiff.  It's been produced in
10         litigation and marked as "SMITH000027."  I'm going
11         to play it in full.
12              (At this time the recorded voicemail was played
13         for the witness.)
14              MS. JAEGER:  Hi, Ruth.  This is Samantha
15         calling with America Protection.  I'm just calling
16         you to get the VIN number on your BMW to get your
17         coverage going for you.  I will be back in the
18         office in about an hour.  I'm going to lunch.
19              My number is 1-800-427-1806, extension 5005.
20              Talk to you soon.  Bye-bye.
21              (Recording concluded.)
22      BY MR. SMITH:
23         Q.   Do you recognize that voice at all?
24         A.   She's identified herself as Samantha.
25         Q.   Yeah.  So would this be Samantha Jaeger?
```

Page 180

1          A.    Yes.

2          Q.    -- to Plaintiff?

3          A.    Yes.

4          Q.    And when you stated that the Five9 system keeps

5     records for 30 to 60 days, was that an estimate or do

6     you know, for a fact, that's true?

7          A.    I know, for a fact, that's true.

8          Q.    Okay.  And did you search the Five9 system for

9     records of any other calls that would be responsive to

10    the subpoena?

11         A.    Yes.

12         Q.    Okay.  And there were no records?

13         A.    None.

14              MR. SMITH:  Okay.  All right.  Greg, you can

15         take over.

16                     CROSS-EXAMINATION

17    BY MR. CAFFAS:

18         Q.    Hi, Mr. Chukran.  Thanks again for taking some

19    time to continue this deposition.

20              As we mentioned last time, my name's

21    Gregory Caffas.  I am here as counsel for SunPath in

22    this case, so I'm just going to be asking you a few

23    questions in addition to what Mr. Smith has -- has given

24    to you today.

25              American Protection's business practices are

                                           Page 195

```
 1    only to call people who have opted in, correct?

 2       A.   Yes.

 3       Q.   And when you -- when you say "only to call

 4    people who opted in" do you -- what do you mean by

 5    "opted in"?

 6       A.   It's --

 7            MR. SMITH:  Objection.  Asked and answered.

 8            MR. TANDY:  You -- you can answer, Kobi.

 9            THE WITNESS:  It means they requested -- they

10       requested to be contacted from us, specifically.

11    BY MR. CAFFAS:

12       Q.   Okay.  And that could be from --

13            Can you tell me what kind of methods they would

14    have been providing their request to be contacted by

15    American Protection, specifically?

16       A.   As I --

17            MR. SMITH:  Objection.  Asked and answered.

18            THE WITNESS:  As I -- as I replied in my

19       response, I provided this information either via

20       online, via a website, or via calling in.

