```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF VIRGINIA
 3                      ALEXANDRIA DIVISION
 4   RUTH SMITH, individually and
     on behalf of all others      Case No. 1:22-cv-00081-LMB-WEF
 5   similarly situated,
 6        Plaintiff,
 7   vs.
 8   SUNPATH, LTD, a Massachusetts
     corporation,
 9
          Defendant.
10   _____
11     VIDEOCONFERENCED 30(b)(6) DEPOSITION OF SUNPATH, LTD
                     (through ANDREW GARCIA)
12                      December 8, 2022
     _____
13
     VIDEOCONFERENCED APPEARANCES:
14
     ON BEHALF OF THE PLAINTIFF:
15           PATRICK H. PELUSO, ESQ.
             Woodrow & Peluso, LLC
16           3900 E. Mexico Avenue, Suite 300
             Denver, Colorado  80210
17           Phone: 720-213-0675
             Email: ppeluso@woodrowpeluso.com
18
     ON BEHALF OF THE DEFENDANT:
19           GREGORY CAFFAS, ESQ.
             Roth Jackson Gibbons Condlin
20           8200 Greensboro Drive, Suite 820
             McLean, Virginia  22102
21           Phone:  703-485-3535
             Email:  gcaffas@rothjackson.com
22
     Also Present:  Paul Sporn, Esq.
23
24
25
```

Page 1

1    addressed with regard to Topic Number 24.
2              Andrew, you said that 100 percent of the
3    revenue is -- is due to sales by third parties because
4    SunPath doesn't sell; right?
5         A.   Yes.
6         Q.   Is SunPath able to discern what portion any
7    percent of that revenue is generated through any specific
8    type of marketing?
9         A.   The specific type of marketing?  No.
10        Q.   Like, for example, you wouldn't be able to
11   tell what proportion is done through direct calls versus
12   online sales or sales generated through a third party's
13   use of mailings, documents?
14        A.   Correct.  We don't know what type of
15   marketing a third party uses.
16        Q.   Okay.  As a proportion of the total revenue
17   that SunPath would generate through third-party sales, do
18   you have any idea what American Protection specifically
19   would be responsible for?
20        A.   It would be very small.  I don't know what
21   percentage, but it would be very small.
22        Q.   So would it be accurate to say that you
23   don't rely in any large part on American Protection's
24   sales of SunPath products?
25        A.   No.  Not at all.

```
 1          Q.   It is not essential to SunPath's business,
 2   American Protection sales?
 3          A.   Not at all.
 4          Q.   Andrew, I want to clarify your testimony
 5   regarding earlier in the deposition, when you discussed
 6   the documents you reviewed in preparation for the
 7   deposition.
 8               In the process of preparing for this
 9   deposition, did you also review relevant pleadings filed
10   in this case including, for example, the complaint, as
11   well as documents produced by American Protection in
12   response to subpoenas in this case?
13          A.   Yes.
14          Q.   And also, when asked if SunPath
15   communicated with any third parties regarding this case, I
16   believe there may have been some confusion regarding who
17   plaintiff's counsel was referring to when it said "third
18   party."
19               Did anyone at SunPath contact American
20   Protection regarding the claims at issue in this case?
21          A.   Paul.
22          Q.   And was that disclosed in the documents
23   that SunPath produced in response to plaintiff's discovery
24   requests in this case?
25          A.   Yes.  I believe so.
```

Page 73

```
 1            Q.   And when you say "Paul," I assume you're
 2   referring to Paul Sporn?
 3            A.   Paul Sporn, our attorney.
 4            Q.   And are you aware of whether he was able to
 5   contact American Protection and receive any response about
 6   the claims in this case?
 7            A.   Yes.  He spoke to them.
 8            Q.   And in any of the communications that
 9   SunPath specifically, through Paul, had with American
10   Protection, are you aware of whether American Protection
11   represented that it violated any of the telemarketing laws
12   that are at issue in this case?
13            A.   No.  They said they didn't.
14            Q.   I'm sorry.  When you say they didn't --
15            A.   They didn't violate any laws.
16            Q.   As part of the preparation for today's
17   deposition, did you review the deposition transcript for
18   the deposition that was conducted with American Protection
19   in connection with this case?
20            A.   Yes.
21            Q.   I'm going to share my screen here.  Sorry.
22   My -- okay.  Can you see on my screen what I have here
23   that's --
24            A.   Yes.
25            Q.   -- the cover page of Mr. Chukran's
```

Page 74

1  deposition as a representative for American Protection?
2      A.   Yes.
3      Q.   And do you recognize this as the transcript
4  that you reviewed?
5      A.   Yes.
6      Q.   And I'll represent that this is just an
7  excerpt of Mr. Chukran's deposition, and I will scroll to
8  testimony that he provided on page 222.
9      Okay. You'll see here it starts at line
10  20 -- the question that I'm referring to -- the question
11  posed to Mr. Chukran was:
12      "Did SunPath provide any kind of training
13  to American Protection?
14      "Answer: Any kind of what?"
15      It was clarified "training" in line 23.
16      And you'll see on line 24, Mr. Chukran
17  answered, "Just in terms of product training."
18      Do you see that?
19      A.   Yes.
20      Q.   Do you have any idea what Mr. Chukran would
21  have been referring to when he referenced "product
22  training"?
23      A.   He would be referring to getting education
24  on what our products are. I really wouldn't call it
25  training. I would call it education. So we explain to

