Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     ALEXANDRIA DIVISION
 3
      RUTH SMITH, individually and on
 4    behalf of all others similarly
      situated,
 5
                    Plaintiff,        Case No.
 6                                    1:22-cv-00081-LMB-
      vs.                             WEF
 7
      SUNPATH, LTD., a Massachusetts
 8    corporation,
 9                      Defendant.
      _____/
10
11                     DEPOSITION OF
      RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
12    d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                        KOBI CHUKRAN
13
                 (Conducted Via Videoconference)
14
15
      DATE:           November 1, 2022
16
17    TIME:           11:03 a.m. to 2:06 p.m.
18
      PURSUANT TO:    Notice by counsel for Plaintiff
19                    for purposes of discovery, use at
                      trial or such other purposes as
20                    are permitted under the Federal
                      Rules of Civil Procedure
21
22    REPORTED BY:    Aaron T. Perkins, RMR, CRR, CRC
                      Notary Public, State of
23                    Florida at Large
24
                      Pages 1 to 128
25
                                              Page 1
```

1        MR. CAFFAS:  Object to form as well.
2    BY MR. SMITH:
3        Q.   You can answer.
4        A.   Can you repeat the question please?
5        Q.   Yeah.  So you said you received leads
6    from various websites, from the BBB, from your
7    website.
8             How do you utilize the leads?  Do you
9    use them for telemarketing?  Do you -- I'm trying
10   to understand how you reach out to these people.
11            MR. TANDY:  I'm going to object.
12            MR. CAFFAS:  Yeah.  Object to form.
13       It's become a compound question.
14   BY MR. SMITH:
15       Q.   You can answer.
16       A.   Yes.  The leads -- yes, we call them.
17       Q.   Call them?
18       A.   Yes.
19       Q.   All right.  I want to talk about your
20   relationship with SunPath.
21            Can you tell me when you started working
22   with SunPath?
23       A.   I don't remember the exact date.
24       Q.   Can you give me an approximate date?
25       A.   No.

Page 24

1          Q.    Okay.  You can't guesstimate?  Has it

2     been five years, ten years?

3          A.    Again, I want to make sure that I'm as

4     accurate as possible.  I don't remember exactly.

5          Q.    So you can't tell me at all.

6                Okay.  Have you worked with them within

7     the relevant time period, which, again, is January

8     26th, 2018, to the present?

9          A.    Yes.

10         Q.    How did you hear about them?

11         A.    I don't recall.

12         Q.    When did your relationship with SunPath

13    end?

14         A.    I want to say approximately six months

15    ago.

16         Q.    Why did it end?

17         A.    Moneys owed.

18         Q.    Moneys owed from American Protection to

19    SunPath or the other way around?

20         A.    Yes.

21         Q.    Okay.  How would you describe your

22    relationship with SunPath?

23                MR. TANDY:  Objection.

24                THE WITNESS:  Good.

25    BY MR. SMITH:

                                          Page 25

1      Q.    Throughout the time you worked with
2    SunPath, were you in regular contact with them?
3      A.    No.
4      Q.    Did you have an individual that you
5    could contact if you needed to discuss something?
6      A.    Yes.
7      Q.    Was it just one person or were there
8    multiple people?
9      A.    Mostly one.
10      Q.    Can you --
11      A.    I apologize.  There were a few different
12    persons.
13      Q.    Okay.  Was there one primary and then a
14    few additional?
15      A.    Yes.
16      Q.    Okay.  Can you tell me who your primary
17    contact was?
18      A.    Mr. Joe Abrahms.
19      Q.    Can you spell that?
20      A.    J-o-e; Abrahms, A-b-r-a-h-m-s.
21      Q.    And who were the other individuals that
22    you would communicate with from SunPath?
23      A.    Mr. Larry Lowe.
24      Q.    Can you spell that?
25      A.    L-a-r-r-y, L-o-w-e.

Page 26

1       Q.   Anyone else?

2       A.   A few persons in the claims department.

3       Q.   Okay.  Do you remember their names?

4       A.   No.

5       Q.   Okay.  Mr. Joe Abrahms, what would you

6 typically communicate with him about?

7       A.   Just business matters, product

8 information, product pricing --

9       Q.   Okay.  Can you tell me how frequently --

10      A.   -- claim information.

11      Q.   Okay.  Can you tell me how frequently

12 you would say you have talked with him?

13      A.   Maybe once a month or so, maybe even

14 less frequently.

15      Q.   Okay.  And Mr. Lowe, how often would you

