Exhibit E

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION


    RUTH SMITH, individually and on
    behalf of all others similarly
    situated,

                        Plaintiff,          Case No.
                                             1:22-cv-00081-LMB-
    vs.                                      WEF


    SUNPATH, LTD., a Massachusetts
    corporation,
                        Defendant.
                                             /


                            DEPOSITION OF
        RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
        d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                            KOBI CHUKRAN

                    (Conducted Via Videoconference)


        DATE:              November 1, 2022

        TIME:              11:03 a.m. to 2:06 p.m.

        PURSUANT TO:       Notice by counsel for Plaintiff
                           for purposes of discovery, use at
                           trial or such other purposes as
                           are permitted under the Federal
                           Rules of Civil Procedure

        REPORTED BY:       Aaron T. Perkins, RMR, CRR, CRC
                           Notary Public, State of
                           Florida at Large

                           Pages 1 to 128
```

Page 1

```
 1    plan?
 2         A.   I'm sorry, repeat the question please.
 3         Q.   Once you determine which plan a customer
 4    is best qualified for, then you back to the
 5    customer and provide them with the plan that you
 6    believe best suits their needs?
 7         A.   Yes.
 8         Q.   Okay.  And then the customer can either
 9    say, no, I don't want that plan, or, yes, I do?
10         A.   Yes.
11         Q.   Okay.  What happens if the customer
12    says, All right, I want to purchase that plan?
13              MR. TANDY:  Objection.  I'm not sure I
14         understood your question, Taylor.
15    BY MR. SMITH:
16         Q.   I'm just trying to understand how they
17    go about closing the sales process.  What happens
18    after a customer says, All right, I will purchase
19    that vehicle service plan?
20         A.   We receive information, and that
21    information is then submitted, in this case,
22    SunPath for fulfillment.
23         Q.   And would SunPath always accept that
24    contract, or would they sometimes decline it?
25              MR. TANDY:  Objection.
```

1        You can answer.  I'm objecting to the
2    form of the question.
3        THE WITNESS:  In some cases it would be
4    rejected.
5  BY MR. SMITH:
6    Q.  Can you tell me an example of why
7  SunPath would reject a particular contract?
8        MR. TANDY:  Objection, Taylor, to the
9    extent you're asking him to surmise why
10   another company rejected the a contract.  Or
11   are you only asking if he's ever been told
12   specific reasons?  Because the first way I'm
13   going to object that that's speculation.  But
14   if it's the second reason, then I would ask
15   you to ask that specific question.
16       Does that make sense?
17       MR. SMITH:  I understand what you're
18   saying.
19 BY MR. SMITH:
20   Q.  Would you ever receive a rationale for
21 why SunPath would have rejected one of
22 American Protection's sales contracts?
23   A.  Yes.
24   Q.  What would those rationales be?
25   A.  It could have been that the title of the

Page 36

1  vehicle was rebuilt or rebranded.
2      Q.  Any other reasons?
3      A.  That's most of the -- that would be the
4  most.
5      Q.  Okay.  Let's say SunPath rejected one of
6  the contracts.  Would American Protection go about
7  trying to fix the issue with SunPath and submit it
8  again?
9      A.  No.  If the vehicle does not qualify for
10 coverage, there's really nothing we can do.
11     Q.  Okay.  And if SunPath rejects the
12 contract, would American Protection ever say, All
13 right, well, then we have these other options with
14 one of the other companies that you work with?
15     A.  No.
16     Q.  Okay.  You said you entered the payment
17 information and submit it to, in this case,
18 SunPath.
19         Where would you enter that payment
20 information?
21     A.  Into our CRM system.
22     Q.  The CRM.
23         And does SunPath have access to that CRM
24 system?
25     A.  I'm not sure.

Page 37

1      territorial scope?
2          A.   It is limited to the states SunPath
3      operates in.
4          Q.   And do you know those states?
5          A.   Not offhand.
6          Q.   Okay.  Does SunPath put any pressure on
7      American Protection to make a certain number of
8      sales each month?
9          A.   No.
10         Q.   Does SunPath require American Protection
11     to maintain a do-not-call list?
12         A.   No.
13         Q.   Does SunPath have a do-not-call list
14     that American Protection is required to adhere to?
15         A.   No.
16         Q.   Does SunPath permit American Protection
17     to use its name in marketing materials?
18         A.   I believe so, yes.
19         Q.   Does SunPath restrict how
20     American Protection can market?
21         A.   Everything would be highlighted in the
22     Seller Agreement.
23         Q.   But nothing beyond a Seller Agreement?
24         A.   Not to my knowledge.
25         Q.   Okay.  Can you tell me how SunPath would

Page 45

