# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION
 3
      RUTH SMITH, individually and on
 4    behalf of all others similarly
      situated,
 5
                          Plaintiff,        Case No.
 6                                          1:22-cv-00081-LMB-
      vs.                                   WEF
 7
      SUNPATH, LTD., a Massachusetts
 8    corporation,
 9                        Defendant.
      _____/
10
11                           DEPOSITION OF
      RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
12    d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                             KOBI CHUKRAN
13
                    (Conducted Via Videoconference)
14
15
       DATE:              November 1, 2022
16
17     TIME:              11:03 a.m. to 2:06 p.m.
18
       PURSUANT TO:       Notice by counsel for Plaintiff
19                        for purposes of discovery, use at
                          trial or such other purposes as
20                        are permitted under the Federal
                          Rules of Civil Procedure
21
22     REPORTED BY:       Aaron T. Perkins, RMR, CRR, CRC
                          Notary Public, State of
23                        Florida at Large
24
                          Pages 1 to 128
25
```

**Page 30**

1 vehicle, as well as the mileage. Based on this
2 information, we can determine what is the best
3 coverage we can offer.
4    Q.  And then once you make that
5 determination, what happens next?
6    A.  Then we submit the sale to the -- to be
7 underwritten by SunPath.
8    Q.  And throughout that sales process, you
9 know, you get the lead, you contact the client,
10 you see what they're qualified for, you determine
11 what's best for them, and then you reach out to
12 SunPath.
13        Is that final step, reaching out to
14 SunPath, is that where contacting SunPath would
15 come in to play or would you have contacted them
16 at some point prior?
17        MR. TANDY:  Objection.
18        MR. CAFFAS:  Yeah.  Objection to form as
19    well.  It's a compound question.
20        MR. TANDY:  And I must object.  To the
21    extent that you're attempting to define the
22    term sales pathway, I object to that, or
23    process.  I'm sorry, Mr. Smith, but I do
24    think that's really compound.
25        MR. SMITH:  That's fine.

**Page 31**

1 BY MR. SMITH:
2    Q.  You can still answer.
3    A.  What was the question again?
4    Q.  I'm just trying to understand when the
5 first time throughout American Protection's sales
6 process they would contact SunPath about a
7 particular sale.  Is it in the end, or is it at
8 some point along the way, for example, when
9 they're trying to find out if a customer is
10 qualified for a product?
11        MR. TANDY:  Object to the form.  I'm
12    going to renew my objection to the compound
13    question.  And as well, I'm not sure that it
14    is accurately characterizing Mr. Chukran's
15    testimony to the extent you're suggesting
16    that they only use SunPath, which I believe
17    he has already said is not the case.  To the
18    extent you are testifying, Mr. Smith, I would
19    object to that.
20        MR. SMITH:  All right, Greg.
21 BY MR. SMITH:
22    Q.  You can answer the question.
23    A.  So we provide the specifications in
24 terms of what would qualify for specific coverage
25 based on a customer's vehicle information.

**Page 32**

1    Q.  Okay.  So let's walk through this.
2        You obtain leads from various sources;
3 is that correct?
4    A.  Yes.
5    Q.  Okay.  And then you're going to reach
6 out to those leads to potentially sell a vehicle
7 service contract, right?
8    A.  Yes.
9    Q.  Okay.  After you contact the potential
10 client, you're going to find out what they're
11 qualified for; is that fair to say?
12    A.  Well, in some cases, the customer
13 contacts us.
14    Q.  Okay.  Maybe they contact you; you
15 contact them.  Once you're in touch with the
16 potential customer, you determine what they're
17 qualified for?
18    A.  Yes.
19    Q.  Okay.  How do you go about doing that?
20    A.  Based on the customer's vehicle
21 characteristics, the year, make, model, and
22 mileage.
23    Q.  And then what do you do with that
24 information?
25    A.  We enter it into our CRM that allows us

**Page 33**

1 to determine what coverage the particular customer
2 qualifies for.
3    Q.  Okay.  And how does your CRM know which
4 product is best for the customer?  Let me rephrase
5 that question.  Sorry.  I will strike that
6 question.
7        What do you input into your CRM to
8 determine what customers will be best qualified
9 for?
10    A.  The year, make, model, and mileage
11 information of the vehicle.
12    Q.  All right.  From, let's say, SunPath, if
13 you're selling a SunPath product, what information
14 would be in your CRM to determine if they qualify
15 for that product?
16    A.  A product availability.
17    Q.  Okay.  While you're determining whether
18 o not they qualify for a product, do you ever
19 reach out to those service companies?
20        MR. TANDY:  Objection.
21        THE WITNESS:  I don't understand the
22    question.
23 BY MR. SMITH:
24    Q.  Okay. Is it fair to say, if I say a
25 vehicle service company, I'm referring to SunPath

9 (Pages 30 - 33)

