**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **RUTH SMITH,** individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | |
| *v.* | Case No. 1:22-cv-00081 (LMB/WEF) |
| **SUNPATH, LTD.,** a Massachusetts corporation, | |
| *Defendant*. | |

**RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant SunPath, Ltd. ("SunPath"), by counsel, hereby submits its Response in Opposition to Plaintiff's Motion for Partial Summary Judgment.

**I.     INTRODUCTION AND BACKGROUND**

Plaintiff claims she is entitled to summary judgment for 122 "calls" she received from a non-party in violation of the Virginia Telephone Privacy Protection Act ("VTPPA"). Yet there is no genuine factual dispute that SunPath did not make any of the calls at issue, nor were they made on behalf or for the benefit of SunPath.  SunPath is the administrator of vehicle service contracts ("VSCs").  Plaintiff never purchased a VSC administered by SunPath.  Indeed, SunPath's first contact with Plaintiff was when her lawyer asserted these claims to SunPath's own counsel.  The record is clear that SunPath had no role in making any call to Plaintiff.

Instead, Plaintiff claims that SunPath is jointly and severally liable under the VTPPA for the actions of non-party American Protection Corp., a d/b/a of Chukran Management Group LLC ("American Protection"), who Plaintiff alleges made the calls at issue.  American Protection had an agreement with SunPath that permitted it to sell SunPath-administered VSCs alongside those

of SunPath's competitors, as an independent contractor, and explicitly within the bounds of applicable law.   But SunPath asserted no control over American Protection's marketing practices, or over the actions of any sub-contractor that American Protection hired to receive calls from or make calls to consumers.  American Protection bought SunPath-related products at wholesale rates, and independently controlled all facets of its sales and marketing operations, including who it employed, what it sold, the prices at which it sold, and whether it would offer a SunPath-related product or a product of any of SunPath's many competitors.  Indeed, a SunPath-administered VSC was never even offered to Plaintiff on any call at issue in this case.

Plaintiff's VTPPA claim therefore fails for several reasons and precludes her entitlement to summary judgment.   First, Plaintiff created an "established business relationship" ("EBR") with American Protection when *she called American Protection first*, before American Protection ever made any outbound calls to her. While this EBR was in place, Plaintiff's claims fail as a matter of law because the calls were not "telephone solicitation calls" actionable under the VTPPA, and secondary liability is irrelevant because there would not even be primary liability as to American Protection.

Furthermore, while the VTPPA contains a presumption that a "seller," as defined by the statute, is jointly and severally liable for unlawful "telephone solicitation calls" made by a third-party under certain prescribed circumstances, there are threshold flaws that defeat Plaintiff's claims before the presumption even applies here. SunPath-related products were not offered or even discussed during the calls at issue.   Liability under the VTPPA is dependent upon the party's products, goods, or services being offered *on the call* at hand, so the absence of any mention of SunPath or its products on any of the calls at issue dooms Plaintiff's VTPPA claims.

2

VTPPA liability also cannot attach to SunPath because SunPath is not a "seller" under the VTPPA because it does not sell the VSCs it administers.  American Protection (and any other independent third-party authorized to sell SunPath-administered VSCs) offers other companies' products alongside SunPath's, and it does not compensate SunPath directly for any particular sales—it buys SunPath-related products from SunPath at wholesale rates and resells them for whatever price it can fetch on the competitive retail market.  As such, American Protection does not make any calls "on behalf of" or for the benefit of SunPath.  Even if the VTPPA's presumption of joint liability could apply to SunPath, SunPath rebuts this presumption, as it has not authorized and did not have any knowledge of any alleged unlawful calling practices by American Protection.

Finally, even if Plaintiff could clear those hurdles, she relies upon inadmissible evidence concerning the "calls" at issue, and the admissible evidence that does exist only supports the inference that many of the "calls" Plaintiff seeks recovery for would not have been sales calls at all, but rather customer-service follow-up communications from American Protection.  Plaintiff is not entitled to summary judgment for the foregoing reasons.

## II.    DISPUTED MATERIAL FACTS

### A.  Plaintiff Improperly Relies on Inadmissible or Genuinely Disputed Evidence.

Before responding to Plaintiff's purported "undisputed" facts, SunPath objects to Plaintiff's improper reliance on her new declaration and records produced by non-party Five9, Inc. ("Five9").  *See* Plaintiff's Memorandum in Support of her Motion for Partial Summary Judgment, ECF No. 74 ("Memo") **Ex. G**, **Ex. H**.  Neither are admissible[1] and Plaintiff cannot

---

[1] The inadmissibility of the Five9 records is addressed in SunPath's First Motion in Limine, ECF No. 84.  The inadmissibility of Plaintiff's Declaration is addressed in SunPath's Motion to Strike Plaintiff's Declaration, ECF No. 82.

rely on them.[2] Further, Plaintiff's declaration cannot be used here because it is based exclusively on Five9 records about which she lacks personal knowledge.[3] These Five9 records are unexplained, non-self-explanatory rows of data that Five9 produced in response to a subpoena for American Protection-related data that Plaintiff served late in the discovery window and which Five9 only authenticated well after the close of discovery.  Plaintiff did not depose a Five9 representative to explain the meaning of this unexplained data.   No one from Five9 has competently explained what this specialized data may mean.  There is no available witness with specialized knowledge of the Five9 records that can explain them through admissible testimony. Without that, Plaintiff's declaration is inadmissible and cannot be used to defeat summary judgment. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would be admissible in evidence[.]").[4]

---

[2] *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

[3] *See* Deposition of Ruth Smith ("Smith Dep.") at 147:3-148:11 ("Q. You contend that June 9 was the last call that you received that you're seeking damages for in this case? A. Again, whatever I provided initially was correct, but I know that there's the call logs that were received. So that is correct, what's in the logs. Q. Can you clarify what you mean by that? A. So when I submitted all the documentation that I had, that was to the best of my knowledge at the time, but I understand that the call logs have different information, and they are – they are correct. Q. [W]hen you say the call logs, are you referring to call logs that you believe you counsel has received but you have not yet reviewed? A. Yes. They just came this week, yes. Q. So when you say that you believe that the call logs confirm this not to be the case, is that based on representations from counsel? A. Because it's an accurate – because of the logs that were received by the company versus what I have. Q. Right, And I'm just saying you haven't reviewed these call logs that you're referring to, right? A. Correct. Q. So how do you know that the call logs confirm this? A. I rely on my counsel."), excerpts attached as **Exhibit 1**.

[4] *See also* Fed. R. Evid. 602 and 701; *Steves & Sons Inc. v. Jeld-Wen, Inc.*, Civil Action No. 3:16cv545, 2018 U.S. Dist. LEXIS 5061, at *4 (E.D. Va. Jan. 10, 2018) ("The modern trend favors the admission of opinion testimony [under Rule 701], provided that it is well founded on **personal knowledge**" (citing *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990))) (emphasis added).

Further, the Five9 records have never been authenticated as "call records," as Plaintiff contends. *See* Declaration of Five9 Representative ("Five9 Decl."), attached as **Exhibit 2**. The records custodian merely calls them "records"—sans adjective. Therefore, even Plaintiff calling the Five9 records "call records" is inadmissible speculation.[5]

Plaintiff's declaration is further improper for summary judgment purposes because it supplements and contradicts her discovery responses and deposition testimony.[6] As explained above, Plaintiff testified at her deposition that she had no personal knowledge of the Five9 records, and had not even reviewed them. Plaintiff cannot now contradict her deposition testimony by claiming that the Five9 records "represent[] an accurate reflection of the calls that [she] recall[s] receiving from" American Protection. Memo **Ex. H** ¶ 2.[7] Plaintiff's declaration cannot be considered here.

---

[5] It is obvious they are not simply call records of the type traditionally produced by phone companies because the column titled "DURATION" contains multiple entries of 00:00:00. All calls take *some* time. Moreover, there are numerous other temporal-related categories in those records that make it further inscrutable as to what they may mean, and Plaintiff never elicited any such testimony from Five9, whether during discovery or to this day.

