# EXHIBIT 7

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE EASTERN DISTRICT OF VIRGINIA
 3                     ALEXANDRIA DIVISION
 4   RUTH SMITH, individually and
     on behalf of all others      Case No. 1:22-cv-00081-LMB-WEF
 5   similarly situated,
 6        Plaintiff,
 7   vs.
 8   SUNPATH, LTD, a Massachusetts
     corporation,
 9
          Defendant.
10   _____
11     VIDEOCONFERENCED 30(b)(6) DEPOSITION OF SUNPATH, LTD
                     (through ANDREW GARCIA)
12                      December 8, 2022
     _____
13
     VIDEOCONFERENCED APPEARANCES:
14
     ON BEHALF OF THE PLAINTIFF:
15        PATRICK H. PELUSO, ESQ.
          Woodrow & Peluso, LLC
16        3900 E. Mexico Avenue, Suite 300
          Denver, Colorado  80210
17        Phone: 720-213-0675
          Email: ppeluso@woodrowpeluso.com
18
     ON BEHALF OF THE DEFENDANT:
19        GREGORY CAFFAS, ESQ.
          Roth Jackson Gibbons Condlin
20        8200 Greensboro Drive, Suite 820
          McLean, Virginia  22102
21        Phone:  703-485-3535
          Email:  gcaffas@rothjackson.com
22
     Also Present:  Paul Sporn, Esq.
23
24
25
                                                        Page 1
```

```
 1      Q.  So we're looking at the licensee details
 2  for Chukran Management Group, which is the entity that's a
 3  party to the contract that we just reviewed as Exhibit 3.
 4      A.  Okay.
 5      Q.  Scrolling down, it's kind of split between
 6  the first and second page, but, you know, it says valid
 7  licenses.  The type of license is automobile warranty.
 8  And then it says active appointments, automobile warranty,
 9  and then there's two companies listed there.  One says
10  Wesco Insurance Company, and then the second one says
11  SunPath Ltd Corp d/b/a SunPath Ltd Corp of Delaware.
12          Do you see that?
13      A.  Yep.
14      Q.  Safe to say that that is your company,
15  SunPath?
16      A.  Yes.
17      Q.  Do you have any knowledge of -- of what a
18  licensee appointment in this context means and why SunPath
19  would be listed?
20      A.  Yes.
21      Q.  Can you explain that to me?
22      A.  Because Florida requires that they be
23  appointed to sell there if they want to sell products in
24  Florida.
25      Q.  Okay.  So is it -- is it accurate to say
                                                        Page 30
```

```
 1  that in order to sell SunPath products in Florida, there
 2  has to be a licensee appointment affiliating the entity
 3  with SunPath?
 4          MR. CAFFAS:  I'm going to object to the
 5  extent that it calls for a legal conclusion, object to the
 6  extent it's not relevant, and object to the extent it
 7  calls for speculation.  But, Andrew, you can answer to the
 8  extent you're able to.
 9      A.  Yeah.  I know that they have to get
10  appointed and they need to have a license for Florida, but
11  what that means legally, I have no idea.
12      Q.  (By Mr. Peluso)  Right.  Okay.  Is SunPath
13  involved in the process of being listed as an active
14  appointment with the State of Florida, or is that
15  something that the third party just kind of handles?
16          MR. CAFFAS:  Before you answer, Andrew,
17  I'll also raise the objection of relevance before you
18  answer, but you can answer to the extent you're able to.
19      A.  We confirmed that they obtained the license
20  when they request signup to, you know, get access to our
21  products.
22      Q.  (By Mr. Peluso)  Is there any paperwork
23  that SunPath has to file with the State of Florida in
24  order to get this appointment active?
25          MR. CAFFAS:  Objection again, relevance and
                                                        Page 31
```

```
 1  to the extent it calls for speculation.  You can answer,
 2  Andrew.
 3      A.  Yeah.  Our attorney handles it after we
 4  find out if they have a license.  I don't know the exact
 5  process.
 6      Q.  (By Mr. Peluso)  Okay.  But SunPath is
 7  involved in that appointment process, even if it's just
 8  handled by SunPath's in-house attorney; correct?
 9          MR. CAFFAS:  Objection.  Again, relevance.
10  Objection on the grounds of speculation and on the grounds
11  that it misstates the witness's testimony.  You can answer
12  to the extent you're able to, Andrew.
13      A.  I know we have to get the license from the
14  entity, and I don't know what happens after that.
15      Q.  (By Mr. Peluso)  Would anyone at SunPath
16  know?
17      A.  Our attorney.
18      Q.  Okay.  What is that attorney's name?
19      A.  Paul Sporn.
20      Q.  And then on that "Active Appointment" tab
21  there, you know, next to SunPath, it says there's an issue
22  date of 9/20/2021, and then I guess it expires on
23  9/30/2023.  Do you see that?
24      A.  Yeah.
25      Q.  If we go down to sort of the bottom of that
                                                        Page 32
```

```
 1  page, there's, you know, a tab titled "Inactive
 2  Appointments."  And the second company under the inactive
 3  appointment category is -- is SunPath; correct?
 4      A.  Yep.
 5      Q.  And there, it says that the issue date was
 6  7/13/2017, which expired on 7/31/2021.  Do you have any
 7  knowledge of why the appointment would have expired at the
 8  end of July 2021, only to be reactivated sometime in
 9  September 2021?
10      A.  No.  I see lots of expirations there.
11      Q.  Right.  Right.  I understand.  I'm just
12  only asking about SunPath.  As you see, it sort of expired
13  and then the one that's listed as active picked back up
14  seven weeks after that.