21    BY MR. CAFFAS:

22       Q.   Has American Protection, including through any

23    subcontractors, ever knowingly or willfully called

24    anyone who had specifically requested not to be called

25    by American Protection?
```

```
 1    here.
 2            So it would seem that Ms. -- or Dawn would have
 3    known that someone had already expressed interest, so
 4    she would have used a telephone where she manually took
 5    that customer's information and called them, in
 6    particular, herself?
 7            MR. SMITH:  Objection.  Calls for speculation.
 8        Misstates the witness's testimony.
 9            THE WITNESS:  Yes.
10    BY MR. CAFFAS:
11        Q.   Okay.  So do you --
12            Are you able to say, for a fact, whether that
13    was on a physical telephone, or would this be stored in
14    a computer system?
15        A.   No.  It was -- that was the same phone system
16    that would be virtual or via web browser.
17            In this case, the plaintiff gave us a credit
18    card number and agreed to the terms of the sale, so as
19    far as Dawn, she had written consent from a customer of
20    ours.
21        Q.   Uh-huh.  So my confusion, Mr. Chukran, is I
22    believe your testimony earlier was, when someone is
23    contacted as a potential -- to make a potential sale,
24    they are in a list, and they are being -- the
25    subcontractor of American Protection that is going to be
```

Page 199

1      A.   Yes.

2      Q.   I'll stop sharing my screen for a sec.

3           Mr. Chukran, do you have record of Ms. Smith,

4    the plaintiff, ever making a Do Not Call request?

5      A.   No, I do not.

6      Q.   Mr. Chukran, I'm going to ask you some

7    questions now about American Protection's specific

8    relationship with SunPath.

9           Did SunPath assert any control over where

10   American Protection had any kind of physical offices?

11     A.   Not to my knowledge.

12     Q.   Now, did SunPath ever instruct you on what type

13   of dialing system to use?

14     A.   Not to my knowledge.

15     Q.   Did SunPath have any say over who

16   American Protection hired?

17     A.   No.

18     Q.   Did SunPath have any say over whether or not

19   American Protection could fire or terminate any kind of

20   employee or independent contractor?

21     A.   With the exception of anybody that has a

22   noncompete with SunPath.

23     Q.   What do you mean by that?

24     A.   So if a previous employee, for example, of

25   SunPath would have gotten a new job with

Page  220

1    American Protection, then maybe that they left some

2    restrictions in place for them.  That's the only

3    scenario I'm familiar with.

4         Q.   Did that ever happen?

5         A.   No.

6         Q.   Did SunPath have any say over the number of

7    employees or independent contractors that

8    American Protection had on its staff?

9         A.   No.

10        Q.   To your knowledge, would SunPath even know the

11   names of any of American Protection's employees or

12   independent contractors, besides yourself?

13        A.   No.

14        Q.   Does SunPath have any kind of control over

15   whether American Protection uses subcontractors to

16   generate lead information?

17        A.   No.

18        Q.   Does SunPath control where or how

19   American Protection would purchase any kind of supplies

20   for its services, like computers or anything like that?

21        A.   No.

22        Q.   Did SunPath direct how American Protection was

23   going to perform any work at all?

24        A.   Re -- can you please repeat the question?

25        Q.   Did SunPass -- Path control how

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1          A.    No.

2          Q.    Did SunPath ever reimburse you for any of --

3     any expenses associated with office space, travel

4     expenses, or office supplies?

5          A.    No.  I believe they may have provided some

6     stationeries, pens, and mouse pads and -- and -- and

7     table -- table -- or desk mats with their product name

8     on it and stuff.

9          Q.    So this would be like mouse pads and

10    advertising-type products?

11         A.    Yes.

12         Q.    But there was no reimbursement for

13    American Protection or any of its subcontractors like

14    providing office supplies, right?

15         A.    No, I don't believe so.

16         Q.    Who paid American Protection's subcontractors?

17         A.    We did.

18         Q.    Is it correct to say that American Protection's

19    subcontractors were not ever compensated directly by

20    SunPath?

21         A.    Yes.

22         Q.    All right.  Mr. Chukran, I'm sharing my screen

23    with you again.

24              Can you see what's listed -- or what's

25    displayed on my screen as a "Seller Agreement"?

Page  226

 1        A.   No.
 2        Q.   Is it correct that, in this exhibit, as
 3   written, SunPath's name isn't mentioned in the sales
 4   script or on the -- the cover of the -- the script at
 5   all?
 6        A.   Correct.
 7        Q.   Okay.  Has American Protection or any
 8   subcontractors that it hired ever intentionally violated
 9   the Telephone Consumer Protection Act, to your