Page 75

```
 1   people what our products are and how they work.
 2          Q.   And -- but as part of that product
 3   education, would SunPath ever provide American Protection
 4   with any kind of instruction as to how to market or sell
 5   that product at all?
 6          A.   No.
 7          Q.   To your knowledge, would SunPath have any
 8   knowledge of any subcontractor that American Protection
 9   would have hired in order to market or sell any product?
10          A.   No.
11          Q.   Okay.  I'd like to now direct you to the
12   bottom of page 223 of Mr. Chukran's deposition testimony
13   where it -- where it states at page -- at line 24, it
14   says:
15               "On occasion, some companies would offer
16   training that could be done, for example, via Zoom, and
17   that would include some subcontractors attending those
18   trainings."
19               Do you ever know of an -- are you aware of
20   any instance in which SunPath would have provided any Zoom
21   training of any type to any subcontractor of American
22   Protection?
23          A.   No.
24          Q.   I'd like to now direct you to line 6 of
25   page 224 of Mr. Chukran's deposition, where he says,
```

Page 76

1    "Possibly."  And that is in the context of whether or not
2    American Protection's subcontractors may have received
3    training.  And then he continues:
4               "I'm not sure of an exact -- I don't have a
5    time.  I don't know exactly, but SunPath does have a sales
6    representative.  His name's Brian.  It is my understanding
7    his job is to provide training."
8               Are you aware of an employee of SunPath
9    named Brian that Mr. Chukran --
10        A.    Yes.
11        Q.    -- is referring to?
12        A.    Yes.
13        Q.    And who is Brian that Mr. Chukran is
14   referring to?
15        A.    Brian is our account rep, so when, you
16   know, an independent company has a question about our
17   product or something, they can call Brian.  If they have
18   an issue that they think a customer is upset over a claim
19   or something, they can call Brian.
20               He's just an account rep that people
21   contact and he would educate people, he would tell them
22   about our products and that's it.  He doesn't provide any
23   kind of training, other than telling people about how our
24   products work.
25        Q.    Okay.  So would it be accurate to say that

Page 77

```
 1   he never conducted training sessions of any kind for any
 2   third party authorized to sell --
 3            A.   No.  He does not provide training ever.
 4            Q.   And would that be accurate then to also say
 5   that he didn't provide -- "he" being Brian in this case or
 6   anyone else at SunPath -- did not provide any kind of
 7   training or instruction on how to market or sell any
 8   SunPath product in any way to a third party authorized to
 9   market or sell SunPath's product?
10            A.   Yes.  That's accurate.  Brian doesn't do
11   any training.
12            Q.   Do you have any idea why Mr. Chukran would
13   have testified to that?
14            A.   No.  I mean, he may have had other
15   companies provide training, but Brian didn't do it.  I
16   mean, I don't -- I have no idea what someone provided to
17   them, but it wasn't SunPath or Brian.
18            Q.   Okay.  I'd like you now to look at line 15
19   of page 224 of Mr. Chukran's deposition testimony where
20   the question was asked:
21                "And you said already, though, that if it
22   was any kind of training, it would just be as to what
23   SunPath's products are."
24                To which Mr. Chukran responded:
25                "In some cases, they would offer -- and,
```

Page 78

1   again, I -- I don't have specific incidents, but just in
2   terms of industry, sometimes they would offer some
3   incentives of the highest sales for the month, for
4   example.  They would offer some kind of cash incentive."
5              To your knowledge, Andrew, was there ever
6   any incentives SunPath offered based on monthly sales or a
7   cash incentive to any third-party marketer or seller of
8   SunPath's products?
9         A.   No.  We have never offered them or anyone
10  else a cash incentive to sell products, no.
11        Q.   Okay.  And specifically, with regard to
12  American Protection, would it also be accurate that there
13  was no kind of any cash or monthly incentive for the
14  volume of SunPath's products?
15        A.   Correct.  We never offered American
16  Protection any type of incentive or anything else.
17        Q.   Andrew, did SunPath ever in any way
18  restrict American Protection's ability to offer other
19  companies' products at the same time American, for
20  example, was authorized to sell SunPath's products?
21        A.   Did we restrict what?
22        Q.   Was -- for example, did the agreement that
23  SunPath has with American Protection or any third party
24  restrict those parties from offering other companies'
25  products?  For example, SunPath's competitors' products?