16 say you have spoke with him?

17      A.   More regularly.

18      Q.   Daily, weekly?

19      A.   Weekly.

20      Q.   And what would you talk to Mr. Lowe

21 about?

22      A.   Clients' claims.

23      Q.   Okay.  Was SunPath involved in American

24 Protection's sales process?

25          MR. TANDY:  Could you repeat that

Page 27

1    vehicle, as well as the mileage.  Based on this

2    information, we can determine what is the best

3    coverage we can offer.

4         Q.   And then once you make that

5    determination, what happens next?

6         A.   Then we submit the sale to the -- to be

7    underwritten by SunPath.

8         Q.   And throughout that sales process, you

9    know, you get the lead, you contact the client,

10    you see what they're qualified for, you determine

11    what's best for them, and then you reach out to

12    SunPath.

13              Is that final step, reaching out to

14    SunPath, is that where contacting SunPath would

15    come in to play or would you have contacted them

16    at some point prior?

17              MR. TANDY:  Objection.

18              MR. CAFFAS:  Yeah.  Objection to form as

19         well.  It's a compound question.

20              MR. TANDY:  And I must object.  To the

21         extent that you're attempting to define the

22         term sales pathway, I object to that, or

23         process.  I'm sorry, Mr. Smith, but I do

24         think that's really compound.

25              MR. SMITH:  That's fine.

                                          Page 30

1    Q.    Okay.  So let's walk through this.

2          You obtain leads from various sources;

3    is that correct?

4    A.    Yes.

5    Q.    Okay.  And then you're going to reach

6    out to those leads to potentially sell a vehicle

7    service contract, right?

8    A.    Yes.

9    Q.    Okay.  After you contact the potential

10   client, you're going to find out what they're

11   qualified for; is that fair to say?

12   A.    Well, in some cases, the customer

13   contacts us.

14   Q.    Okay.  Maybe they contact you; you

15   contact them.  Once you're in touch with the

16   potential customer, you determine what they're

17   qualified for?

18   A.    Yes.

19   Q.    Okay.  How do you go about doing that?

20   A.    Based on the customer's vehicle

21   characteristics, the year, make, model, and

22   mileage.

23   Q.    And then what do you do with that

24   information?

25   A.    We enter it into our CRM that allows us

Page 32

1      plan?

2            A.    I'm sorry, repeat the question please.

3            Q.    Once you determine which plan a customer

4      is best qualified for, then you back to the

5      customer and provide them with the plan that you

6      believe best suits their needs?

7            A.    Yes.

8            Q.    Okay.    And then the customer can either

9      say, no, I don't want that plan, or, yes, I do?

10           A.    Yes.

11           Q.    Okay.    What happens if the customer

12     says, All right, I want to purchase that plan?

13           MR. TANDY:    Objection.    I'm not sure I

14        understood your question, Taylor.

15     BY MR. SMITH:

16           Q.    I'm just trying to understand how they

17     go about closing the sales process.    What happens

18     after a customer says, All right, I will purchase

19     that vehicle service plan?

20           A.    We receive information, and that

21     information is then submitted, in this case,

22     SunPath for fulfillment.

23           Q.    And would SunPath always accept that

24     contract, or would they sometimes decline it?

25           MR. TANDY:    Objection.

                                      Page 35

1    vehicle was rebuilt or rebranded.

2         Q.   Any other reasons?

3         A.   That's most of the -- that would be the

4    most.

5         Q.   Okay.  Let's say SunPath rejected one of

6    the contracts.  Would American Protection go about

7    trying to fix the issue with SunPath and submit it

8    again?

9         A.   No.  If the vehicle does not qualify for

10   coverage, there's really nothing we can do.

11        Q.   Okay.  And if SunPath rejects the

12   contract, would American Protection ever say, All

13   right, well, then we have these other options with

14   one of the other companies that you work with?

15        A.   No.

16        Q.   Okay.  You said you entered the payment

17   information and submit it to, in this case,

18   SunPath.

19             Where would you enter that payment

20   information?

21        A.   Into our CRM system.

22        Q.   The CRM.

23             And does SunPath have access to that CRM

24   system?

25        A.   I'm not sure.

Veritext Legal Solutions
303-988-8470