```
 1      compensate American Protection for the sale of one
 2      of its vehicle service contracts?
 3              MR. TANDY:  I'm going to object to the
 4      extent of relevance, but I will leave that --
 5      I don't know that it's protected by the
 6      contract.
 7              MR. CAFFAS:  I will also object to the
 8      form in that it's leading, suggesting that
 9      SunPath does pay American Protection at all,
10      which I don't believe that's in the
11      testimony, so I will object, again, to
12      leading, as I believe that's your testimony,
13      Mr. Smith.
14  BY MR. SMITH:
15      Q.   You can answer, Kobi.
16      A.   SunPath does not compensate us for the
17  sales.  We are -- we pay SunPath a cost for the
18  policy, and we then collect the payments from the
19  customer.
20      Q.   Okay.  So American Protection, would
21  they set the price of the vehicle service
22  contracts?
23      A.   Yes.
24      Q.   Okay.  And, then, a portion of that is
25  the cost of the contract.  Is that fair to say?
```

```
 1         A.   Yes.
 2         Q.   And that's the portion that
 3   American Protection has to provide to SunPath?
 4         A.   Yes.
 5         Q.   Okay.  And then whatever amount above
 6   that cost portion American Protection keeps
 7   themselves?
 8         A.   Yes.
 9         Q.   Got it.
10              All right.  Let me put up my next
11   exhibit.  Give me a second.
12              (Exhibit No. 2 was marked for
13         identification.)
14   BY MR. TANDY:
15         Q.   All right.  I'm showing you what has
16   been marked as Exhibit 2.
17              Do you recognize this document?
18         A.   Yes.
19         Q.   Can you tell me what it is?
20         A.   I believe this is the Call Center
21   Marketing Agreement.
22         Q.   And that agreement is between SunPath
23   and American Protection; is that correct?
24         A.   Yes.
25         Q.   It looks like it was entered into on
```

Page 47

```
 1    other than what was previously produced?
 2         A.   No.
 3         Q.   Okay.  Does American Protection ever
 4    obtain a listing of numbers registered on the DNC
 5    Registry?
 6         A.   Yes.
 7         Q.   How often does it obtain that list?
 8         A.   That is provided to us by any lead
 9    providers in this case.  So, in other words, if
10    we -- any kind of leads that we acquire are
11    cleansed and cleaned and suppressed against the
12    National Do Not Call List.
13         Q.   Okay.  After American Protection
14    receives those leads, does it take any steps to
15    ensure that it's not calling numbers that are in
16    those leads that are registered on the National Do
17    Not Call Registry?
18         A.   We run those against our internal DNC
19    lists.
20         Q.   Just your internal DNC list?
21         A.   Yes.
22         Q.   Not the National DNC List?
23         A.   Not -- no.  It's already done by the
24    lead providers.
25         Q.   Okay.  Does American Protection maintain
```

Page 83

1  records of prior express consent from the
2  individuals that it places calls to?
3      A.   No.
4      Q.   How does American Express [sic] ensure
5  that the individuals that it's placing calls to
6  provided prior express consent?
7           MR. CAFFAS:  I will object to this as
8      vague.  I believe you just asked about
9      American Express.  I assume you're not
10     talking about the credit card company.
11          MR. SMITH:  Did I say American Express?
12          MR. CAFFAS:  Yes.
13          MR. SMITH:  Strike that.
14 BY MR. SMITH:
15     Q.   How does American Protection ensure that
16 individuals that it's placing calls to have
17 provided prior express consent?
18     A.   We review the method of which they
19 request information.
20     Q.   So can you say that again?
21     A.   We review the method of which they have
22 requested information.
23     Q.   What do you mean by that?
24     A.   I mean I review to make sure that the
25 proper opting language is present, that our name

Page 84