```
 1  and the other parties who you sell their vehicle
 2  services contracts?  Do you understand that?
 3     A.  Yes.
 4     Q.  Okay.  So when you're trying to
 5  determine if a customer is qualified for a
 6  particular plan, do you ever contact these
 7  companies?
 8     A.  No.
 9     Q.  So American Protection would make that
10  determination, and then they would provide the
11  potential client with the best plan.
12         MR. TANDY:  I will object to the form
13     and, again, object to the extent that you're
14     characterizing Mr. Chukran's testimony
15     regarding whether or not American Protection
16     is making a determination.
17  BY MR. SMITH:
18     Q.  You can answer.
19     A.  Again, we provide the specifications,
20  plan specifications, by, in this case, SunPath
21  which allows us to determine what is the best plan
22  for the customer's needs.
23     Q.  Okay.  And once you determine what's the
24  best plan that customer is qualified for, then you
25  go back to the customer and provide them with that
                                              Page 34

 1  plan?
 2     A.  I'm sorry, repeat the question please.
 3     Q.  Once you determine which plan a customer
 4  is best qualified for, then you back to the
 5  customer and provide them with the plan that you
 6  believe best suits their needs?
 7     A.  Yes.
 8     Q.  Okay.  And then the customer can either
 9  say, no, I don't want that plan, or, yes, I do?
10     A.  Yes.
11     Q.  Okay.  What happens if the customer
12  says, All right, I want to purchase that plan?
13         MR. TANDY:  Objection.  I'm not sure I
14     understood your question, Taylor.
15  BY MR. SMITH:
16     Q.  I'm just trying to understand how they
17  go about closing the sales process.  What happens
18  after a customer says, All right, I will purchase
19  that vehicle service plan?
20     A.  We receive information, and that
21  information is then submitted, in this case,
22  SunPath for fulfillment.
23     Q.  And would SunPath always accept that
24  contract, or would they sometimes decline it?
25         MR. TANDY:  Objection.
                                              Page 35

 1         You can answer.  I'm objecting to the
 2     form of the question.
 3         THE WITNESS:  In some cases it would be
 4     rejected.
 5  BY MR. SMITH:
 6     Q.  Can you tell me an example of why
 7  SunPath would reject a particular contract?
 8         MR. TANDY:  Objection, Taylor, to the
 9     extent you're asking him to surmise why
10     another company rejected the a contract.  Or
11     are you only asking if he's ever been told
12     specific reasons?  Because the first way I'm
13     going to object that that's speculation.  But
14     if it's the second reason, then I would ask
15     you to ask that specific question.
16         Does that make sense?
17         MR. SMITH:  I understand what you're
18     saying.
19  BY MR. SMITH:
20     Q.  Would you ever receive a rationale for
21  why SunPath would have rejected one of
22  American Protection's sales contracts?
23     A.  Yes.
24     Q.  What would those rationales be?
25     A.  It could have been that the title of the
                                              Page 36