[6] *See Gomez v. Haystax Tech, Inc.*, 761 Fed. Appx. 220, 229 (4th Cir. 2019) (When a party fails to provide information as required by Fed. R. Civ. P. 26(e) "the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." (citing Fed. R. Civ. P. 37(c)(1))); *see also Alba v. Merrill Lynch & Co*, 198 Fed. Appx. 288, 300 (4th Cir. 2006) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984))).

[7] Plaintiff's declaration also serves to improperly supplement and contradict her timely discovery responses. Since August 29, 2022, Plaintiff had a duty to fully answer and supplement her answer to an interrogatory asking her to identify all calls she sought recovery for in this Lawsuit. *See* SunPath's First Set of Discovery Request to Plaintiff Ruth Smith at 7, attached as **Exhibit 3**. In her initial answer and two supplemental answers, Plaintiff never identified more than 54 calls, none of which occurred after June 9, 2020. Then, the day before the end of discovery, Plaintiff supplemented her answer a third time to claim she is now seeking recovery for calls she claims are reflected in the inadmissible Five9 records. *See* Plaintiff's Third Supplemental Discovery Responses at 6, attached as **Exhibit 4**. Based on Plaintiff's declaration, apparently that totals 118 *more calls* that occurred after June 9, 2020. Plaintiff cannot now rely on the contradictory

The Five9 records are inadmissible as there is no witness who can properly testify to them. Five9 (a publicly traded company based in California) cannot testify at trial because Plaintiff untimely disclosed them at 5:46 PM on the last day of discovery.[8] Plaintiff has neither sought leave for, nor provided substantial justification for, her untimely disclosure. The harm and prejudice to SunPath is self-evident. Until that disclosure, the Five9 spreadsheets were simply a non-party's unauthenticated data dump of unidentified data produced in response to Plaintiff's subpoena late in the discovery window.  This Court's Orders, its Local Rules, the Federal Rules, and *Gomez* all confirm that Five9 should be precluded from testifying at trial.

Since Five9 cannot appear at trial, Plaintiff has no witness with specialized knowledge to testify to the Five9 records. Again, the Five9 records are not self-explanatory. They are complex data that require specialized experience and knowledge to decipher and explain.  An expert witness competent in elucidating their meaning is needed to explain them.  Any lay testimony about them, even if they were somehow relevant, would create an undue risk of confusion and would be misleading to the jury.[9] *See* Fed. R. Evid. 403, 602, 701, 702.

---

statements in her declaration to support her claim *to more than three times* the amount of calls she was seeking recovery for throughout the entire discovery period.  The dramatic incongruence between the calls Plaintiff knew about and the unexplained "records" produced by Five9 further highlights why Plaintiff cannot reasonably assume them to be "call records."

[8] *See* Plaintiff's Second Supplemental Initial Disclosures at 3, dated December 9, 2020 (listing Five9 and its unidentified "agents, former agents, employees, former employees, and records custodians of Five9"), attached as **Exhibit 5**; *see also* August 5, 2022 Order, ECF No. 25 (ordering discovery completed by "December 9, 2022" and that "no person may testify whose identity, being subject to disclosure or timely requested in discovery, was not disclosed in time to be deposed or to permit the substance of his knowledge and opinions to be ascertained.") (emphasis in Court's Order); *see also See Gomez*, 761 Fed. Appx. at 229, 233-34 ("When a party fails to make a disclosure 'as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless. . . . [holding] the district court did not abuse its discretion in excluding . . . witnesses . . . [disclosed] the last day of discovery.") (internal citations omitted).

[9] *See Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 101 (D. Md. 2020) (Excluding testimony where "there is no basis for the Court to conclude that [the witness] has 'specialized knowledge'

Plaintiff untimely produced the Five9 Decl. on January 6, 2023. *See* Five9 Decl. Plaintiff cannot use that Declaration due to its untimely production.[10] Even if Plaintiff could offer the Five9 Decl., it does not state that the Five9 records are "*call* records." The Declaration refers to the spreadsheets simply as "records." *Id.* Records of what, we do not know. Neither SunPath, the Court, nor the jury should be made to guess. Therefore, Plaintiff cannot offer them as "call records." *See* Fed. R. Evid 901(a).

### B. Statement of Disputed Facts.

Pursuant to Local Civil Rule 56(B), SunPath hereby responds to each of Plaintiff's purported "undisputed facts." As a preliminary note, because Plaintiff's statement of "undisputed facts" also includes legal arguments, SunPath has included statements of dispute responding to such arguments. SunPath also incorporates its objection to each "fact" in support of which Plaintiff cites the Five9 records or her declaration.

1.       Undisputed.

2.       Disputed. SunPath authorizes certain third parties to market its VSCs on a non-exclusive basis.[11] Plaintiff's claim that third parties conducted telemarketing on SunPath's

---

regarding medical billing practices[.]"); *see also Abrams v. Nucor Steel Marion, Inc.*, Case No. 3:13 CV 137, 2015 U.S. Dist. LEXIS 154161, at *128 (N.D. Ohio Nov. 9, 2015) (refusing to permit Plaintiff to present a "'data dump' [of] EPA records for a jury to decipher."); *see also Butzer v. CoreCivic, Inc.*, 5:17-cv-360-Oc-30PRL, 2019 U.S. Dist. LEXIS 41026, at *9 (M.D. Fla. Jan. 9, 2019) (denying a motion to take judicial notice of documents where it was argued that "admitting [] complex documents to the jury without explanatory testimony would cause confusion.").

[10] *See* August 5, 2022 Order ("Exhibits not so disclosed and listed will not be permitted at trial except for impeachment or rebuttal[.]") (emphasis in Court's Order); *see also Lafleur v. Dollar Tree Stores, Inc.*, Case No.: 2:12-cv-363, 2013 U.S. Dist. LEXIS 205078, at *8 (E.D. Va. Aug. 29, 2013) (Ordering the exclusion of untimely declarations where "Plaintiffs fail[ed] to provide substantial justification as to why the Declarations were proffered at or after the close of discovery," and failed to establish why the "late production was harmless.").

[11] Declaration of Andrew Garcia ("Garcia Decl.") ¶¶ 7, 9-10, ECF No. 11-1; Call Center Marketing Agreement ("Agreement"), attached as **Exhibit 6**; Deposition of SunPath ("SunPath

"behalf" is an improper legal conclusion, which Plaintiff knows. *See* SunPath Dep. at 46:1-4 ("Q. (By Mr. Pelsuo) So you know, the – that's the 'on behalf of' thing again. I understand that, you know, that's sort of a legal conclusion[.]"). Those third parties (and their subcontractors), including American Protection, only market SunPath VSCs on their own behalf.[12]

3.      Disputed as phrased. Not all of SunPath's revenue is generated through telemarketing.[13] The revenue generated by American Protection was not essential to SunPath's business, and represented a "very small" proportion of SunPath's overall revenue.  SunPath Dep. at 72:16 to 73:3.  Moreover, as here, Plaintiff called American Protection first after she received an advertisement in the mail from American Protection, so this was *inbound* telemarketing.

---

Dep.") at 79:22 to 80:2 ("Q. [D]id the agreement that SunPath has with American Protection or any third party restrict those parties from offering other companies' products? For example, SunPath's competitors' products? A. No. No. They – they all offer other products."), excerpts attached as **Exhibit 7**.