15      A.  I see a whole bunch expired.  I have no
16  idea.  It's probably just a Florida standard.  I have no
17  idea.
18      Q.  Right.  Okay.  Was there ever a gap in the
19  relationship between American Protection and SunPath?
20  Stated another way, did -- did the relationship between
21  SunPath and American Protection continue during the period
22  of 7/31/2021 and 9/20/2021?
23          MR. CAFFAS:  Objection.  Vague.  Objection,
24  as well, to the extent it calls for a legal conclusion and
25  speculation.  You can answer, Andrew.
                                                        Page 33
```

1    A. I'm not aware.
2    Q. (By Mr. Peluso) Is there anyone at SunPath
3 that would be aware, do you think?
4    A. It would have to be looked into. They're a
5 very small account. I don't know when exactly they used
6 us and didn't.
7    Q. Okay. So are you aware of any sort of gaps
8 or terminations in the relationship between SunPath and
9 American Protection?
10    A. Any gaps or term -- I'm not aware of any
11 terminations until recently, but I'm not -- I'm not aware
12 of when they would have, you know, utilized our products
13 or not.
14    Q. Okay. You said you're not aware of any
15 terminations until recently. Has there been a recent
16 termination of the relationship?
17    A. We don't -- we don't work with them
18 anymore.
19    Q. When did that happen?
20    A. I think in -- probably around March or
21 April of this year.
22    Q. Okay. All right. I'm going to go back to
23 the document that you labeled Exhibit 1. Just for your
24 recollection, this is the -- the deposition notice --
25 excuse me -- that has the list of topics. I would just

Page 34

1 like to go through these topics with you.
2    Topic 1 says, "All telephone calls you or
3 any third party acting on your behalf caused to be made to
4 plaintiff."
5    Did SunPath place any calls to plaintiff?
6    A. No. We don't -- we don't make any phone
7 calls unless it's for people who have called us about
8 claims.
9    Q. Right. That's my understanding, as well.
10 So SunPath does not do outbound telemarketing itself;
11 correct?
12    A. No. Nobody makes calls on our behalf,
13 either.
14    Q. Okay. I think we could disagree on that,
15 but --
16    MR. CAFFAS: Objection to form.
17    Q. (By Mr. Peluso) Any legal conclusions
18 about "on behalf of" are not really what I'm asking about.
19    So safe to say SunPath doesn't make
20 telemarketing calls? Any calls that it would make would
21 just be sort of direct calls with its customers if someone
22 calls in with an issue about a claim or something like
23 that?
24    A. Yes. And no one makes calls for us,
25 either. On behalf.

Page 35

1    Q. Okay. 2 says, "Your complete relationship
2 with American Protection, including all contracts,
3 agreements, leads, and communications sent and received
4 by" -- it says "by between you and American Protection
5 regarding any marketing or other services performed by
6 American Protection or its agents on your behalf."
7    Let's just kind of break that up. We've
8 already reviewed the contract from June of 2017 between
9 SunPath and American Protection. Are there any other
10 contracts or agreements between the two parties?
11    A. No. Not that I'm aware of.
12    Q. Okay. That response not that you're aware
13 of, have you looked into whether there are other contracts
14 or agreements?
15    A. No. Because there wouldn't be any. I
16 mean, that's our only agreement that we have with any
17 independent contractor.
18    Q. Okay. So you're comfortable saying that
19 the 2017 agreement, that's the only contract?
20    A. Yes.
21    Q. Okay. Now, can you, in your own words,
22 describe SunPath's relationship with American Protection?
23    A. That's the document.
24    Q. Right. So I understand there's a Call
25 Center Marketing Agreement, and, you know, the document

Page 36

1 speaks for itself. But under that agreement, is it fair
2 to say that American Protection is authorized to market
3 and sell SunPath products?
4    MR. CAFFAS: I'm going to object on the
5 grounds of speculation, calling for a legal conclusion,
6 and asked and answered to the extent it relates to the
7 last question, but you can answer, Andrew.
8    A. Yeah. The only agreement we have with them
9 is what's outlined in the agreement.
10    Q. (By Mr. Peluso) Okay. What sort of
11 contracts -- excuse me.
12    What sort of products does SunPath offer
13 that American Protection is authorized to market?
14    A. Service contracts.
15    Q. Service contracts.
16    A. Vehicle service contracts.
17    Q. Vehicle service contracts. Okay. Car
18 warranties, in layman's terms; right?
19    A. Yeah. You're not supposed to use the word
20 "warranty."
21    Q. Okay. What -- what sort of additional
22 detail or explanation can you provide to me about what
23 those service contracts are? You know, if someone buys
24 one, what are they buying?
25    A. It outlines the terms under which we pay

Page 37

10 (Pages 34 - 37)

**Page 46**

1  Q. (By Mr. Peluso) So, you know, the --
2  that's the "on behalf of" thing again. I understand that,
3  you know, that's sort of a legal conclusion that we don't
4  need to sort of argue over. But do you dispute -- do you
5  dispute that American Protection made phone calls in an
6  effort to sell your product?
7      MR. CAFFAS: I'll object to the form of the
8  question to the extent that it calls for a legal
9  conclusion, but you can answer.
10     A. I honestly don't know what they did,
11 whether they were inbound calls, outbound calls. They
12 need to adhere by the law. That's in the Standards of
13 Conduct. And we have nothing to do with, you know, how
14 they operate. They're expected to operate legally, within
15 the bounds of the law and the TCPA or any other rules that
16 exist.
17     Q. (By Mr. Peluso) Does SunPath take any
18 steps to ensure that they are doing so, or is it simply
19 sending the Standards of Conduct? Are there any
20 procedures to ensure --
21     A. If we get --
22     Q. -- compliance?
23     A. If we get a complaint, we will look into
24 the complaint if we're able to. But other than that, no.