10   knowledge?
11        A.   No.
12        Q.   Have you ever advised any of
13   American Protection's employees or subcontractors to
14   violate the Telephone Consumer Protection Act?
15        A.   No.
16        Q.   Has SunPath ever advised American Protection to
17   violate the Telephone Consumer Protection Act?
18        A.   No.
19        Q.   Has American Protection, including any of its
20   subcontractors, ever intentionally violated the Virginia
21   Telephone Privacy Protection Act?
22             MR. SMITH:  Objection.
23             THE WITNESS:  No.
24             MR. SMITH:  Lacks foundation.
25   BY MR. CAFFAS:

                                        Page  234

1      Q.   Has SunPath ever directed American Protection

2  or any of its subcontractors to violate the Virginia

3  Telephone Privacy Protection Act?

4      A.   No.

5      Q.   Has American Protection ever knowingly called

6  the plaintiff, Ruth Smith, in violation of the Telephone

7  Consumer Protection Act?

8           MR. SMITH:  Objection.  Calls for speculation.

9           THE WITNESS:  No.

10 BY MR. CAFFAS:

11     Q.   I'll rephrase in case I said that incorrectly.

12          Had -- has American Protection ever

13 intentionally or knowingly called Ruth Smith in

14 violation of the Telephone Consumer Protection Act?

15          MR. SMITH:  Objection.  Calls for speculation.

16          THE WITNESS:  No.

17 BY MR. CAFFAS:

18     Q.   Has American Protection, including any of its

19 subcontractors, ever intentionally or knowingly called

20 Ruth Smith in violation of the Virginia Telephone

21 Privacy and Protection Act?

22          MR. SMITH:  Objection.  Calls for speculation.

23          THE WITNESS:  No.

24 BY MR. CAFFAS:

25     Q.   Has SunPath ever directed American Protection

Page  235

1    or any of its subcontractors to intentionally or

2    knowingly violate the Virginia Telephone Privacy

3    Protection Act?

4         A.   No.

5         Q.   Has American Protection, including through any

6    of its subcontractors/employees, ever knowingly violated

7    any telemarketing laws?

8         A.   Can you please repeat the question?

9         Q.   Has American Protection, including through any

10   of its employees or subcontract -- subcontractors, ever

11   knowingly violated any telemarketing laws?

12        A.   No.

13        Q.   And has SunPath ever directed or controlled

14   American Protection, including through any of its

15   employees or subcontractors, to violate any kind of

16   telemarketing law?

17        A.   I'm sorry.  Can you repeat the question?

18        Q.   Has SunPath ever --

19        A.   I apologize.  I apologize.  Go ahead.

20        Q.   Has SunPath ever directed or controlled

21   American Protection, including through any kind of

22   employee or subcontract -- subcontractor, to violate any

23   kind of telemarketing law?

24        A.   I'm sorry.  Can you please repeat the question

25   again?  For the last time.

Page  236

1     Q.   Has SunPath ever directed or controlled

2   American Protection, including through any kind of

3   subcontractor/employee, to violate any kind of

4   telemarketing law?

5     A.   No.

6          MR. CAFFAS:  Thank you.  That's all --

7          THE WITNESS:  I apologize, Greg.  By the way,

8       that was not intentional.  My apology.

9          MR. CAFFAS:  Not a problem.

10         That's all I have for you right now.

11         I reserve my right to -- to recross based on

12      anything Taylor might -- might ask you or anything I

13      might have missed, but I'll cede to Taylor again

14      right now.

15         MR. SMITH:  Okay.

16                 REDIRECT EXAMINATION

17   BY MR. SMITH:

18     Q.   Kobi, I'll try to be quick so you can get out

19   of here.  I want to discuss Exhibit 4, which is the

20   sales script, and I'm happy to bring it up, if you want.

21   Just let me know.  The questions are pretty

22   straightforward, though.

23         You've just testified that, when a

24   subcontractor would utilize the sales agreement, they

25   would say hi, insert the name of the prospective client,

Page  237

```
 1                   CERTIFICATE OF REPORTER

 2                    (VIA VIDEOCONFERENCE)

 3     STATE OF WISCONSIN:

 4     COUNTY OF WINNEBAGO:

 5

 6          I, COURTNEY N. LANGHOFF, RMR, CRR, FPR-C,

 7     Notary Public, State of Florida, certify that I was

 8     authorized to and did stenographically and remotely

 9     report the Zoom videoconference deposition of

10     KOBI CHUKRAN (CHUKRAN MANAGEMENT GROUP, LLC); that a

11     review of the transcript was requested; and that the

12     foregoing transcript, pages 134 through 248, is a true

13     and accurate record of my stenographic notes.

14          I further certify that I am not a relative,

15     employee, or attorney, or counsel of any of the parties,

16     nor am I a relative or employee of any of the parties'

17     attorneys or counsel connected with the action, nor am I

18     financially interested in the action.

19

20          DATED this 16th day of November, 2022.

21

22

23

            COURTNEY N. LANGHOFF, RMR, CRR, FPR-C

24

25

                                          Page  250
```