Page 79

```
 1              A.   No.  No.  They -- they all offer other
 2     products.
 3              Q.   So, to your understanding, American, for
 4     example, would have been authorized to offer SunPath's
 5     competitors' products alongside SunPath's products to any
 6     consumer they contacted?
 7              A.   Yes.  That's up to them.  We have nothing
 8     to do with it.
 9              Q.   And to your knowledge, did American
10     Protection offer other companies' products at the same
11     time it was authorized to sell SunPath's products?
12              A.   I believe so, but I don't know for sure
13     because I don't know what they sell.
14              Q.   You mentioned there may have been one other
15     complaint involving American Protection besides the
16     complaint in this lawsuit.
17                   Do you recall, in that other case, whether
18     or not SunPath or American Protection were found to be
19     liable for violating any telemarketing laws?
20              A.   We haven't been liable for anything, and to
21     my knowledge, they haven't been, either, but -- that's my
22     understanding.
23              Q.   And to your knowledge, regarding the other
24     complaint or case you referred to involving American
25     Protection, were the telemarketing calls that were the
```

Page 80

```
 1   subject of that case or complaint prior to or after the
 2   calls at issue in the present lawsuit?
 3          A.   I believe they were after, but I would have
 4   to check.
 5          Q.   To the best of your knowledge, do you have
 6   any knowledge at all of American Protection being accused
 7   of telemarketing violations prior to the calls that are at
 8   issue in this case that Ruth Smith has filed against
 9   SunPath?
10          A.   No.
11          Q.   Do you recall reviewing and verifying the
12   contents of the written discovery responses that SunPath
13   provided in this case?
14          A.   Yes.
15          Q.   And were those responses accurate to the
16   best of your knowledge based on the information you had
17   available?
18          A.   Yes.
19          Q.   Andrew, if you'll recall, the agreement
20   between SunPath and American Protection that you reviewed
21   earlier today, is it your understanding that pursuant to
22   the terms of that agreement, American Protection agreed to
23   obey all applicable laws that are the subject of any
24   marketing that it undertook?
25          A.   Yes.  Yes, I did.
```

Page 81

```
 1              Q.   Has SunPath ever directed American
 2    Protection or any other third-party authorized sellers of
 3    SunPath's product to violate the Telephone Consumer
 4    Protection Act?
 5              A.   No.
 6              Q.   Has SunPath ever directed American
 7    Protection or any other third party authorized to sell or
 8    market SunPath's product to violate the Virginia Telephone
 9    Privacy Protection Act?
10              A.   No.
11              Q.   Has SunPath ever directed American
12    Protection to violate any telemarketing laws?
13              A.   No.
14              Q.   Has SunPath ever authorized American
15    Protection to operate outside of the bounds of the
16    agreement between the parties?
17              A.   No.
18              Q.   Is SunPath aware at all that American
19    Protection has at any time violated any telemarketing
20    laws?
21              A.   No.
22              Q.   Has SunPath ever intentionally violated the
23    Virginia Telephone Privacy Protection Act?
24              A.   No.
25              Q.   Has SunPath ever caused another party to
```

Page 82

```
 1   call Ruth Smith or any other person in violation of any
 2   law governing telemarketing?
 3           A.   No.
 4                MR. CAFFAS:  I think that's all I have for
 5   the moment.  If you wouldn't mind, Pat, I'd like to take a
 6   5-minute recess just to review my notes and make sure I
 7   haven't missed anything.  But, otherwise, I think that's
 8   all I have for now.
 9                MR. PELUSO:  Yeah.  Sure.  No problem.
10                MR. CAFFAS:  Let's go off the record.
11   Again, I'll just take 5 minutes.
12                MR. PELUSO:  All right.
13                (Recess taken, 1:11 p.m. to 1:13 p.m.)
14                MR. CAFFAS:  I do not have any other
15   questions.  So we're back on the record.  I'll turn it
16   back over to you, Pat, if you have any additional
17   questions, but I'm finished.
18                MR. PELUSO:  That will be it for me, too.
19                THE COURT REPORTER:  And do you want a copy
20   of the deposition, Greg?
21                MR. CAFFAS:  Yes, I would like a copy of
22   the deposition.  I would say by Monday, if possible.
23                THE COURT REPORTER:  Will you handle
24   signature for me?
25                MR. CAFFAS:  Yes.
```

Page 83

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2   STATE OF COLORADO              )
 3   CITY AND COUNTY OF DENVER      )
 4            I, Bonnie Carpenter Johnshoy, a Registered
 5   Professional Reporter, commissioned to administer oaths,
 6   do hereby certify that previous to the commencement of
 7   the examination, the witness was duly sworn by me to
 8   testify to the truth in relation to matters in
 9   controversy between the said parties; that the said
10   deposition was taken in stenotype by me at the time and
11   place aforesaid and was thereafter reduced to typewritten
12   form by me; and that the foregoing is a true and correct
13   transcript of my stenotype notes thereof.
14            That I am not an attorney nor counsel nor in any
15   way connected with any attorney or counsel for any of the
16   parties to said action nor otherwise interested in the
17   outcome of this action.
18
19                    [signature: Bonnie Carpenter]
20                    Bonnie Carpenter Johnshoy
                      Registered Professional Reporter
21                    Certified Shorthand Reporter
                      Certified Realtime Reporter
22
23
24
25
                                                    Page 86
```