```
 1              A.    I'm not sure of the technical process in

 2        place, so I would -- I don't want to provide

 3        inaccurate information.   I would assume that it's

 4        some kind of feed that goes from the CRM to

 5        SunPath's office.

 6              Q.    Okay.

 7              A.    It depends on what language or how it's

 8        done.   I'm not sure.

 9              Q.    Does SunPath have any systems that they

10        provided American Protection with access to?

11              A.    No.

12              Q.    Does SunPath provide any resources to

13        American Protection?

14              A.    No.

15              Q.    Okay.   Do they provide any oversight

16        over your business?

17              A.    We are appointed by SunPath in Florida

18        in terms of the agent of record.

19              Q.    What does that mean?

20              A.    That means that SunPath appoints us as

21        an agent of record in Florida in terms of

22        licensing or in terms of the ability to sell this

23        product.

24              Q.    Okay.   And when you say "appoints," is

25        this through a government database, or is this
```

Page 39

1          would be highlighted in the Seller Agreement

2          between American Protection and SunPath.

3    BY MR. SMITH:

4          Q.    Okay.   Did SunPath ever provide any

5    guidance on telemarketing?

6          A.    Whatever is listed within the Seller

7    Agreement with SunPath.

8          Q.    Okay.   Nothing else?

9          A.    From time to time we would receive an

10   e-mail from Mr. Sporn with specific numbers that

11   have to be added to our internal DNC list.

12         Q.    How frequently would you receive those?

13         A.    I don't know if there was a particular

14   way to quantify that.

15         Q.    Okay.   Any other guidance?

16         A.    No.

17         Q.    Okay.   Did SunPath ever provide any

18   training to American Protection?

19         A.    No.

20         Q.    Does SunPath ever have any seminars,

21   gatherings, or meetings that they would invite

22   American Protection to?

23         A.    No.

24         Q.    Does SunPath provide any training on the

25   Telephone Consumer Protection Act?

Page 43

1     compensate American Protection for the sale of one
2     of its vehicle service contracts?
3            MR. TANDY:  I'm going to object to the
4        extent of relevance, but I will leave that --
5        I don't know that it's protected by the
6        contract.
7            MR. CAFFAS:  I will also object to the
8        form in that it's leading, suggesting that
9        SunPath does pay American Protection at all,
10       which I don't believe that's in the
11       testimony, so I will object, again, to
12       leading, as I believe that's your testimony,
13       Mr. Smith.
14    BY MR. SMITH:
15       Q.   You can answer, Kobi.
16       A.   SunPath does not compensate us for the
17    sales.  We are -- we pay SunPath a cost for the
18    policy, and we then collect the payments from the
19    customer.
20       Q.   Okay.  So American Protection, would
21    they set the price of the vehicle service
22    contracts?
23       A.   Yes.
24       Q.   Okay.  And, then, a portion of that is
25    the cost of the contract.  Is that fair to say?

Page 46

1      A.    Yes.

2      Q.    And that's the portion that

3  American Protection has to provide to SunPath?

4      A.    Yes.

5      Q.    Okay.  And then whatever amount above

6  that cost portion American Protection keeps

7  themselves?

8      A.    Yes.

9      Q.    Got it.

10          All right.  Let me put up my next

11  exhibit.  Give me a second.