```
 1   strike that.
 2           Do you know if it's been altered during
 3   the relevant time period, since January 26th,
 4   2018, to the present?
 5       A.   No, I don't believe so.
 6       Q.   And who would this be provided to?
 7       A.   To a subcontractor.
 8       Q.   Could you give me an example of --
 9   sorry.  Look to the first line.  "It says, Hi,
10   blank.  This is, blank, thank you for calling
11   American Protection Corp. How may I direct your
12   call?"
13           Would you provide any instructions to
14   the subcontractors as to how they're supposed to
15   use this?
16       A.   No.
17       Q.   You would just provide the document and
18   say, Adhere to this?
19       A.   That is the essence of a subcontractor,
20   correct.
21       Q.   Okay.  Would you ever tell the
22   subcontractors that they're retired -- sorry, that
23   they're required to identify themselves by first
24   and last name?
25       A.   I believe it's left to their choice of
```

Page 88

1   how they would prefer to, whether it's the first
2   name or last name or both.
3       Q.   Okay.  And is this the script that all
4   of your subcontractors would use to sell any
5   vehicle service plan?
6       A.   Yes.
7       Q.   Okay.  Did American Protection ever
8   provide training to the subcontractors as to how
9   they should conduct telemarketing?
10      A.   No.
11      Q.   Does it have a written agreement with
12  all of the subcontractors?
13      A.   Yes.
14      Q.   Would that be the affiliate agreement
15  that you produced?  Is that an example of that?
16      A.   Yes.
17      Q.   Okay.  We'll get to that in a minute and
18  move on to another exhibit.
19          (Exhibit No. 5 was marked for
20      identification.)
21  BY MR. SMITH:
22      Q.   Kobi, I'm showing you what has been
23  marked as Exhibit 5.
24          Do you recognize this document?
25      A.   Yes.

Page 89

1  are you able to figure out the source of that
2  contact information, where it came from?
3      A.  In some cases I could, and in some cases
4  I can't.
5      Q.  Okay.  What about in the plaintiff's
6  situation?
7      A.  What about it?
8      Q.  You previously said that
9  American Protection sent a mailing to her; is that
10 correct?
11     A.  Yes.
12     Q.  Do you know where it got her contact
13 information prior to sending that mailing?
14     A.  I do not, no.
15     Q.  Did you search for that information?
16     A.  Yes.
17     Q.  What repositories were searched?
18     A.  Our CRM.
19     Q.  CRM.
20         Does SunPath ever provide leads to
21 American Protection?
22     A.  No.
23     Q.  All right.  I will pull up my next
24 exhibit.
25         (Exhibit No. 7 was marked for

Page 100

```
 1          record?
 2                  THE COURT REPORTER:  Back on the record, sir.
 3          Thank you.
 4                  MR. SMITH:  All right.
 5   BY MR. SMITH:
 6          Q.   I'm going to re-ask that question, Kobi.
 7               Does American Protection have any records of
 8   the actual inbound or outbound calls to Plaintiff?
 9          A.   No.
10          Q.   Okay.  Does American Protection have any other
11   documents in its possession related to Plaintiff that
12   have not been produced?
13          A.   No.
14          Q.   Does American Protection have any record of
15   Plaintiff providing any prior express written consent?
16          A.   I'm sorry.  What -- what was the question
17   again?
18          Q.   Yeah.  Does American Protection have any record
19   of Plaintiff providing any prior express written
20   consent?
21                  MR. CAFFAS:  I'm going to object to the
22          vagueness of that question.  Prior express written
23          consent, to what?
24                  MR. TANDY:  I will join.
25   BY MR. SMITH:
```

Page 155

```
 1        Q.    You can answer.
 2        A.    No.
 3        Q.    Does American Protection have any policies or
 4   procedures to ensure compliance with the Virginia
 5   Telephone Privacy (sic) Act?
 6        A.    Everything has been provided to you.
 7        Q.    Okay.  Other than the documents that have been
 8   provided, does American Protection have any policies or
 9   procedures to ensure compliance with the Virginia
10   Telephone Privacy Act?
11        A.    No.
12        Q.    Okay.  And does American Protection have any
13   specific policies or procedures that relate to
14   compliance with the Virginia Telephone Privacy Act?
15        A.    No.
16        Q.    Prior to this lawsuit, did you have -- were you
17   aware of the Virginia Telephone Privacy Act?
18        A.    No.
19        Q.    Okay.  I want to go through calls to Plaintiff
20   briefly and ask you questions about them.
21              So Plaintiff alleges, on May 26th, 2020, that
22   she received two calls, and the caller ID was a
23   410-844-6327.
24              Do you know if American Protection has ever
25   utilized that number to place calls?
```