 1  vehicle was rebuilt or rebranded.
 2     Q.  Any other reasons?
 3     A.  That's most of the -- that would be the
 4  most.
 5     Q.  Okay.  Let's say SunPath rejected one of
 6  the contracts.  Would American Protection go about
 7  trying to fix the issue with SunPath and submit it
 8  again?
 9     A.  No.  If the vehicle does not qualify for
10  coverage, there's really nothing we can do.
11     Q.  Okay.  And if SunPath rejects the
12  contract, would American Protection ever say, All
13  right, well, then we have these other options with
14  one of the other companies that you work with?
15     A.  No.
16     Q.  Okay.  You said you entered the payment
17  information and submit it to, in this case,
18  SunPath.
19         Where would you enter that payment
20  information?
21     A.  Into our CRM system.
22     Q.  The CRM.
23         And does SunPath have access to that CRM
24  system?
25     A.  I'm not sure.
                                              Page 37
```

10 (Pages 34 - 37)

**Page 62**

1  collect each monthly payment from those clients?
2  A. Yes.
3  Q. Okay. What happens if they cancel their
4  contract or stop paying?
5  A. Then the plan --
6      MR. CAFFAS: Object to the form.
7      THE WITNESS: Then the contract is
8  cancelled.
9  BY MR. SMITH:
10  Q. Does SunPath provide a refund of the
11  cost to American Protection then?
12  A. Yes.
13  Q. Okay. I will scroll to page 2,
14  paragraph 10. Give me one second. All right. So
15  it says, "All amounts constituting product seller
16  cost and/or net price which are received by CCM
17  shall be held in trust by CCM for the company's
18  sole benefit."
19      Do you see that?
20  A. Yes.
21  Q. Is product seller costs in this context,
22  is that the cost that you were referring to that
23  gets paid to SunPath?
24  A. Yes.
25  Q. And is net price in this context, is

**Page 63**

1  that the amount that American Protection gets to
2  keep for each sale?
3  A. Yes.
4  Q. Okay. And so is it fair to say that
5  this paragraph requires American Protection to
6  hold SunPath's portion of the financials in trust
7  on behalf of SunPath?
8  A. I'm sorry, can you repeat the question?
9  Q. Yeah.
10     Is it fair to say that this paragraph
11  requires American Protection to hold SunPath's
12  portion of the financials for each sale in trust
13  on behalf of SunPath?
14     MR. CAFFAS: I will object to the form.
15  I believe that's -- I think it's vague. I
16  didn't understand the question, and to the
17  extent it's leading.
18  BY MR. SMITH:
19  Q. You can answer.
20  A. Yeah. Again, I'm having a hard time
21  also understanding not only the question but also
22  the relevance to this topic at hand.
23  Q. I'm trying to understand. If I
24  understand this correctly, American Protection is
25  required to hold the product seller cost in trust

**Page 64**

1  on behalf of SunPath after they make the sale.
2     MR. CAFFAS: Objection. Form and
3  relevance. We're not here for your
4  understanding.
5     THE WITNESS: It is my understanding
6  that American Protection would submit the
7  cost of the product to SunPath.
8  BY MR. SMITH:
9  Q. Okay. Does this paragraph create a
10  fiduciary duty that American Protection owes to
11  SunPath?
12     MR. CAFFAS: Objection. Calls for
13  speculation.
14     MR. TANDY: And I'm going to object that
15  the witness is not a lawyer. And to the
16  extent that answering the question would
17  require him to explain some type of legal
18  relationship that will impinge on the
19  attorney-client privilege and any advice he
20  may have received from myself or others,
21  other attorneys, I'm instructing him not to
22  answer that question.
23     MR. SMITH: You're instructing him not
24  to answer based on the --
25     MR. TANDY: I'm instructing him not to

**Page 65**

1  answer the question as to whether or not
2  somebody has informed him with enough
3  information or legal advice to determine
4  whether or not some sort of fiduciary
5  relationship has occurred. He's not a
6  lawyer.
7     And, Mr. Smith, I have let you go a long
8  time, but he's not a lawyer, and he's not
9  going to answer legal questions that are
10  determined down the road.
11     MR. SMITH: You can certainly object to
12  a legal conclusion, but that's not a basis to
13  instruct a witness not to answer a question.
14     MR. TANDY: No, no. Wait. I'm
15  instructing him that to the extent that he
16  was provided with legal advice from an
17  attorney that would need to be disclosed in
18  answering your question, I'm instructing him
19  not to answer that question for that purpose.
20     So if you want to ask him -- Mr. Smith,
21  if you want to ask him a "yes" or "no"
22  question, Did somebody tell you that
23  American Protection is a fiduciary for
24  SunPath? you can ask that "yes" or "no"
25  question. But what you can't ask is how he

```
 1                  CERTIFICATE OF REPORTER

 2                     (VIA VIDEOCONFERENCE)

 3    STATE OF WISCONSIN:

 4    COUNTY OF WINNEBAGO:

 5

 6        I, COURTNEY N. LANGHOFF, RMR, CRR, FPR-C,

 7    Notary Public, State of Florida, certify that I was

 8    authorized to and did stenographically and remotely

 9    report the Zoom videoconference deposition of

10    KOBI CHUKRAN (CHUKRAN MANAGEMENT GROUP, LLC); that a

11    review of the transcript was requested; and that the

12    foregoing transcript, pages 134 through 248, is a true

13    and accurate record of my stenographic notes.

14        I further certify that I am not a relative,

15    employee, or attorney, or counsel of any of the parties,

16    nor am I a relative or employee of any of the parties'

17    attorneys or counsel connected with the action, nor am I

18    financially interested in the action.

19

20        DATED this 16th day of November, 2022.

21

22

23
             COURTNEY N. LANGHOFF, RMR, CRR, FPR-C

24

25
```

Page 250