[12] *See* Agreement ¶ 9 ("[American Protection] is at all times acting as an independent contractor and not as an employee of [SunPath].  Nothing herein shall be construed to create a relationship of employer and employee, a partnership, joint venture, or association between [SunPath] and [American Protection]."); Garcia Decl. ¶¶ 9-10, 14-15; Deposition of American Protection ("AP Dep.") at 79:13-22 ("Q. You previously testified that American Protection does not have employees . . . [h]ow does American Protection place telephone calls to potential clients?  . . . A. Who? We work with some subcontractors . . . that are speaking to the consumers."); *id.* at 221:10-13 ("Q. To your knowledge, would SunPath even know the names of any of American Protection's employees or independent contractors, besides yourself? A. No."), excerpts attached as **Exhibit 8**; SunPath Dep. at 76:7-10 ("Q. To your knowledge, would SunPath have any knowledge of any subcontractor that American Protection would have hired in order to market or sell any product?  A. No."); AP Dep. at 226:16-21 (American Protection's subcontractors were paid by American Protection, never by SunPath); *id.* at 45:25 to 47:8 ("SunPath does not compensate [American Protection] for the sales."); *id.* at 60:24 to 61:12 ("Q. Now, these contracts, they're on a monthly basis, right? These customers pay a certain amount each month? A. Yes.  Q. Okay. Who do they that amount to?  A. To [American Protection].  Q. And then does a share of that each month go to SunPath or . . . how does that work? A. No. . . . No. SunPath bills us for the policy."); SunPath Dep. at 35:12-13 (A. "Nobody makes calls on [SunPath's] behalf[.]").

[13] SunPath Dep. at 72:2-9 ("Q. Andrew, you said that 100 percent of the revenue is – is due to sales by third parties because SunPath doesn't sell; right? A. Yes. Q. Is SunPath able to discern what portion any percent of that revenue is generated through any specific type of marketing? A. The specific type of marketing? No.").

4.      Undisputed.

5.      Disputed as phrased. American Protection agreed "to actively market" SunPath's VSCs as an independent contractor and "not to solicit the sale of" SunPath's VSCs "anywhere other than . . . in the continental US[.]" *See* Agreement at 1, 7.

6.      Disputed. SunPath never provided American Protection with call scripts, marketing materials, or marketing guidelines.[14]

7.      Disputed as phrased. The Agreement provides that American Protection will "perform such other acts as are necessary for the proper conduct of the business and for the protection and safeguarding of the interests of [SunPath] in accordance with [SunPath's] policies and procedures." Agreement at 1.

8.      Disputed. SunPath did not exercise control over what activities American Protection undertook to market SunPath-administered products.[15] Plaintiff's claim that American

---

[14] SunPath Dep. at 67:22-25 (Q. "Has SunPath ever provided call scripts, marketing materials, or marketing guidelines to American Protection? A: No.); AP Dep. at 53:20-24 ("Q. Okay. Did SunPath ever provide any professional material to American Protection? . . . THE WITNESS: No, I don't recall."); *id*. at 54:7-8 ("Q. What [did SunPath] provide? A. The rates of their coverage claims.").

[15] Garcia Decl. ¶¶ 12-14; AP Dep. at 26:1-3 ("Q. Throughout the time you worked with SunPath, were you in regular contact with them? A. No."); *id*. at 38:12-23 ("[D]id SunPath recommend that you use this specific [Customer Relationship Management system]? A. No. . . . Q. Did you provide SunPath with access to that CRM? A: No."); *id*. at 39:9-14 ("Q. Does SunPath have any systems that they provided American Protection with access to? A. No. Q. Does SunPath provide any resources to American Protection? A. No."); *id*. at 43:4-7 ("Q. Okay. Did SunPath ever provide any guidance on telemarketing? A. Whatever is listed within the Seller Agreement with SunPath."); *id*. at 43:17-23 ("Q. Okay. Did SunPath ever provide any training to American Protection? A. No. Q. Does SunPath ever have any seminars, gatherings, or meetings that they would invite American Protection to? A. No."); *id*. at 100:20-22 ("Q. Does SunPath ever provide leads to American Protection? A: No."); SunPath Dep. at 75:6 to 78:17 (SunPath has never offered guidance or training related to how to market or sell its products to American Protection or any other third party); *id*. at 79:22 to 80:2 ("Q. [D]id the agreement that SunPath has with American Protection or any third party restrict those parties from offering other companies' products? For example, SunPath's competitors' products? A. No. No. They – they all offer other products.").

Protection engaged in soliciting sales "on behalf of" SunPath is an improper legal conclusion.

SunPath Dep. at 46:1-4. American Protection (and its subcontractors) only marketed SunPath's

VSCs on American Protection's own behalf.[16]

       9.      Undisputed.

      10.      Disputed. American Protection has subcontractors that contact potential clients,

including those, like Plaintiff, who called American Protection in response to a mailed

advertisement. AP Dep. at 79:13-22.

      11.      Denied as phrased. American Protection determines which company's VSC it will

offer a consumer once it speaks with the consumer and confirms the consumer's vehicle's

characteristics.[17] SunPath's approval or rejection of American Protection's sales was related

solely to confirming that the vehicles qualified for coverage after the sale.[18]

      12.      Disputed. SunPath does not compensate American Protection in any way—

American Protection covered all of its own expenses, and was ultimately compensated under the

Agreement by receiving the difference between the wholesale prices of the SunPath VSCs and

---

[16] Garcia Decl. ¶¶ 7, 9-10, 12-15; Agreement ¶ 9; SunPath Dep. at 35:12-13, 76:7-10, 79:22 to 80:2; AP Dep. at 45:25 to 47:8, 60:24 to 61:12, 79:13-22, 180:10-20 (transcription of recording produced as SMITH_000027, in which "Samantha calling with American Protection" left a voicemail requesting Ms. Smith provide the VIN number for her BMW that had previously been discussed with American Protection), 221:10-13, 226:16-20.

[17] AP Dep. at 32:14-22 ("Q. Once you're in touch with the potential customer, you determine what they're qualified for? A. Yes. Q. Okay. How do you go about doing that? A. Based on the customer's vehicle characteristics, the year, make, model, and mileage.").

[18] *See* AP Dep. at 36:20-37:4 "(Q. Would you ever receive a rationale for why SunPath would have rejected one of American Protection's sales contracts? A. Yes. Q. What would those rationales be? A. It could have been that the title of the vehicle was rebuilt or rebranded. Q. Any other reasons? A. That's most of the – that would be the most.").

whatever price American Protection charged consumers, which was at the sole discretion of American Protection.[19]

13.      Disputed. SunPath does not compensate American Protection in any way—American Protection covered all of its own expenses, and was ultimately compensated under the Agreement by receiving the difference between the wholesale prices of the SunPath VSCs and whatever price American Protection charged consumers, which was at the discretion of American Protection. Garcia Decl. ¶¶ 14-15; AP Dep. at 45:25 to 47:8, 60:24 to 61:12. In practice, American Protection submitted the wholesale cost of the VSCs to SunPath.[20]

14.      Disputed as phrased. SunPath filed with the Florida Department of Financial Services the state-required form disclosing American Protection as a licensed seller of SunPath-related service contracts in Florida.[21]

15.      Disputed as phrased. SunPath's approval or rejection of American Protection's sales was related solely to whether the vehicles qualified for coverage. AP Dep. at 36:20-37:4.

---

[19] Garcia Decl. ¶¶ 14-15; AP Dep. at 45:25 to 47:8 ("SunPath does not compensate [American Protection] for the sales."); *id.* at 60:24 to 61:12 ("Q. Now, these contracts, they're on a monthly basis, right? These customers pay a certain amount each month?  A. Yes.  Q. Okay. Who do they pay that amount to?  A. To [American Protection].  Q. And then does a share of that each month go to SunPath or . . . how does that work? A. No. . . . No. SunPath bills us for the policy.").

[20] AP Dep. at 63:23-64:7 ("Q. I'm trying to understand. If I understand this correctly, American Protection is required to hold the product seller cost in trust on behalf of SunPath after they make the sale. . . . A: It is my understanding that American Protection would submit the cost of the product to SunPath.").

[21] SunPath Dep. at 30:17-24 ("Q. Do you have any knowledge of – of what a licensee appointment in this context means and why SunPath would be listed? A. Yes. Q. Can you explain that to me? A: Because Florida requires that they be appointed to sell there if they want to sell products in Florida."); *see also* Fla. Stat. § 634.171 ("Salesperson to be licensed and appointed.—Salespersons for motor vehicle service agreement companies and insurers shall be licensed, appointed, renewed, continued, reinstated, or terminated as prescribed in chapter 626 for insurance representatives in general. . . . No employee or salesperson of a motor vehicle service agreement company or insurer may directly or indirectly solicit or negotiate insurance contracts, or hold herself or himself out in any manner to be an insurance agent, unless so qualified, licensed, and appointed therefor under the Florida Insurance Code.").