25     Q. When you say "complaint," what do you mean

**Page 47**

1  by that?
2      A. If a customer were to call us and complain
3  that they think they're getting illegal calls or something
4  like that, we would try to help them out and figure out,
5  you know, what's wrong, but that's it. We have our policy
6  that they need to operate within the bounds of the law.
7  That's the Standards of Conduct.
8      Q. Okay. So just to close the loop, other
9  than the Standards of Conduct, SunPath doesn't have any
10 other practices, policies, or procedures that have been
11 implemented to ensure compliance with the TCPA or the
12 VTPPA, other than the Standards of Conduct and, you know,
13 responding to a consumer calling in with a complaint?
14     MR. CAFFAS: Objection to the extent that
15 question is vague. Object to the form of the question.
16 Misstates the witness's testimony so far and calls for
17 improper legal conclusions. Andrew, if you can answer, do
18 so.
19     A. That's all, I mean, I've said, that took
20 place.
21     Q. (By Mr. Peluso) Okay. The next topic
22 here, the dialing equipment used to place any telephone
23 call to plaintiff's cellular telephone number, this will
24 probably be a quick one.
25     Did SunPath place any telephone calls to

**Page 48**

1  plaintiff's telephone number?
2      A. No.
3      Q. Does SunPath have any dialing equipment?
4      A. No.
5      Q. "Any prior express consent that was
6  obtained for you, American Protection, or anyone acting on
7  your behalf to place telephone calls to plaintiff or to
8  any other person, including the complete consent language
9  used."
10     Let's just start with the plaintiff Ruth
11 Smith. Are you aware of any prior express consent
12 obtained --
13     MR. CAFFAS: I will -- sorry. I'll let you
14 finish.
15     Q. (By Mr. Caffas) Sorry. I lost my train of
16 thought. Are you aware of any prior express consent
17 obtained by SunPath that would have given permission to
18 place telephone calls to plaintiff?
19     MR. CAFFAS: Objection to the extent that
20 that term "prior express consent" hasn't been defined.
21 Calls for a legal conclusion and form of the question.
22 Vague. You can answer if you're able to, Andrew.
23     A. Okay. We don't make any calls, so we
24 wouldn't have any prior consent to call. I would expect
25 that if American Protection had called, which I don't know

**Page 49**

1  if they did or not, that they would have prior consent and
2  be operating within the bounds of the law.
3      Q. (By Mr. Peluso) But does SunPath have any
4  knowledge of whether American Protection actually had that
5  prior express consent, or is it just an assumption on your
6  part?
7      MR. CAFFAS: Objection. Calls for
8  speculation and an improper legal conclusion. Andrew, you
9  can answer.
10     A. I don't know.
11     Q. (By Mr. Peluso) You don't know. So you're
12 just making assumptions is what I'm saying? You don't
13 have any specific knowledge about whether --
14     A. Well, I'm not making an assumption. We
15 wouldn't have any prior consent because we don't make any
16 phone calls and no one makes them on our behalf. I would
17 assume if they called someone, then they have consent if
18 they needed it.
19     Q. Right. Again, so I understood your
20 testimony that SunPath does not place telemarketing calls.
21 The second half, though, where you said you're assuming
22 that American Protection would have obtained whatever they
23 needed to obtain, I'm wondering if SunPath has actual
24 knowledge that they did that, or is it just you're making
25 assumptions?

**Page 50**

1  MR. CAFFAS: Objection.
2  A. They assigned --
3  MR. CAFFAS: Andrew -- Andrew, before you
4  answer, I want to object. I'll object to that -- to the
5  form of the question. We're bordering on harassment at
6  this point. It's been asked and answered, calls for
7  speculation and a legal conclusion. Andrew, you can
8  answer.
9  A. They signed our agreement and said they are
10 operating legally, so based on that, I assume they had
11 consent.
12  Q. (By Mr. Peluso) You assume. Okay. Did
13 SunPath conduct any investigations to see if American
14 Protection had consent?
15  A. No. I'm not aware of any investigation. I
16 don't know why we would need to have an investigation.
17  Q. Okay. Okay. I think we can move on.
18  The next topic says, "The identities of all
19 persons, and the total number of such persons, who you or
20 American Protection called using the same dialing
21 equipment that was used to call plaintiff where prior
22 express consent to call the person was obtained in the
23 same manner as consent was obtained to call plaintiff."
24  Now, I understand from prior testimony
25 that, you know, SunPath didn't directly call plaintiff,

**Page 51**

1  doesn't have any dialing equipment, doesn't have any prior
2  express consent. So is it correct to say that you don't
3  know the identities of any persons who check all these
4  boxes?
5  MR. CAFFAS: I'm going to object to the
6  extent you're misstating the witness's prior testimony and
7  maybe calling for speculation. Andrew, you can answer.
8  A. As I said, we would -- yeah. This question
9  is just like the others. We don't call people. We
10 wouldn't know who the people are. Yeah.
11  (Reporter dropped internet connection.)
12  (Recess taken, 12:19 p.m. to 12:27 p.m.)
13  Q. (By Mr. Peluso) All right. So we're back
14 on the record. We kind of -- just for the sake of the
15 transcript, we lost the court reporter to an internet
16 issue for -- for a few minutes there, but we're back on.
17 So I want to sort of pick up where we left off, which was
18 on this Topic 8.
19  Perhaps it would be helpful to -- to break
20 this down to make sure that I understand your testimony.
21  So if we're just focusing on SunPath, my
22 understanding of your prior testimony is that SunPath does
23 not make direct outbound telemarketing calls to anyone,
24 including the plaintiff Ruth Smith; is that right?