12          (Exhibit No. 2 was marked for

13      identification.)

14  BY MR. TANDY:

15      Q.    All right.  I'm showing you what has

16  been marked as Exhibit 2.

17          Do you recognize this document?

18      A.    Yes.

19      Q.    Can you tell me what it is?

20      A.    I believe this is the Call Center

21  Marketing Agreement.

22      Q.    And that agreement is between SunPath

23  and American Protection; is that correct?

24      A.    Yes.

25      Q.    It looks like it was entered into on

Page 47

1          "maintenance" refers to.  He's not clear what

2          "maintenance" refers to in this context.

3               THE WITNESS:  I'm not clear as to what

4          "maintenance" refers to.

5     BY MR. SMITH:

6          Q.    Okay.  Once American Protection sells

7     one of SunPath's vehicle protection plans, is

8     there a continued relationship with that client

9     that American Protection has?

10         A.    Yes.

11         Q.    How long would that relationship be?

12         A.    For the lifetime of the agreement.

13         Q.    Okay.  And what would

14    American Protection's responsibilities be through

15    the lifetime of that agreement?

16         A.    The customer might ask us for the

17    numbers to the claims department or might call us

18    to find out if something in particular is covered

19    within the plan.

20         Q.    Okay.  And we previously discussed, when

21    a contract was sold, the division of moneys from

22    American Protection to SunPath, right?

23         A.    Yes.

24         Q.    Now, these contracts, they're on a

25    monthly basis, right?  These customers pay a

                                        Page 60

1      certain amount each month?

2          A.   Yes.

3          Q.   Okay.  Who do they pay that amount to?

4          A.   To us.

5          Q.   And then does a share of that each month

6      go to SunPath or does -- or how does that work?

7          A.   No.

8               MR. CAFFAS:  Objection.  Asked and

9          answered.

10     BY MR. SMITH:

11         Q.   Go ahead.

12         A.   No.  SunPath bills us for a policy.

13         Q.   Okay.  So after a policy is sold,

14     American Protection has to pay the cost of the

15     policy to SunPath; is that fair to say?

16         A.   Yes.

17         Q.   How soon do they have to pay that cost?

18         A.   We've at various times have had to pay

19     for the cost.

20         Q.   Can you give me an estimate on the

21     amount of time that you have?

22         A.   Somewhere between some months and --

23     between 30 days and more.

24         Q.   Okay.  And then is it fair to say that

25     it's American Protection's responsibility to

Page 61

1    collect each monthly payment from those clients?

2        A.   Yes.

3        Q.   Okay.  What happens if they cancel their

4    contract or stop paying?

5        A.   Then the plan --

6             MR. CAFFAS:  Object to the form.

7             THE WITNESS:  Then the contract is

8        cancelled.

9    BY MR. SMITH:

10       Q.   Does SunPath provide a refund of the

11   cost to American Protection then?

12       A.   Yes.

13       Q.   Okay.  I will scroll to page 2,

14   paragraph 10.  Give me one second.  All right.  So

15   it says, "All amounts constituting product seller

16   cost and/or net price which are received by CCM

17   shall be held in trust by CCM for the company's

18   sole benefit."

19            Do you see that?

20       A.   Yes.

21       Q.   Is product seller costs in this context,

22   is that the cost that you were referring to that

23   gets paid to SunPath?

24       A.   Yes.

25       Q.   And is net price in this context, is

Page 62