```
 1                (Deposition Exhibit 16 was marked.)
 2      BY MR. SMITH:
 3           Q.   All right, Kobi.  I'm showing you what's been
 4      marked as Exhibit 16.
 5                Do you recognize this document?
 6           A.   (Witness perused document.)  Yes.
 7           Q.   Okay.  And I'll represent this is a document
 8      that was produced by Plaintiff in this litigation, and
 9      it's been marked as SMITH000025 through 26.
10                Can you tell me what it is?
11           A.   It seems to be an e-mail quote re- -- that was
12      requested by the plaintiff.
13           Q.   This e-mail was sent on May 28th, 2020, at
14      6:03 p.m.; is that correct?
15           A.   I don't know.  I -- I don't know if that's
16      correct or not.
17           Q.   Okay.  That's what the exhibit states, though,
18      right?
19           A.   That's what it -- yes.
20           Q.   Okay.  It was sent to Ruth Smith, and it's --
21                I guess, it was sent by Samantha Jaeger; is
22      that correct?
23                MR. TANDY:  Objection.
24                MR. CAFFAS:  Yeah.  Objection.  It calls for
25           speculation.
```

```
 1              THE WITNESS:  It looks like the e-mail address
 2       is of Samantha Jaeger.
 3   BY MR. SMITH:
 4       Q.   Okay.  This e-mail also begins -- or --
 5   sorry -- strike that.
 6            This e-mail begins with, "Thank you for taking
 7   the time to discuss your vehicle protection needs."
 8            Do you see that?
 9       A.   Yes.
10       Q.   Fair to say this e-mail would have followed a
11   phone call?
12       A.   Yes.
13       Q.   Okay.  Do you know why this document wasn't
14   also produced by American Protection?
15       A.   No, I do not.  I believe -- I'm not sure if
16   this is an attachment or what exactly is the format this
17   came in.
18       Q.   Okay.  But you don't know why it was -- wasn't
19   produced?
20       A.   No, I do not.
21            MR. TANDY:  Objection.
22            (Deposition Exhibit 17 was marked.)
23   BY MR. SMITH:
24       Q.   Okay.  I'm showing you what's been marked as
25   Exhibit 17.
```

```
 1                 Do you recognize this document?
 2       A.    (Witness perused document.)  Yes, I do.
 3       Q.    Can you tell me what it is?
 4       A.    Well, I think this is the link that is
 5   generated by Inline when a customer presses the
 6   "Buy Now" button on their e-mail.
 7       Q.    Okay.  All right.  That's all the questions I
 8   had about this one.
 9             (Deposition Exhibit 18 was marked.)
10   BY MR. SMITH:
11       Q.    Kobi, I'm showing you what's been marked as
12   Exhibit 18.
13             Do you recognize this document?
14       A.    Yes.
15       Q.    Can you tell me what it is?
16       A.    This is a confirmation of an e-mail from
17   Paul Sporn of SunPath, confirming appointment of our
18   company, in terms of the Florida licensing requirement.
19       Q.    Okay.  And it's dated September 20th, 2021; is
20   that correct?
21       A.    Yes.
22       Q.    And this is, it looks like, a reappointment; is
23   that correct?
24       A.    That's what it says, yes.
25       Q.    Okay.  Is this a confirmation that SunPath
```

1   American Protection has never spoofed any telephone
2   number associated with First Citizens Bank, to your
3   knowledge?
4        A.   Yes.
5        Q.   Does -- strike that.
6             Does American Protection subscribe to the
7   reg- -- the Federal Do Not Call Registry?
8        A.   Not at this time, no.
9        Q.   Why?  Why not?
10       A.   Our subscription expired.
11       Q.   And does AP --
12            Or at what time did it subscribe to the Do Not
13  Call Registry?
14       A.   I don't have the exact dates.
15       Q.   Would it be --
16            Would it have been within the past year that
17  your subscription expired?
18       A.   No.
19       Q.   Can you give me a ballpark of when the
20  subscription would have expired?
21       A.   I believe a couple of years.
22       Q.   Okay.  And in that time, did AP intentionally
23  make calls to consumers --
24       A.   No.
25       Q.   -- on the Do Not Call Registry?

Page 231