16.      Disputed. American Protection would communicate with Joe Abrahms from SunPath once a month at most regarding business matters, product information, product pricing, and claim information.[22] American Protection would communicate with Larry Lowe at SunPath weekly regarding customer claims.[23]

17.      Undisputed.

18.      Undisputed.

19.      Undisputed.

20.      Undisputed.

21.      Disputed. SunPath objects to Plaintiff's reliance on the Five9 records and her declaration. During discovery, Plaintiff only produced hearsay evidence claiming that she received 54 calls from American Protection between May 26, 2020 and June 9, 2020.[24] Plaintiff never produced any call records or invoices from her wireless carrier, AT&T, evidencing any of these calls. Moreover, even if every row in the inadmissible Five9 spreadsheets represented a phone call, many of the 172 "calls" Plaintiff claims to have "received" were zero seconds in duration, which makes it impossible to understand how such a "call" would have been

---

[22] AP Dep. at 27:5-14 ("Q. Okay. Mr. Joe Abrahms, what would you typically communicate with him about? A: Just business matters, product information, product pricing -- Q: Okay. Can you tell me how frequently -- A. – claim information. Q. Okay. Can you tell me how frequently you would say you have talked with him? A. Maybe once a month or so, maybe even less frequently.").

[23] *Id*. at 27:15-22 ("A. Okay. And Mr. Lowe, how often would you say you spoke with him? A. More regularly. Q. Daily, weekly? A. Weekly. Q. And what would you talk to Mr. Lowe about? A: Clients' claims.").

[24] Plaintiff's First Supplemental Discovery Responses at 2-6, dated November 11, 2022 (listing 54 calls Plaintiff claims to have received), attached as **Exhibit 9**.

"received," and many of the "calls" from American Protection were not for the purpose offering or advertising *any* property, goods, or services.[25]

22.      Undisputed that Plaintiff first called American Protection on May 26, 2020[26] after it mailed her an advertisement on May 22, 2020.[27] SunPath objects to Plaintiff's reliance on her declaration and the Five9 records.

23.      Undisputed that that call occurred. SunPath objects to Plaintiff's reliance on her declaration and the Five9 records.

_____

[25] AP Dep. at 183:10-184:15 (playing a recording of a voicemail Plaintiff allegedly received from American Protection stating "[t]his is Dawn with American Automotive Protection Corp . . . it's important that you give us a call back so we can confirm your information for the file . . . Q. Do you recognize that voice? A. Yes. Q: Can you tell me who that is? A: Her name is Dawn. Q. Do you know her last name? A. Coletta"); *id*. at 185:7-8 (A: "Dawn is . . . a back office or admin type of a role."); *id*. at 197:15-200:11 (Q. "[Y]ou had said that Dawn worked on the – the backend of American Protection. Is that how you described her position? A. Yes. Q. And does that mean Dawn would have only been making calls to someone who was already a customer or who had already expressed interest in purchasing a product from American Protection? . . . A. Yes. . . . Q. Would Dawn be making any kind of sales calls at all? . . . A. No."); Five9 records summary, ECF No. 74-7 (SunPath maintains that these records are in admissible but notes the records list "dcoletta@americanprotectioncorp.com" in the agent column for 78 of the entries).

[26] While Plaintiff claimed not to remember making such a call, *see* Smith Dep. at 167:20 to 170:21, SunPath notes here that the inadmissible Five9 data appears to corroborate American Protection's testimony that Plaintiff first made a call to American Protection four days after she was sent a direct mail advertisement, and before American Protection made any calls to Plaintiff. That is, while there is much in the Five9 data that is difficult or impossible for a layperson with no personal knowledge about the meaning of the data to ascertain, the very first instance of Plaintiff's phone number in the produced records is in a row of data in which the word "INBOUND" is used on the day at issue.

[27] AP Dep. at 81:24 to 82:3 ("As it relates to this particular case that we are gathered here today to discuss, this was a consumer that received a mailer from us and called us to receive information."); *id.* at 199:17-20 ("In this case, the plaintiff gave us a credit card number and agreed to the terms of a sale, so as far as [American Protection's subcontractor], she had written consent [to call] from a customer of [American Protection]."); Screenshots of American Protection CRM system, attached as **Exhibit 10** (reflecting Ms. Smith was sent "Direct Mail" on 5/22/2020 and responded on 5/26/2020); Smith Dep. at 92:10-18 ("Q. And in the process of trying to determine [who was trying to contact you], did you make an inquiry about who they were and what they were selling? A. Yeah, I was trying to determine who was trying to contact me."); AP Dep. at 180:10-20.

24.     Disputed. SunPath's name was not in the email Plaintiff received after she made her second inquiry regarding American Protection's products; as Plaintiff testified, she received an email from American Protection that did not contain any reference to SunPath, and did not see SunPath's name at all until clicking a separate link in the email that then re-directed Plaintiff to American Protection's webpage. It was on this webpage where a SunPath VSC was listed.[28]

25.     Undisputed she sent the identified email, which speaks for itself.

26.     Disputed. SunPath objects to Plaintiff's sole reliance on her declaration and the Five9 records. Plaintiff lacks any admissible evidence to prove this claim is a fact.

27.     Disputed. SunPath objects to Plaintiff's sole reliance on her declaration and the Five9 records. Plaintiff lacks any admissible evidence to prove this claim is a fact.

28.     Disputed. An EBR was formed between Plaintiff and American Protection through Plaintiff's May 26, 2020 call to American Protection. *See* Memo at 12-13. This provided American Protection with permission to call Plaintiff.[29] Consent was further received through Plaintiff providing her credit card information and agreeing to the terms of a sale.[30]

29.     Undisputed; SunPath never called Plaintiff.

30.     Disputed. SunPath disputes that American Protection solicited Plaintiff a SunPath VSC as SunPath's name was not mentioned during the calls at issue. American Protection sold multiple companies' products and was unaware of what product would be offered until the

---

[28]Smith Dep. at 206:1 to 208:1 (Describing the actions Plaintiff took after receiving an email from American Protection); *see also* Email from American Protection to Plaintiff and Screenshot from American Protection's webpage (Bates labeled SMITH000022-26), attached as **Exhibit 11**.

[29] *See* AP Dep. at 81:24 to 82:3, 199:17-20; Screenshots of American Protection CRM system; Smith Dep. at 92:10-18; AP Dep. at 180:10-20.

[30] AP Dep. at 199:17-20 ("A. [P]laintiff gave us a credit card number and agreed to the terms of the sale, so as far as Dawn, she had written consent from a customer of ours.").

consumer provided his or her vehicle information.[31] Plaintiff mischaracterizes her deposition testimony in attempting to establish that "SunPath" was said on a call. But the full context of Plaintiff's testimony shows that her complete recollection of whether SunPath or another company's name was mentioned during the calls at issue was contained in the notes she created at the time of the calls.[32] Yet her notes never mention SunPath. *See* Plaintiff's notes (Bates labeled SMITH000031-36), attached as **Exhibit 12**. Plaintiff's claim about what Ms. Jaeger may have said on the call is inadmissible hearsay. It was only later, when American Protection emailed her a link to one of its websites, that she learned of SunPath's name.[33] Moreover, the sales script American Protection used does not mention SunPath's name. *See* **Exhibit 13**. Thus, it is undisputed that SunPath's name was never mentioned on any of the calls at issue.

SunPath disputes the relevance of what American Protection did when SunPath rejected a consumer for coverage. The only record evidence is that **Plaintiff rejected** a VSC she had been offered by American Protection. *See* Plaintiff's June 11, 2020 email, attached as **Exhibit 14**. Plaintiff never purchased a SunPath VSC. *See* Statement of Uncontested Facts ¶ 12, ECF No. 56.