25  A. Not quite. We don't make any outbound

**Page 52**

1  direct or indirect or have anyone make on our behalf phone
2  calls.
3  Q. Understood. But I'm trying to break this
4  down. So I'm not asking about indirect or on behalf of.
5  A. You said direct.
6  Q. Correct. That's all I was asking about.
7  So let's just take it one step at a time, so it's clear.
8  SunPath's testimony is it doesn't make any direct outbound
9  telemarketing calls to plaintiff or to anyone else?
10  A. Correct.
11  Q. Okay. Because it doesn't make any direct
12 outbound telemarketing calls, it, of course, didn't use
13 any dialing equipment to make these nonexistent calls;
14 right? Do you agree with that statement?
15  A. Yeah. Yeah.
16  Q. Okay. And because it doesn't make direct
17 outbound telemarketing calls, it doesn't try to obtain
18 prior express consent to obtain calls that it doesn't
19 make; right?
20  A. Right.
21  Q. Okay. That's established. The next sort
22 of prong of this is with this third party American
23 Protection. Correct me if I'm wrong, but I believe your
24 prior testimony was that SunPath doesn't have knowledge of
25 any outbound telemarketing calls that may have been placed

**Page 53**

1  by American Protection; is that accurate?
2  MR. CAFFAS: Objection. It misstates
3  Mr. Garcia's testimony, but you can answer to the extent
4  you're able to, Andrew.
5  A. Yes. We don't have any knowledge of any
6  calls they made.
7  Q. (By Mr. Peluso) Okay. So then, if I'm
8  asking you for the identities of persons and the total
9  number of persons who American Protection called using the
10 same dialing equipment that was used to call the
11 plaintiff, is SunPath's answer we don't know because, as
12 you just said, we don't have knowledge of their
13 telemarketing activities? I mean, is that fair?
14  A. We don't have any knowledge of --
15  MR. CAFFAS: Hold on, Andrew, before you
16 answer. I'll object to the form of the question in that
17 it is vague and it calls for a legal conclusion and calls
18 for speculation. But you can answer.
19  A. We don't have any knowledge of any calls
20 they made or if they even called the plaintiff or what
21 they used to call.
22  Q. (By Mr. Peluso) Got it. So, therefore,
23 you're not aware of any identities or the total number of
24 such persons who ostensibly were called; right?
25  A. Correct.

**Page 54**

1  Q. Okay. We're on the same page there.
2 Understanding that your testimony is that SunPath is not
3 aware of American Protection's telemarketing activities,
4 is SunPath aware of the identities of persons who were
5 sold SunPath products by American Protection?
6  A. Yes. We have -- we know who has a
7 contract -- if they purchased a contract because we have
8 to administer it.
9  Q. Okay. Understood. Fair. That ended up a
10 lot smoother on the second go-around once we got the court
11 reporter back.
12   So Topic 9 says, "The dates, times, and
13 total number of all calls you or American Protection made
14 to each such person identified in response to Topic 8."
15   Is SunPath aware of any dates, times, or
16 total number of calls American Protection placed to
17 plaintiff or other persons during the relevant time
18 period?
19   MR. CAFFAS: Objection to the form. The
20 question is vague. It calls for speculation. You can
21 answer, Andrew.
22  A. It's the same answer as the last question.
23 I wouldn't have any idea who they made calls to or when
24 they were or anything else about them.
25  Q. (By Mr. Peluso) Okay. Topic 10 is going

**Page 55**

1 to be the same answer, so we can just skip that.
2   Topic 11, though, asks about any internal
3 do not call lists or policy regarding any such list that
4 SunPath or a third party acting on your behalf implemented
5 or considered implementing. Let's just stop there.
6   Does SunPath have an internal do not call
7 list?
8  A. We don't make any calls, so we don't have
9 an internal do not call list.
10  Q. Okay.
11  A. We don't have anyone calling on our behalf.
12  Q. Okay. So SunPath does not have an internal
13 do not call list. Does SunPath have or manage an internal
14 do not call list on behalf of any third parties?
15   MR. CAFFAS: Objection.
16  A. No.
17   MR. CAFFAS: Vague. Calls for a legal
18 conclusion.
19  Q. (By Mr. Peluso) You can answer if you
20 understand the question, Mr. Garcia.
21  A. We don't -- we don't have an internal do
22 not call list. We don't manage internal do not call lists
23 for anyone else.
24  Q. Okay. Has SunPath ever conducted any
25 training regarding an internal do not call list?

**Page 56**

1  A. That seems like the same question. We
2 don't -- we don't do training and we don't have an
3 internal do not call list.
4  Q. Has SunPath ever encouraged or required any
5 third party to conduct training regarding an internal do
6 not call list?
7   MR. CAFFAS: Objection to the form. Vague.
8 And I believe it's asked and answered. But you can answer
9 it, Andrew.
10  A. We don't have an internal do not call list
11 and we haven't had anyone train on a do not call list and
12 we don't make any calls --
13  Q. (By Mr. Peluso) Let me just ask -- pardon
14 me. I broke my rule and spoke over you and I'm sorry.
15   Let's just focus on American Protection,
16 this third party that we've discussed during this
17 deposition. Has SunPath ever conducted any training to
18 American Protection regarding an internal do not call
19 list?
20  A. No. We don't have an internal do not call
21 list.
22  Q. Okay. Has SunPath ever encouraged American
23 Protection to implement its own internal do not call list?
24  A. No.
25  Q. Okay. For Topic 12 -- I don't want to keep

**Page 57**

1 going over the same ground. Regarding the customers that
2 American Protection successfully sold a SunPath product
3 to, which you testified that you're -- you're aware of
4 those identities because SunPath had to administer the
5 contracts, are you aware of any such persons that reside
6 in the State of Virginia?