```
 1              THE WITNESS:  I don't recall exactly
 2       back then.
 3    BY MR. SMITH:
 4       Q.    All right.  When did American Protection
 5    start utilizing telemarketing to sell products?
 6              MR. TANDY:  Objection.  Just so I'm
 7         clear, Taylor, when you say the word
 8         "telemarketing," for purposes of this
 9         deposition, you're talking about outbound
10         calls that are not generated from the -- from
11         a prior contact?
12              MR. SMITH:  No.  I'm talking about any
13         outbound call.
14              MR. TANDY:  Okay.  But --
15              MR. SMITH:  Maybe we should talk about
16         mailing.
17              THE WITNESS:  Maybe that will help.
18    BY MR. SMITH:
19       Q.    Based on your responses before, it's my
20    understanding that American Protection mails out
21    postcards and letters to potential clients; is
22    that true?
23       A.    Yes.
24       Q.    Okay.  And then is the hope of that that
25    those potential clients will call
```

Page 76

1     American Protection to inquire about products or

2     services?

3          A.   Yes.

4          Q.   Okay.  And does -- sorry.  Strike that.

5               After those consumers call in, does

6     SunPath -- sorry.  Strike that.

7               After those consumers call in, does

8     American Protection sometimes place additional

9     calls to that individual to sell vehicle service

10    plans?

11         A.   Yes.

12         Q.   Okay.  Does American Protection ever

13    just place calls to consumers that they haven't

14    previously sent a mailer to?

15         A.   I'm sorry, repeat the question.

16         Q.   Yeah.

17              Does American Protection ever place

18    telemarketing calls to consumers that it hasn't

19    previously sent a mailer to?

20         A.   We only contact prospects that have

21    requested information about those services.  I

22    don't know if -- if you define that as

23    telemarketing or not, but that's the only -- we

24    have no interest in just contacting folks that

25    have no interest in our products.

Page 77

1    are you able to figure out the source of that

2    contact information, where it came from?

3          A.    In some cases I could, and in some cases

4    I can't.

5          Q.    Okay.  What about in the plaintiff's

6    situation?

7          A.    What about it?

8          Q.    You previously said that

9    American Protection sent a mailing to her; is that

10   correct?

11         A.    Yes.

12         Q.    Do you know where it got her contact

13   information prior to sending that mailing?

14         A.    I do not, no.

15         Q.    Did you search for that information?

16         A.    Yes.

17         Q.    What repositories were searched?

18         A.    Our CRM.

19         Q.    CRM.

20               Does SunPath ever provide leads to

21   American Protection?

22         A.    No.

23         Q.    All right.  I will pull up my next

24   exhibit.

25               (Exhibit No. 7 was marked for

                                        Page 100

Kobi Chukran (Chukran Management Group), Volume 2 - November 9, 2022

1    record?

2         THE COURT REPORTER:  Back on the record, sir.

3    Thank you.

4         MR. SMITH:  All right.

5    BY MR. SMITH:

6         Q.   I'm going to re-ask that question, Kobi.

7              Does American Protection have any records of

8    the actual inbound or outbound calls to Plaintiff?

9         A.   No.

10        Q.   Okay.  Does American Protection have any other

11   documents in its possession related to Plaintiff that

12   have not been produced?

13        A.   No.

14        Q.   Does American Protection have any record of

15   Plaintiff providing any prior express written consent?

16        A.   I'm sorry.  What -- what was the question

17   again?

18        Q.   Yeah.  Does American Protection have any record

19   of Plaintiff providing any prior express written

20   consent?

21             MR. CAFFAS:  I'm going to object to the

22        vagueness of that question.  Prior express written

23        consent, to what?

24             MR. TANDY:  I will join.

25   BY MR. SMITH:

Page 155

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1      Q.    You can answer.

2      A.    No.

3      Q.    Does American Protection have any policies or

4    procedures to ensure compliance with the Virginia

5    Telephone Privacy (sic) Act?

6      A.    Everything has been provided to you.

7      Q.    Okay.   Other than the documents that have been

8    provided, does American Protection have any policies or

9    procedures to ensure compliance with the Virginia

10   Telephone Privacy Act?

11     A.    No.

12     Q.    Okay.   And does American Protection have any

13   specific policies or procedures that relate to

14   compliance with the Virginia Telephone Privacy Act?

15     A.    No.

16     Q.    Prior to this lawsuit, did you have -- were you

17   aware of the Virginia Telephone Privacy Act?

18     A.    No.

19     Q.    Okay.   I want to go through calls to Plaintiff

20   briefly and ask you questions about them.

21           So Plaintiff alleges, on May 26th, 2020, that

22   she received two calls, and the caller ID was a

23   410-844-6327.

24           Do you know if American Protection has ever

25   utilized that number to place calls?

                                              Page 156

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1            (Deposition Exhibit 16 was marked.)

2     BY MR. SMITH:

3         Q.   All right, Kobi.  I'm showing you what's been

4     marked as Exhibit 16.

5            Do you recognize this document?

6         A.   (Witness perused document.)  Yes.

7         Q.   Okay.  And I'll represent this is a document

8     that was produced by Plaintiff in this litigation, and

9     it's been marked as SMITH000025 through 26.

10           Can you tell me what it is?

11        A.   It seems to be an e-mail quote re- -- that was

12    requested by the plaintiff.

13        Q.   This e-mail was sent on May 28th, 2020, at

14    6:03 p.m.; is that correct?

15        A.   I don't know.  I -- I don't know if that's

16    correct or not.

17        Q.   Okay.  That's what the exhibit states, though,

18    right?

19        A.   That's what it -- yes.

20        Q.   Okay.  It was sent to Ruth Smith, and it's --

21           I guess, it was sent by Samantha Jaeger; is

22    that correct?

23           MR. TANDY:  Objection.

24           MR. CAFFAS:  Yeah.  Objection.  It calls for

25       speculation.

                                        Page 189

Kobi Chukran (Chukran Management Group), Volume 2 - November 9, 2022