---

[31] AP Dep. at 74:1-5 ("Q. . . . So at the time American Protection places a call, does it know which company's vehicle service plans it will be pitching on the call? A. No."); *id.* at 32:9 to 33:16 (when American Protection spoke with any consumer, he or she would first need the consumer's vehicle information before determining what products they qualified for).

[32] *See* Smith Dep. at 52:12-19; 53:9-54:2; 54:5-6 (Q. "The next line of that paragraph and the final line says, 'Further, the caller solicited plaintiff to purchase SunPath's vehicle service contracts.' Can you describe how the caller solicited you to purchase SunPath's vehicle service contract. A. I would have to – for the exact information, **I would have to refer to my notes**. . . . Q. Why would you have to refer to your notes? A. For the exact language. Q. Do you remember anything about the language that led you to make that statement that the purpose of the call was to solicit the sale of SunPath's vehicle service contracts? A. Based on my memory, they gave the name of the company and what they were – what they were – I think what they were selling. Q. When you say the name of the company, what was the name of the company? A: SunPath. Q. You say that they used the word 'SunPath' as the name of the company, not another company's name? . . . A. **I would have to refer to my notes for exactly what the…**") (emphasis added).

[33] *See* Email from American Protection to Plaintiff and Screenshot from American Protection's webpage (American Protection email containing a link that re-directed to American Protection's webpage); Smith Dep. at 206:1 to 208:1.

31.   Undisputed.

## III.   ARGUMENT

### A.  72 of the Calls at Issue Did not Violate the VTPPA

The calls at issue can be split into four groups. Group One contains the six calls occurring from May 26-28, 2020. Group Two contains the 50 "calls" (or inadmissible Five9 spreadsheet entries) that occurred between May 28, 2020 and June 11, 2020, which Plaintiff concedes did not violate the VTPPA. *See* Memo at 12-13. Group Three contains the 66 "calls" that occurred from June 11, 2020-July 11, 2020. Group Four contains the 50 "calls" that occurred after July 11, 2020. The Group One calls did not violate the VTPPA due to an existing EBR between Plaintiff and American Protection. The Group Three "calls" did not violate the VTPPA because they occurred during the applicable 30-day safe harbor period. Plaintiff lacks any admissible evidence showing that the Group Three and Four "calls" actually occurred.

#### 1.   The Group One Calls Did Not Violate the VTPPA.

Count II of Plaintiff's Complaint alleges violations of Va. Code § 59.1-514(B) for making "telemarketing solicitation call(s)" to phone numbers on the National Do Not Call Registry.  *See* Compl. ¶¶ 47-54.  The VTPPA defines a "telephone solicitation call." Va. Code § 59.1-510. Va. Code § 59.1-514(D) excludes from the definition of "telemarketing solicitation call," calls made to those "(ii) with whom the person on whose behalf the telephone call is made has an established business relationship[.]" Thus, calls to people with whom the caller has an EBR are not "telemarketing solicitation calls," by definition.

The VTPPA's EBR exception provides that a call is not considered a "telemarketing solicitation call" if the party is making a call to a consumer within three months after the consumer's last inquiry.  Va. Code § 59.1-510 (defining an "established business relationship").

16

47 C.F.R. § 64.1200(f)(5) explains that an EBR is "formed by a voluntary two-way communication" between the consumer and company.[34]

There is no dispute that Plaintiff made a voluntary inquiry to American Protection regarding the products it sold by calling American Protection on May 26, 2020.[35] This created an EBR that permitted American Protection to call Plaintiff back for a three-month period because such calls are not "telephone solicitation calls," and therefore do not present actionable claims under Va. Code § 59.1-514.[36] The EBR remained in place until June 11, 2020, when Plaintiff made her first and only do-not-call request to American Protection.[37]

Accordingly, SunPath, not Plaintiff, is entitled to summary judgment for the six Group

---

[34] The voluntary two-way communication between Plaintiff and American Protection occurred in one of two ways: First, American Protection sent a direct mailer to Plaintiff, then Plaintiff voluntarily called American Protection on May 26, 2020. Second, *even if* Plaintiff fails to recall that this is what prompted her to call American Protection in the first place, Plaintiff still concedes that she voluntarily called American Protection on May 26, 2020, and American Protection then returned her call. Either way, by Plaintiff first calling American Protection, there was a reasonable "expectation on the part of [Plaintiff] that" American Protection would return her call. *See Rules and Regulations Implementing the Telephone Consumer Protection Act*, 68 FR 44144-01, 44159 (2003).

[35] *See* Memo at 6; *see also* AP Dep. at 81:24 to 82:3 ("As it relates to this particular case that we are gathered here today to discuss, this was a consumer that received a mailer from us and called us to receive information."); *see id.* at 199:17-20 ("In this case, the plaintiff gave us a credit card number and agreed to the terms of a sale, so as far as [American Protection's subcontractor], she had written consent [to call] from a customer of [American Protection]."); *see also* Screenshots of American Protection CRM system (reflecting that Ms. Smith was sent "Direct Mail" on 5/22/2020); Smith Dep. at 92:10-18 ("Q. And in the process of trying to determine [who was trying to contact you], did you make an inquiry about who they were and what they were selling? A. Yeah, I was trying to determine who was trying to contact me.").

[36] Decisions regarding the TCPA's EBR exception likewise show that the existence of the EBR exempts analogous federal do-not-call claims. *See, e.g., Rowan v. US Dealer Servs., Inc.*, Civ. No. 21-09945 (KM)(LDW), 2022 U.S. Dist. LEXIS 127153, at *13-14 (D.N.J. July 18, 2022), *appeal dismissed*, No. 22-2522 (3rd Cir. Nov. 21, 2022) (granting summary judgment in favor of TCPA defendant because the calls at issue were made pursuant to an established business relationship with a related business that was not a party to the case); *Thomas-Lawson v. Koons Ford of Balt., Inc.*, Civil Case No. SAG-19-3031, 2020 U.S. Dist. LEXIS 59517, at *12-13 (D. Md. Apr. 6, 2020) (dismissing TCPA claims for failure to plead calls were actionable "telephone solicitations" due to existing EBR).

[37] *See* Plaintiff's June 11, 2020 Email.

One calls that occurred during the EBR period (i.e. between May 26, 2020 and May 28, 2020). Those calls were not "telephone solicitation calls" and are not actionable under the VTPPA's do-not-call provision as a matter of law.

### 2. Group Three "Calls"

The Group Three "calls" occurred in the 30 days after Plaintiff sent her June 11, 2020 do-not-call request to American Protection. American Protection is entitled to 47 C.F.R. § 64.1200(d)(3)'s 30-day safe harbor provision. The 66 "calls" in Group Three occurred during the 30-day safe harbor. Therefore, they did not violate the VTPPA.

The VTPPA does not explicitly prescribe how long a company has to implement a do-not-call request. 47 C.F.R. § 64.1200(d)(3) provides the applicable guidance.[38]   47 C.F.R. § 64.1200(d)(3)'s 30-day safe harbor provision requires that do-not-call requests be honored within a reasonable period of time, not to "exceed **thirty days** from the date of such request." (emphasis added). Plaintiff's June 11, 2020 email to American Protection highlights why the 30-day safe harbor exists. Do-not-call requests are often not made in an automated fashion. They can be received any time of day and in a variety of forms. The company receiving such requests needs an opportunity to process them. The 30-day safe harbor provision provides that opportunity.

---

[38] *See* Va. Code § 59.1-514(B) (incorporating 47 C.F.R. § 64.1200, which provides in subsection 64.1200(d)(3) that an entity making calls for telemarketing purposes must honor a do-not-call request within 30 days); *see also Bryant v. King's Creek Plantation, LLC*, No. 4:20-cv-00061, 2020 U.S. Dist. LEXIS 226044, at *8-9 (E.D. Va. June 22, 2020) (noting that the VTPPA is analogous to the TCPA's DNC provision, comparing 47 C.F.R. § 64.1200(c)(2) with Va. Code § 59.1-514(B)); *Hamilton v. Spurling*, Case No. 3:11cv00102, 2013 U.S. Dist. LEXIS 38585, at *34 n.12 (S.D. Ohio Mar. 20, 2013) ("[A]s the FCC report points out, it is not until a person who has an EBR with a telemarketer requests to be placed on a DNC list that a company must comply with the dictates of Section 64.1200.") (citation omitted).