7   MR. CAFFAS: Objection. Calls for
8 speculation.
9  A. I don't know offhand if any of the people
10 who purchased contracts are in the State of Virginia or
11 not.
12  Q. (By Mr. Peluso) Would the contract --
13 sorry. Scratch that.
14   So would the contracts that were sold by
15 American Protection have the address of the customer on
16 the contract?
17  A. Yes.
18  Q. Okay. Would it be possible for SunPath to
19 review those contracts to see if any of the addresses that
20 appear on the contract are Virginia addresses?
21  A. Yes.
22  Q. Do the contracts contain the customers'
23 telephone number?
24  A. Usually. They don't always. It depends if
25 it gets entered onto the contract.

**Page 66**

1 you -- you asked the question specifically with regard to
2 American Protection?
3        MR. PELUSO:  I did.
4    A.  Okay.  Well, 18 says people calling on your
5 behalf.  Nobody calls on our behalf.  And the receipt of
6 complaints regarding American Protection -- receipt of
7 complaints.  Complaints from consumers or people who
8 bought contracts?
9    Q.  (By Mr. Peluso)  That's what I'm asking
10 about, yes.  Has SunPath --
11    A.  I'm not -- I'm not personally aware of
12 complaints that we've gotten about -- from purchasers of
13 American Protection, no.  But -- there may have been some.
14    Q.  When a consumer contacts SunPath with a
15 complaint about the conduct of a third party, are those
16 complaints logged by SunPath?
17    A.  That would depend on the complaint.  So if
18 somebody calls up and says they don't think their claim
19 was fixed right or something like that, I mean -- I mean,
20 I don't -- I don't know.  If someone were to complain and
21 say, you know, these guys called me, can you have them
22 stop, that would be referred to our attorney and our
23 attorney would look into it.
24        But I'm not -- I'm personally not aware
25 that we've received complaints regarding American

**Page 67**

1 Protection.
2    Q.  Okay.
3    A.  It doesn't mean we didn't get any, but I'm
4 not aware of any.
5    Q.  And that's -- that's why I'm asking if the
6 complaints would be logged in any way.  I understand
7 you're saying you're not aware of any.  I'm just wondering
8 if there would be records of the complaints that SunPath
9 would have.
10    A.  If it was someone who was very upset and,
11 you know -- this is the case with anything:  Our customer
12 service people, our claims people would transfer them to
13 Paul and he would log it.
14    Q.  Okay.  Is there anyone other than Paul who
15 would be involved in that process?
16    A.  No.
17    Q.  Okay.  Is Paul the only attorney that works
18 in-house for SunPath?
19    A.  Yes.
20    Q.  Okay.  So Topic 19, are there -- let me ask
21 this another way.  Let's start with just American
22 Protection.  Has SunPath ever provided call scripts,
23 marketing materials, or marketing guidelines to American
24 Protection?
25    A.  No.

**Page 68**

1    Q.  Has it ever provided call scripts,
2 marketing materials, or marketing guidelines to any other
3 third party?
4        MR. CAFFAS:  Objection.  Relevance.  You
5 can answer.
6    Q.  (By Mr. Peluso)  I think you may have
7 answered no, but I'm not sure if the reporter caught that.
8    A.  We don't provide any of those things.
9 That's not the business we're in.
10    Q.  Okay.  Topic 20, we'll stick again just
11 with American Protection.  Has SunPath ever conducted
12 audits or periodic reviews of American Protection?
13    A.  No.
14    Q.  No.  Has SunPath ever conducted any
15 oversight of American Protection's marketing behavior or
16 practices?
17        MR. CAFFAS:  I'll object to the form of the
18 question.  It's vague.  You may answer, Andrew.
19    A.  No.
20    Q.  (By Mr. Peluso)  All right.  I know you're
21 trying to get out of here in 3 minutes.  I'm actually
22 almost done.
23    A.  Yeah.  I have to get off like soon.  Yeah.
24    Q.  Yeah.  I know.  I know.  We're really
25 almost done.  I'm not going to ask any more questions once

**Page 69**

1 we get through these topics.  Is it okay if we proceed?
2        THE DEPONENT:  I've got to be off at
3 exactly 1:00.  I can get back on probably at 12:40, but I
4 have to be off at 1.
5        MR. CAFFAS:  And Pat, I have -- I have
6 redirect, as well.  So would it be helpful --
7        MR. PELUSO:  That's fine.  Yeah.  We can
8 just break here.  What time do you think you can be back,
9 Andrew?  I just want to make sure I'm clear on that.
10        THE DEPONENT:  To be safe, 12:45 -- 1:45.
11        MR. PELUSO:  Right.  I was going --
12        THE DEPONENT:  1:45 East Coast.  I think
13 you guys are somewhere else.
14        MR. PELUSO:  Okay.  All right.  So we'll
15 break and then we'll hop back on at 1:45 Eastern.
16        THE DEPONENT:  Okay.
17        (Recess taken, 12:58 p.m. to 1:47 p.m.)
18    Q.  (By Mr. Peluso)  Okay.  All right.  We're
19 back on the record.  Are you able to see my -- my screen?
20 Is it still sharing?
21    A.  Yes.
22    Q.  Okay.  So, you know, just to sort of
23 refocus, we're on Exhibit 1, the Rule 30(b)(6) deposition
24 notice.  There's just a few more topics here that I kind
25 of want to address with you and then we'll -- we'll turn

**Page 70**

1  it over for Greg's -- Greg's redirect.