```
1              THE WITNESS:  It looks like the e-mail address
2        is of Samantha Jaeger.
3    BY MR. SMITH:
4        Q.   Okay.  This e-mail also begins -- or --
5    sorry -- strike that.
6              This e-mail begins with, "Thank you for taking
7    the time to discuss your vehicle protection needs."
8              Do you see that?
9        A.   Yes.
10       Q.   Fair to say this e-mail would have followed a
11   phone call?
12       A.   Yes.
13       Q.   Okay.  Do you know why this document wasn't
14   also produced by American Protection?
15       A.   No, I do not.  I believe -- I'm not sure if
16   this is an attachment or what exactly is the format this
17   came in.
18       Q.   Okay.  But you don't know why it was -- wasn't
19   produced?
20       A.   No, I do not.
21            MR. TANDY:  Objection.
22            (Deposition Exhibit 17 was marked.)
23   BY MR. SMITH:
24       Q.   Okay.  I'm showing you what's been marked as
25   Exhibit 17.
```

Veritext Legal Solutions
303-988-8470

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1          Do you recognize this document?

2     A.   (Witness perused document.)  Yes, I do.

3     Q.   Can you tell me what it is?

4     A.   Well, I think this is the link that is

5 generated by Inline when a customer presses the

6 "Buy Now" button on their e-mail.

7     Q.   Okay.  All right.  That's all the questions I

8 had about this one.

9          (Deposition Exhibit 18 was marked.)

10 BY MR. SMITH:

11     Q.   Kobi, I'm showing you what's been marked as

12 Exhibit 18.

13          Do you recognize this document?

14     A.   Yes.

15     Q.   Can you tell me what it is?

16     A.   This is a confirmation of an e-mail from

17 Paul Sporn of SunPath, confirming appointment of our

18 company, in terms of the Florida licensing requirement.

19     Q.   Okay.  And it's dated September 20th, 2021; is

20 that correct?

21     A.   Yes.

22     Q.   And this is, it looks like, a reappointment; is

23 that correct?

24     A.   That's what it says, yes.

25     Q.   Okay.  Is this a confirmation that SunPath

                                        Page 191