Courts have held that calls occurring within the 30-day safe harbor are not actionable.[39]
Neither the VTPPA nor 47 C.F.R. § 64.1200 provides that a party can be held liable for calls
occurring during 30-day safe harbor. SunPath, not Plaintiff, is entitled to summary judgement for
the Group Three "calls" since they all occurred during the applicable 30-day safe harbor.

### 3. Group Three and Four "Calls"

There are 116 "calls" in Groups Three and Four for which Plaintiff seeks to hold SunPath
liable.[40] Plaintiff has no personal knowledge or admissible evidence of those calls. *See supra*
Section II.A. The Five9 records are the *only* evidence supporting Plaintiff's claim that she
received those "calls."[41] But the Five9 records are inadmissible. There are no witnesses that can
offer admissible testimony relating to the Five9 records. *Id.* Thus, Plaintiff lacks any admissible
evidence that she even received the "calls" in Groups Three and Four. In addition to lacking such
evidence, Plaintiff crucially cannot even prove these 116 "calls" were "telephone solicitation
calls" as defined by the VTPPA. *See* AP Dep. at 183:10-184:15, 185:7-8, 197:15-200:11.
SunPath, not Plaintiff, is entitled to summary judgment for those 116 "calls."

### B. SunPath Is Not Jointly or Severally Liable for any VTPPA-Violating Calls.

Plaintiff's Motion fails to show that SunPath can be held jointly or severally liable for
any VTPPA-violating telephone solicitation calls at issue. Plaintiff, in relying on a number of

---

[39] *See Orsatti v. Quicken Loans, Inc.*, 2:15-cv-09380-SVW-AGRa, 2016 U.S. Dist. LEXIS 182873, at *19 (C.D. Cal. Sept. 12, 2016) (referring to 47 C.F.R. § 64.1200(d)(3) as a "safe harbor provision" and holding that calls occurring within the 30-day "safe harbor provision of the FCC regulation [do] not constitute a cause of action."); *see also Mattson v. Quicken Loans, Inc.*, Case No. 3:18-CV-00989-YY, 2018 U.S. Dist. LEXIS 180737, at *6 (D. Or. Oct. 22, 2018) (holding that "[a]llegations of calls **beyond** the 30-day safe-haven have been held to be sufficient to state a claim") (emphasis added).

[40] For the reasons described above, SunPath disputes that these are properly classified as "calls." *See supra* Section II.A. They are unidentified data records.

[41] As they relate to the 116 "calls," Plaintiff's improper declaration and the pertinent portion of Plaintiff's untimely Third Supplemental Discovery Responses to SunPath's Discovery Requests rely solely on the inadmissible Five9 records.

irrelevant "facts," never establishes that any VTPPA-violating call at issue was made by American Protection on behalf of, or for the benefit of, SunPath. Therefore, it is never proven that SunPath is a "seller" as defined by the VTPPA. Instead, the facts show that no SunPath-related VSC was ever offered on any call to Plaintiff. Even if SunPath was considered a "seller" to which Va. Code § 59.1-514.1(B)'s presumption applies, SunPath can overcome this presumption because it had no affiliation with or knowledge of the calls to Plaintiff at issue here, if they ever occurred. Therefore, SunPath, not Plaintiff, is entitled to summary judgment.

**1. SunPath's Property, Goods or Services Were not Offered to Plaintiff on Any Call.**

The VTPPA's "seller" definition and presumption are **contingent** on the seller's "property, goods, or services" being offered or advertised **during** the subject telephone solicitation calls. *See* Va. Code §§ 59.1-510; 59.1-514.1. They have broad application in cases where a seller outsources its telemarketing sales operations to a dedicated third-party marketing company that exclusively sells that seller's products. This is typically the case where the seller provides the scripts the call center should use, monitors the third-party's operations as if they were its own, and exercises control over the call center. But they become far more tenuous in cases, like this -- where the independent seller controls its own operations and independently resells the products of various competitors after purchasing them wholesale.[42] Therefore,

---

[42] The VTPPA is not designed or intended to extend liability to companies whose products are sold by a telephone solicitor that also sells products from other companies. This is demonstrated by Va. Code § 59.1-512 which requires a telephone solicitor to identify "the name of the person on whose behalf the telephone solicitation call is being made[.]" If a telephone solicitor's calls are made on behalf of every company whose products it could potentially sell on the call, the telephone solicitor would have to name each individual company whose products it may ultimately sell in order to comply with Va. Code § 59.1-512. This is an unreasonable construction. It must be that a telephone solicitor reselling other companies' products in its own name only makes a telephone solicitation call on its own behalf.

whether a company's name is stated on the telephone solicitation call is imperative to determining whether a company's product was *offered or advertised on the call*.

There is no material factual dispute that SunPath's name was never mentioned on any *call* between American Protection and Plaintiff.[43] Plaintiff's mischaracterizing of her own testimony creates no dispute. The first time Plaintiff ever saw (and crucially, not heard) SunPath's name was when she received an email from American Protection after inquiring about *American Protection*'s products, and then took an additional step to click a hyperlink in that email. At that point, she was re-directed to *American Protection*'s website. There, she finally saw that a SunPath-related VSC was available for purchase based on the specifications of her vehicle that she had provided to American Protection. Thus, Plaintiff did not even *see*—not hear—SunPath's name until she was two steps removed from her call with American Protection. Nowhere does the VTPPA provide that a liability determination can be made by reviewing after-the-fact email correspondence and weblinks exchanged well after a call ends. The plain and unambiguous language of the VTPPA's seller definition and presumption shows that their applicability is determined solely based on what occurs during the call, not after.[44] Since there is

---

[43] As Plaintiff stated at deposition, her complete recollection of whether SunPath or another company's name was mentioned during the calls at issue was contained in the notes she created at the time of the calls, yet **her notes never mention SunPath**—nor was SunPath's name contained in American Protection's sales script or the email Plaintiff received. *See* Smith Dep. 53:9 to 54:6 (Plaintiff's recollection of the calls is contained in her call notes); *see also* Plaintiff's Notes (Bates labeled SMITH000031-36, which contain no reference to SunPath); AP Dep. at 234:2-6 ("Q: Is it correct that, in [American Protection's sales script], as written, SunPath's name isn't mentioned in the sales script or on the – the cover of the – the script at all?  A: Correct."); Smith Dep. at 206:1 to 208:1 (Describing the actions Plaintiff took after receiving an email from American Protection); *see also* Email from American Protection to Plaintiff and Screenshot from American Protection's webpage.

[44] *See Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 571 F. Supp. 2d 712, 716 (E.D. Va. 2008) ("[I]n Virginia, where . . . a statutory term is plain and unambiguous, there is no need for judicial construction; the language will be applied as written.") (internal quotations omitted).

no evidence that a SunPath product was ever offered or advertised to Plaintiff on any call at issue, VTPPA's seller definition and presumption cannot apply to SunPath.[45]

### 2. Plaintiff Lacks Evidence that the Calls at Issue That Occurred After June 9, 2020 Were VTPPA-Violating "Telephone Solicitation Calls."

The VTPPA's definition of "telephone solicitation call" requires the call to be "for the purpose of offering or advertising any property, goods, or services for sale[.]" Va. Code § 59.1-510. Plaintiff lacks evidence showing that any "call" at issue she received after June 9, 2020 was for such purpose. Plaintiff lacks personal knowledge relating to "calls" at issue she now allegedly received after June 9, 2020. *See supra* Section II.A. American Protection did not provide any testimony relating to the context of "calls" that occurred after June 9, 2020, and Plaintiff never even knew they existed (if they ever did) until Five9's unexplained data dump appeared in the case late in discovery. Plaintiff cannot prove those "calls" were "telephone solicitation calls."[46] Plaintiff's lack of evidence precludes her entitlement to summary judgment.