2       I think we left off the Topic 20, which
3  says, "Any oversight, audits, or periodic reviews of
4  American Protection or any third party that places calls
5  on your behalf or for your benefit during the relevant
6  time period."
7       To some extent, this is ground that we've
8  covered, but does SunPath conduct any oversight of
9  telemarketing practices of American Protection?
10      A.  Okay.  Well, nobody places calls on our
11  behalf, I'll say again.  And as far as oversight audits
12  and periodic reviews of American Protection, no.  We just
13  look into problems we think -- if there's a problem that
14  needs to be addressed.
15      Q.  What sort of problems would those be?
16      A.  If we had a customer -- if we had a
17  customer complaint, we would look into the customer
18  complaint.
19      Q.  Got it.  Got it.  But other than that, no
20  periodic reviews or anything like that?
21      A.  No.
22      Q.  Okay.  I think, really, the last topic I
23  want to -- sorry.  My phone is going off here.  My
24  apologies.
25      The last topic I kind of want to discuss

**Page 71**

1  with you about is Topic 24 here, that says, "Your sources
2  of revenue, including the portion of your revenue that is
3  generated from sales made by third parties acting on your
4  behalf."
5       So just, you know, to sort of -- to frame
6  this a little bit, I'm not asking you to disclose
7  SunPath's total revenue; right?  Give me a number.  I'm
8  not asking that.  And I -- I understand sort of your
9  consistent statement through this deposition that third
10  parties don't act on your behalf.  So let's sort of
11  reframe this to -- a way that I think everyone can agree.
12      I'm interested in understanding the portion
13  of SunPath's revenue that is generated from sales made by
14  third parties who sell SunPath's service contracts.
15      Is that 100 percent of SunPath's revenue?
16  Is it 10 percent?  What sort of chunk of its revenue do
17  you think is generated by third-party sales?
18      A.  100 percent of our revenue is from third
19  parties because we don't do any selling.
20      MR. PELUSO:  Okay.  Easy enough.  I don't
21  really have anything else.  I'll turn it over to Greg.
22      EXAMINATION
23  BY MR. CAFFAS:
24      Q.  Great.  First things first.  I just want to
25  address that last line of questioning that Pat just

**Page 72**

1  addressed with regard to Topic Number 24.
2       Andrew, you said that 100 percent of the
3  revenue is -- is due to sales by third parties because
4  SunPath doesn't sell; right?
5       A.  Yes.
6       Q.  Is SunPath able to discern what portion any
7  percent of that revenue is generated through any specific
8  type of marketing?
9       A.  The specific type of marketing?  No.
10      Q.  Like, for example, you wouldn't be able to
11  tell what proportion is done through direct calls versus
12  online sales or sales generated through a third party's
13  use of mailings, documents?
14      A.  Correct.  We don't know what type of
15  marketing a third party uses.
16      Q.  Okay.  As a proportion of the total revenue
17  that SunPath would generate through third-party sales, do
18  you have any idea what American Protection specifically
19  would be responsible for?
20      A.  It would be very small.  I don't know what
21  percentage, but it would be very small.
22      Q.  So would it be accurate to say that you
23  don't rely in any large part on American Protection's
24  sales of SunPath products?
25      A.  No.  Not at all.

**Page 73**

1       Q.  It is not essential to SunPath's business,
2  American Protection sales?
3       A.  Not at all.
4       Q.  Andrew, I want to clarify your testimony
5  regarding earlier in the deposition, when you discussed
6  the documents you reviewed in preparation for the
7  deposition.
8       In the process of preparing for this
9  deposition, did you also review relevant pleadings filed
10  in this case including, for example, the complaint, as
11  well as documents produced by American Protection in
12  response to subpoenas in this case?
13      A.  Yes.
14      Q.  And also, when asked if SunPath
15  communicated with any third parties regarding this case, I
16  believe there may have been some confusion regarding who
17  plaintiff's counsel was referring to when it said "third
18  party."
19      Did anyone at SunPath contact American
20  Protection regarding the claims at issue in this case?
21      A.  Paul.
22      Q.  And was that disclosed in the documents
23  that SunPath produced in response to plaintiff's discovery
24  requests in this case?
25      A.  Yes.  I believe so.

1  Q.  And when you say "Paul," I assume you're
2  referring to Paul Sporn?
3  A.  Paul Sporn, our attorney.
4  Q.  And are you aware of whether he was able to
5  contact American Protection and receive any response about
6  the claims in this case?
7  A.  Yes.  He spoke to them.
8  Q.  And in any of the communications that
9  SunPath specifically, through Paul, had with American
10 Protection, are you aware of whether American Protection
11 represented that it violated any of the telemarketing laws
12 that are at issue in this case?
13 A.  No.  They said they didn't.
14 Q.  I'm sorry.  When you say they didn't --
15 A.  They didn't violate any laws.
16 Q.  As part of the preparation for today's
17 deposition, did you review the deposition transcript for
18 the deposition that was conducted with American Protection
19 in connection with this case?
20 A.  Yes.
21 Q.  I'm going to share my screen here.  Sorry.
22 My -- okay.  Can you see on my screen what I have here
23 that's --
24 A.  Yes.
25 Q.  -- the cover page of Mr. Chukran's

Page 74

1  deposition as a representative for American Protection?
2  A.  Yes.
3  Q.  And do you recognize this as the transcript
4  that you reviewed?
5  A.  Yes.
6  Q.  And I'll represent that this is just an
7  excerpt of Mr. Chukran's deposition, and I will scroll to
8  testimony that he provided on page 222.