### 3. SunPath is not a "Seller" as Defined by the VTPPA.

SunPath cannot be considered a "seller" under the VTPPA, and therefore cannot be subjected to joint and several liability for American Protection's actions. Per Va. Code § 59.1-510, "'Seller' means any person on whose behalf or for whose benefit a telephone solicitation

---

[45] When the calling party is offering products from multiple companies, it further requires that liability be determined at the time a call is made, not after. If not, it results in liability being assigned by luck of the draw: If SunPath were to be held liable in this case, it would only be because SunPath was the unlucky party whose VSC happened to be the best match for Plaintiff. This is illogical. It cannot be the Virginia Legislature's intent for seller liability to be determined by something as arbitrary as the year, make, model, or mileage of a person's vehicle.

[46] The fact that at least one call was made only for information-collection purposes prevents Plaintiff from being able to establish which calls were actually "telephone solicitation calls." *See* AP Dep. at 183:10-184:15, 185:7-8, 197:15-200:11; *see also In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 (2006) (Communications are not advertisements when their "purpose is to facilitate, complete, or confirm a commercial transaction [] the recipient previously agreed to[.]").

call offering or advertising the person's property, goods, or services is made or initiated." Due to Va. Code § 49.1-514.1(A)'s use of the term "seller," it is Plaintiff's burden to prove that term applies to SunPath before Va. Code § 59.1-514.1(B)'s rebuttable presumption applies. But Plaintiff cannot do so because the factual record in this case is clear that any of the calls at issue were not "on behalf of," or "for the benefit of," SunPath.

Most obviously, SunPath is not a seller because it does not sell anything. SunPath is the administrator of VSCs: it administers and pays for covered claims customers make under their SunPath-administered service contracts. SunPath does not sell the VSCs it administers—its products are sold by third-party sellers, much like auto manufacturers' cars are sold by independent dealers.[47]

More specific to the VTPPA's definition of the term, SunPath does not benefit from any specific sales American Protection makes via its own marketing efforts. American Protection purchased the SunPath VSCs at wholesale and was ultimately compensated under the Agreement by receiving the difference between the wholesale prices of the SunPath VSCs and whatever price American Protection charged its consumers at retail. This latter price was set at American Protection's sole discretion.[48] Moreover, Plaintiff has never purchased a VSC administered by SunPath, so it certainly received no benefit from any calls made to Plaintiff, regardless of how the term "benefit" is construed.

Furthermore, American Protection did not make any calls "on behalf" of SunPath. In fact, the record shows that subcontractors American Protection hired, and who had no

---

[47] Garcia Decl. ¶¶ 4, 7.

[48] Garcia Decl. ¶¶ 14-15; AP Dep. at 45:25 to 47:8 ("SunPath does not compensate [American Protection] for the sales."); *id.* at 60:24 to 61:12 ("Q. Now, these contracts, they're on a monthly basis, right? These customers pay a certain amount each month? A. Yes. Q. Okay. Who do they that amount to? A: To [American Protection]. Q. And then does a share of that each month go to SunPath or . . . how does that work? A. No. . . . No. SunPath bills us for the policy.").

relationship with SunPath,[49] made the calls at issue to sell the products marketed by American Protection, the only "seller" in this case. SunPath has no relationship whatsoever with the subcontractor(s) responsible for making any call to Plaintiff, and is a further step removed from any telephone solicitations that may be governed by the VTPPA.

There is no factual dispute that American Protection's subcontractors did not know what company's products would be offered to any consumer when a call was received or made:  The product being offered—whether a SunPath-related product or a competitor's—was not determined until after a consumer provided information related to his or her vehicle.[50]  Much like a grocery store is not acting "on behalf" of every company whose products line its shelves, and a bar is not acting "on behalf of" every brewery whose beer is on tap, American Protection could not be considered to be acting "on behalf of" SunPath or any other party whose products it sold. *See Worsham v. Disc. Power, Inc.*, Civil Action No. RDB-20-0008, 2022 U.S. Dist. LEXIS 139580, at *21 (D. Md. Aug. 4, 2022) (dismissing analogous TCPA claims on a motion for summary judgment because "[a]t best, Hound Energy and AGR were responsible for independently soliciting customers for Discount Power, not for 'act[ing] on the principal's behalf

---

[49] *See* AP Dep. at 79:13-22 ("Q. You previously testified that American Protection does not have employees . . . [h]ow does American Protection place calls to potential clients?  . . . A. Who? We work with some subcontractors . . . that are speaking to the consumers."); *id*. at 221:10-13 ("Q. To your knowledge, would SunPath even know the names of any of American Protection's employees or independent contractors, besides yourself?  A. No."); SunPath Dep. at 76:7-10 ("Q. To your knowledge, would SunPath have any knowledge of any subcontractor that American Protection would have hired in order to market or sell any product?  A. No."); AP Dep. at 226:16-20 (American Protection's subcontractors were paid by American Protection, never by SunPath).

[50] *See* AP Dep. at 74:1-5 ("Q. . . . . So at the time American Protection places a call, does it know which company's vehicle service plans it will be pitching on the call?  A. No."); *id*. at 32:9 to 33:16 (when American Protection spoke with any consumer, they would first need the consumer's vehicle information before determining what products they qualified for).

and subject to the principal's control.'") (internal citations omitted).[51] The fact that the Agreement contemplated that American Protection would market SunPath's products is of no consequence. It is clear that *American Protection*, not SunPath, is the party on whose behalf the calls were being made because American Protection's subcontractors announced this on voicemail recordings Plaintiff produced.[52] There is no dispute that American Protection is the only party that tried to sell anything in this case, and it did so as an independent contractor, as provided by the terms of the Agreement, and for its own benefit.

Accordingly, SunPath is not considered a "seller" under the VTPPA. Because any joint liability pursuant to Va. Code § 59.1-514.1 is conditioned on the non-calling party's status as a seller, Plaintiff is not entitled to summary judgment.

> ### 4. The Factual Record Supports that SunPath Had No Connection to any Allegedly Unlawful Calling Practices that Could Subject it to Joint Liability Under the VTPPA's Rebuttable Presumption.

The foregoing establishes that Va. Code § 59.1-514.1(B)'s seller presumption does not apply to SunPath here. But even if this presumption did apply to SunPath, it is rebutted. The presumption is rebutted by "clear and convincing evidence that the seller did not retain or request the telephone solicitor to make telephone solicitation calls on the seller's behalf or for the seller's

---

[51] *See also*, *e.g.*, *Litsinger v. Forest River, Inc.*, 536 F. Supp. 3d 334, 365 (N.D. Ind. 2021) (citing *Carlisle v. Deere & Co.*, 576 F.3d 649 (7th Cir. 2009)) (finding that a dealer is not an agent of the manufacturers of the products it sells, especially when the dealer sells multiple brands); *In re Monitronics Int'l, Inc.*, 223 F. Supp. 3d 514, 527-28 (N.D.W. Va. 2016) (granting summary judgment because "the mere fact that a dealer uses a suppliers name does not render it an agent of the supplier, just as every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise."); *Makaron v. GE Sec. Mfg.*, CV-14-1274-GW (AGRx), 2015 U.S. Dist. LEXIS 75240, at *19-20 (C.D. Cal. May 18, 2015) (granting motion for summary judgment due to lack of actual agency despite license to use trademarks and logos because applicable contracts indicated the dealers were independent contractors).

[52] *See* AP Dep. at 180:10-20 (transcription of recording produced as SMITH_000027, in which "Samantha calling with *American Protection*" left a voicemail for Plaintiff).

benefit and that the telephone solicitation calls offering or advertising the seller's property, goods, or services were made by the telephone solicitor without the seller's knowledge or consent." Va. Code § 59.1-514.1(B).