9      Okay.  You'll see here it starts at line
10 20 -- the question that I'm referring to -- the question
11 posed to Mr. Chukran was:
12     "Did SunPath provide any kind of training
13 to American Protection?
14     "Answer:  Any kind of what?"
15     It was clarified "training" in line 23.
16     And you'll see on line 24, Mr. Chukran
17 answered, "Just in terms of product training."
18     Do you see that?
19 A.  Yes.
20 Q.  Do you have any idea what Mr. Chukran would
21 have been referring to when he referenced "product
22 training"?
23 A.  He would be referring to getting education
24 on what our products are.  I really wouldn't call it
25 training.  I would call it education.  So we explain to

Page 75

1  people what our products are and how they work.
2  Q.  And -- but as part of that product
3  education, would SunPath ever provide American Protection
4  with any kind of instruction as to how to market or sell
5  that product at all?
6  A.  No.
7  Q.  To your knowledge, would SunPath have any
8  knowledge of any subcontractor that American Protection
9  would have hired in order to market or sell any product?
10 A.  No.
11 Q.  Okay.  I'd like to now direct you to the
12 bottom of page 223 of Mr. Chukran's deposition testimony
13 where it -- where it states at page -- at line 24, it
14 says:
15     "On occasion, some companies would offer
16 training that could be done, for example, via Zoom, and
17 that would include some subcontractors attending those
18 trainings."
19     Do you ever know of an -- are you aware of
20 any instance in which SunPath would have provided any Zoom
21 training of any type to any subcontractor of American
22 Protection?
23 A.  No.
24 Q.  I'd like to now direct you to line 6 of
25 page 224 of Mr. Chukran's deposition, where he says,

Page 76

1  "Possibly."  And that is in the context of whether or not
2  American Protection's subcontractors may have received
3  training.  And then he continues:
4      "I'm not sure of an exact -- I don't have a
5  time.  I don't know exactly, but SunPath does have a sales
6  representative.  His name's Brian.  It is my understanding
7  his job is to provide training."
8      Are you aware of an employee of SunPath
9  named Brian that Mr. Chukran --
10 A.  Yes.
11 Q.  -- is referring to?
12 A.  Yes.
13 Q.  And who is Brian that Mr. Chukran is
14 referring to?
15 A.  Brian is our account rep, so when, you
16 know, an independent company has a question about our
17 product or something, they can call Brian.  If they have
18 an issue that they think a customer is upset over a claim
19 or something, they can call Brian.
20     He's just an account rep that people
21 contact and he would educate people, he would tell them
22 about our products and that's it.  He doesn't provide any
23 kind of training, other than telling people about how our
24 products work.
25 Q.  Okay.  So would it be accurate to say that

Page 77

20 (Pages 74 - 77)

**Page 78**

1 he never conducted training sessions of any kind for any
2 third party authorized to sell --
3    A.  No.  He does not provide training ever.
4    Q.  And would that be accurate then to also say
5 that he didn't provide -- "he" being Brian in this case or
6 anyone else at SunPath -- did not provide any kind of
7 training or instruction on how to market or sell any
8 SunPath product in any way to a third party authorized to
9 market or sell SunPath's product?
10    A.  Yes.  That's accurate.  Brian doesn't do
11 any training.
12    Q.  Do you have any idea why Mr. Chukran would
13 have testified to that?
14    A.  No.  I mean, he may have had other
15 companies provide training, but Brian didn't do it.  I
16 mean, I don't -- I have no idea what someone provided to
17 them, but it wasn't SunPath or Brian.
18    Q.  Okay.  I'd like you now to look at line 15
19 of page 224 of Mr. Chukran's deposition testimony where
20 the question was asked:
21       "And you said already, though, that if it
22 was any kind of training, it would just be as to what
23 SunPath's products are."
24       To which Mr. Chukran responded:
25       "In some cases, they would offer -- and,

**Page 79**

1 again, I -- I don't have specific incidents, but just in
2 terms of industry, sometimes they would offer some
3 incentives of the highest sales for the month, for
4 example.  They would offer some kind of cash incentive."
5       To your knowledge, Andrew, was there ever
6 any incentives SunPath offered based on monthly sales or a
7 cash incentive to any third-party marketer or seller of
8 SunPath's products?
9    A.  No.  We have never offered them or anyone
10 else a cash incentive to sell products, no.
11    Q.  Okay.  And specifically, with regard to
12 American Protection, would it also be accurate that there
13 was no kind of any cash or monthly incentive for the
14 volume of SunPath's products?
15    A.  Correct.  We never offered American
16 Protection any type of incentive or anything else.
17    Q.  Andrew, did SunPath ever in any way
18 restrict American Protection's ability to offer other
19 companies' products at the same time American, for
20 example, was authorized to sell SunPath's products?
21    A.  Did we restrict what?
22    Q.  Was -- for example, did the agreement that
23 SunPath has with American Protection or any third party
24 restrict those parties from offering other companies'
25 products?  For example, SunPath's competitors' products?

**Page 80**

1    A.  No.  No.  They -- they all offer other
2 products.
3    Q.  So, to your understanding, American, for
4 example, would have been authorized to offer SunPath's
5 competitors' products alongside SunPath's products to any
6 consumer they contacted?
7    A.  Yes.  That's up to them.  We have nothing
8 to do with it.
9    Q.  And to your knowledge, did American
10 Protection offer other companies' products at the same
11 time it was authorized to sell SunPath's products?
12    A.  I believe so, but I don't know for sure
13 because I don't know what they sell.
14    Q.  You mentioned there may have been one other
15 complaint involving American Protection besides the
16 complaint in this lawsuit.
17       Do you recall, in that other case, whether
18 or not SunPath or American Protection were found to be
19 liable for violating any telemarketing laws?