The Agreement between SunPath and American Protection states that "[American Protection] . . . shall use utmost good faith and best efforts to ensure that their respective operations are conducted in connection with the Products are in compliance in all material respects with all applicable laws, rules and regulations of all jurisdictions in which it performs its duties." Agreement at ¶ 30.[53]

As discussed above, a "telephone solicitation call" under the VTPPA excludes calls made pursuant to an EBR. Va. Code § 59.1-514(D). The definition also excludes calls made with the person's prior express invitation or permission to be called. *Id.* Therefore, if American Protection was engaged in making "telephone solicitation calls" as defined by the VTPPA, i.e., not within either of these exceptions, it was acting *outside the scope* of its contractual authority by violating the VTPPA without SunPath's knowledge and contrary to its contractual commitments to SunPath. Moreover, the VTPPA's provision regarding joint liability only applies to "prohibited acts," (*see* Va. Code § 59.1-514.1 titled "Joint Liability of seller and telephone solicitor for *prohibited acts*; rebuttable presumption.") (emphasis added), which again would be outside the scope of American Protection's authority under the Agreement.

In other words, pursuant to the express terms of the Agreement, there was no scenario in which SunPath authorized American Protection to make "telephone solicitation calls" or engage

---

[53] A duty to comply with the VTPPA or the analogous TCPA can be delegated to independent contractors. *See Mantian Zhu v. Dish Network, LLC*, 808 F. Supp. 2d 815, 819 (E.D. Va. 2011); *see also Worsham*, 2022 U.S. Dist. LEXIS 139580, at *18; *Simmons v. Charter Commc'ns., Inc.*, 222 F. Supp. 3d 121, 137 (D. Conn. 2016) ("there is no better way to ensure compliance with the TCPA than to include such compliance as an essential term of the contract.").

in any "prohibited acts" that could subject it to joint liability under the VTPPA.   Indeed, another court very recently ruled on summary judgment that SunPath could not be held liable for a third-party seller's actions allegedly made in violation of the TCPA, because any unlawful conduct was explicitly prohibited under the applicable agreement, and therefore was not authorized by SunPath.  *See Black v. SunPath Ltd.*, Case No. 3:21-cv-00023, 2022 U.S. Dist. LEXIS 165799, at *9-10 (M.D. Tenn. Sep. 14, 2022), *appeal dismissed*, No. 22-5927 (6th Cir. Dec. 27, 2022) ("By relying on the formal contract between the parties, without any additional evidence of a broader, implicit understanding between SunPath and [an independent third-party seller], [Plaintiff] has placed herself in the difficult position of trying to establish authority to perform an act based on an agreement that clearly and emphatically forbids that act under any circumstances.") (citing *Kern v. VIP Travel Servs.*, Case No. 1:16-CV-8, 2017 U.S. Dist. LEXIS 71139, at *19 (W.D. Mich. May 10, 2017)).

Beyond the plain language of the Agreement, the record is clear that SunPath has no knowledge that American Protection ever undertook to make unlawful "telephone solicitation calls."  In SunPath's investigation relating to Plaintiff's claims in this case, SunPath requested information from American Protection, to which American Protection responded by insisting it did not violate any telemarketing laws in association with Plaintiff's claims.[54]   American Protection testified at deposition that it only made calls to potential customers that had requested to be contacted by American Protection, either by providing consent to be called via a website,

---

[54] *See* SunPath Dep. at 73:14 to 74:15 (American Protection represented to SunPath's in house counsel that American Protection did not violate any telemarketing laws that are at issue in this case); *see* SunPath's Discovery Responses at 5-6 (Answer to Interrogatory 6), attached as **Exhibit 15**.

or, as in Plaintiff's case, via first calling in themselves *to* American Protection.[55]  SunPath is not

aware of any complaints involving telemarketing activities of American Protection that occurred

before the calls to Plaintiff, is not aware of any instance in which American Protection was found

to have violated any law involving telemarketing, and has at no point authorized American

Protection to violate any laws involving telemarketing or ratified any conduct by American

Protection that may have violated any telemarketing laws.[56]

Based on this record—when the alleged unlawful calls were made "without the seller's

knowledge or consent"—summary judgment in favor of Plaintiff is improper.  *See Hodgin v.

UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 253 (4th Cir. 2018) (granting summary judgment for

defendants in part because the record showed defendants repudiated any allegedly unlawful acts

by third-party telemarketers); *see also Black*, 2022 U.S. Dist. LEXIS 165799, at *12-13 (granting

---

[55] *See* AP Dep. at 77:17-25 ("Q. Does American Protection ever place telemarketing calls to consumers that it hasn't previously sent a mailer to?  A. We only contact prospects that have requested information about those services . . . we have no interest in just contacting folks that have no interest in our products."); *id.* at 84:15 to 85:4 ("Q. How does American Protection ensure that individuals that it's placing calls to have provided prior express consent?  . . . A. I mean I review to make sure that the proper opting language is present, that our name is clearly stated, that the consumer understands they will receive a call from us, and that it authorizes us, to receive a call . . . within the means we would be using."); *see also id.* at 138:23 to 139:23 (Q. "Is it fair . . . to say that [American Protection's] subcontractors place calls on behalf of American Protection to solicit sales of vehicle service contracts? A. No, we don't . . . We return requests for contacts from potential customers.  We don't just solicit . . . and call.  We have folks that are calling and requesting information, and in some cases, we reach out to people with requested information."); *id*. at 195:25 to 196:20 (American Protection's business practices are only to call people who have "opted-in," meaning they "requested to be contacted from [American Protection], specifically . . . either via online, via a website, or via calling in.").

[56] *See* SunPath's Supplemental Response to Plaintiff's Discovery Requests at 3, attached as **Exhibit 16**; *see also* SunPath Dep. at 81:5-10 ("Q: [D]o you have any knowledge at all of American Protection being accused of telemarketing violations prior to the calls that are at issue in this case that Ruth Smith has filed against SunPath? A: No."); *id*. at 81:19 to 83:3 (SunPath has never directed or authorized American Protection to violate the TCPA, VTPPA, or any other laws governing telemarketing, or ratified any conduct by American Protection that may have violated any laws involving telemarketing.); AP Dep. at 234:16 to 237:5 (same).

SunPath summary judgment because there was no evidence that SunPath had knowledge of and subsequently ratified any allegedly unlawful calling practices of a third party seller).

Plaintiff's contentions that "SunPath approved hundreds of contracts" sold by American Protection and communicated with American Protection "frequently regarding various matters" are incorrect and/or irrelevant. Memo at 15. SunPath's approval of American Protection's sales was related only to whether *the subject vehicle* qualified for coverage. *See* AP Dep. 36:20-37:4. SunPath's approval or rejection of sales was completely unrelated to whether American Protection's sales call was lawful. SunPath's "frequent" communications with American Protection were related existing customer claims, not sales. *Id*. at 27:15-22.

For the foregoing reasons, even if Va. Code § 59.1-514.1's presumption of joint liability could apply to SunPath, the factual record supports via clear and convincing evidence that none of the calls at issue in this case were made on behalf of SunPath, and SunPath has no knowledge of and has not consented to any party making unlawful telemarketing calls. Accordingly, SunPath, not Plaintiff, is the one entitled to summary judgment.

## IV.    CONCLUSION

WHEREFORE, Defendant SunPath requests that this Court deny Plaintiff's Motion for Partial Summary Judgment and grant SunPath's Motion for Summary Judgment.

Dated: January 18, 2023

Respectfully submitted,

SUNPATH, LTD.

By Counsel

/s/ *Joseph P. Bowser*
Joseph P. Bowser (VSB No. 88399)
Carl Taylor Smith (VSB No. 97376)
ROTH JACKSON
1519 Summit Ave., Ste. 102
Richmond, VA 23230
804-441-8701
804-441-8438 (fax)
tsmith@rothjackson.com
jbowser@rothjackson.com

Mitchell N. Roth (VSB No. 35863)
ROTH JACKSON
8200 Greensboro Drive, Suite 820
McLean, VA 22314
(703) 485-3535
(703) 485-3525 (fax)
mroth@rothjackson.com

*Counsel for SunPath, Ltd.*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that I caused Defendant SunPath, Ltd.'s Response in Opposition to Plaintiff's Motion for Partial Summary Judgment to be served upon counsel of record in this case via the U.S. District Court CM/ECF System on January 18, 2023.


                          /s/ *Joseph P. Bowser*
                          Joseph P. Bowser