20    A.  We haven't been liable for anything, and to
21 my knowledge, they haven't been, either, but -- that's my
22 understanding.
23    Q.  And to your knowledge, regarding the other
24 complaint or case you referred to involving American
25 Protection, were the telemarketing calls that were the

**Page 81**

1 subject of that case or complaint prior to or after the
2 calls at issue in the present lawsuit?
3    A.  I believe they were after, but I would have
4 to check.
5    Q.  To the best of your knowledge, do you have
6 any knowledge at all of American Protection being accused
7 of telemarketing violations prior to the calls that are at
8 issue in this case that Ruth Smith has filed against
9 SunPath?
10    A.  No.
11    Q.  Do you recall reviewing and verifying the
12 contents of the written discovery responses that SunPath
13 provided in this case?
14    A.  Yes.
15    Q.  And were those responses accurate to the
16 best of your knowledge based on the information you had
17 available?
18    A.  Yes.
19    Q.  Andrew, if you'll recall, the agreement
20 between SunPath and American Protection that you reviewed
21 earlier today, is it your understanding that pursuant to
22 the terms of that agreement, American Protection agreed to
23 obey all applicable laws that are the subject of any
24 marketing that it undertook?
25    A.  Yes.  Yes, I did.

21 (Pages 78 - 81)

```
 1      Q.  Has SunPath ever directed American
 2  Protection or any other third-party authorized sellers of
 3  SunPath's product to violate the Telephone Consumer
 4  Protection Act?
 5      A.  No.
 6      Q.  Has SunPath ever directed American
 7  Protection or any other third party authorized to sell or
 8  market SunPath's product to violate the Virginia Telephone
 9  Privacy Protection Act?
10      A.  No.
11      Q.  Has SunPath ever directed American
12  Protection to violate any telemarketing laws?
13      A.  No.
14      Q.  Has SunPath ever authorized American
15  Protection to operate outside of the bounds of the
16  agreement between the parties?
17      A.  No.
18      Q.  Is SunPath aware at all that American
19  Protection has at any time violated any telemarketing
20  laws?
21      A.  No.
22      Q.  Has SunPath ever intentionally violated the
23  Virginia Telephone Privacy Protection Act?
24      A.  No.
25      Q.  Has SunPath ever caused another party to
```
Page 82

```
 1  call Ruth Smith or any other person in violation of any
 2  law governing telemarketing?
 3      A.  No.
 4          MR. CAFFAS:  I think that's all I have for
 5  the moment.  If you wouldn't mind, Pat, I'd like to take a
 6  5-minute recess just to review my notes and make sure I
 7  haven't missed anything.  But, otherwise, I think that's
 8  all I have for now.
 9          MR. PELUSO:  Yeah.  Sure.  No problem.
10          MR. CAFFAS:  Let's go off the record.
11  Again, I'll just take 5 minutes.
12          MR. PELUSO:  All right.
13          (Recess taken, 1:11 p.m. to 1:13 p.m.)
14          MR. CAFFAS:  I do not have any other
15  questions.  So we're back on the record.  I'll turn it
16  back over to you, Pat, if you have any additional
17  questions, but I'm finished.
18          MR. PELUSO:  That will be it for me, too.
19          THE COURT REPORTER:  And do you want a copy
20  of the deposition, Greg?
21          MR. CAFFAS:  Yes, I would like a copy of
22  the deposition.  I would say by Monday, if possible.
23          THE COURT REPORTER:  Will you handle
24  signature for me?
25          MR. CAFFAS:  Yes.
```
Page 83

```
 1          THE COURT REPORTER:  Is there a trial date
 2  I need to be aware of?
 3          MR. PELUSO:  No trial date.
 4          (Exhibit 5 was marked.)
 5              * * * * * * * * * *
 6          (WHEREUPON, the foregoing deposition was
 7  concluded at the hour of 12:14 p.m.  Total time on the
 8  record was 2 hours, 15 minutes.)
```
Page 84

```
 1      I, ANDREW GARCIA, the deponent in the above
 2  deposition, do hereby acknowledge that I have read the
 3  foregoing transcript of my testimony, and state under oath
 4  that it, together with any attached Amendment to
 5  Deposition pages, constitutes my sworn testimony.
 6
 7  _____ I have made changes to my deposition
 8  _____ I have NOT made any changes to my deposition
 9
10
11              _____
                     ANDREW GARCIA
12
13
14
15      Subscribed and sworn to before me this _____
        day of _____, 20____.
16
        My commission expires: _____.
17
18
                     _____
19                        NOTARY PUBLIC
```
Page 85

22 (Pages 82 - 85)

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2    STATE OF COLORADO              )
 3    CITY AND COUNTY OF DENVER      )
 4           I, Bonnie Carpenter Johnshoy, a Registered
 5    Professional Reporter, commissioned to administer oaths,
 6    do hereby certify that previous to the commencement of
 7    the examination, the witness was duly sworn by me to
 8    testify to the truth in relation to matters in
 9    controversy between the said parties; that the said
10    deposition was taken in stenotype by me at the time and
11    place aforesaid and was thereafter reduced to typewritten
12    form by me; and that the foregoing is a true and correct
13    transcript of my stenotype notes thereof.
14           That I am not an attorney nor counsel nor in any
15    way connected with any attorney or counsel for any of the
16    parties to said action nor otherwise interested in the
17    outcome of this action.
18
19                      [signature: Bonnie Carpenter]
20                      Bonnie Carpenter Johnshoy
                        Registered Professional Reporter
21                      Certified Shorthand Reporter
                        Certified Realtime Reporter
22
23
24
25
```

Page 86