# EXHIBIT 8

```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION
 3
        RUTH SMITH, individually and on
 4      behalf of all others similarly
        situated,
 5
                             Plaintiff,        Case No.
 6                                             1:22-cv-00081-LMB-
        vs.                                    WEF
 7
        SUNPATH, LTD., a Massachusetts
 8      corporation,
 9                           Defendant.
        _____/
10
11                         DEPOSITION OF
        RULE 30(b)(6) DEPOSITION OF CHUKRAN MANAGEMENT GROUP
12      d/b/a AMERICAN PROTECTION CORP. ("AMERICAN PROTECTION")
                            KOBI CHUKRAN
13
                     (Conducted Via Videoconference)
14
15
         DATE:              November 1, 2022
16
17       TIME:              11:03 a.m. to 2:06 p.m.
18
         PURSUANT TO:       Notice by counsel for Plaintiff
19                          for purposes of discovery, use at
                            trial or such other purposes as
20                          are permitted under the Federal
                            Rules of Civil Procedure
21
22       REPORTED BY:       Aaron T. Perkins, RMR, CRR, CRC
                            Notary Public, State of
23                          Florida at Large
24
                            Pages 1 to 128
25
                                                      Page 1
```

1     Q.   Throughout the time you worked with
2  SunPath, were you in regular contact with them?
3     A.   No.
4     Q.   Did you have an individual that you
5  could contact if you needed to discuss something?
6     A.   Yes.
7     Q.   Was it just one person or were there
8  multiple people?
9     A.   Mostly one.
10    Q.   Can you --
11    A.   I apologize.  There were a few different
12 persons.
13    Q.   Okay.  Was there one primary and then a
14 few additional?
15    A.   Yes.
16    Q.   Okay.  Can you tell me who your primary
17 contact was?
18    A.   Mr. Joe Abrahms.
19    Q.   Can you spell that?
20    A.   J-o-e; Abrahms, A-b-r-a-h-m-s.
21    Q.   And who were the other individuals that
22 you would communicate with from SunPath?
23    A.   Mr. Larry Lowe.
24    Q.   Can you spell that?
25    A.   L-a-r-r-y, L-o-w-e.

Page 26

1     Q.   Anyone else?
2     A.   A few persons in the claims department.
3     Q.   Okay.  Do you remember their names?
4     A.   No.
5     Q.   Okay.  Mr. Joe Abrahms, what would you
6  typically communicate with him about?
7     A.   Just business matters, product
8  information, product pricing --
9     Q.   Okay.  Can you tell me how frequently --
10    A.   -- claim information.
11    Q.   Okay.  Can you tell me how frequently
12 you would say you have talked with him?
13    A.   Maybe once a month or so, maybe even
14 less frequently.
15    Q.   Okay.  And Mr. Lowe, how often would you
16 say you have spoke with him?
17    A.   More regularly.
18    Q.   Daily, weekly?
19    A.   Weekly.
20    Q.   And what would you talk to Mr. Lowe
21 about?
22    A.   Clients' claims.
23    Q.   Okay.  Was SunPath involved in American
24 Protection's sales process?
25         MR. TANDY:  Could you repeat that

Page 27

1  question?  I may have misheard it.
2         MR. SMITH:  Yeah.
3  BY MR. SMITH:
4     Q.   Was SunPath involved in
5  American Protection's sales process?
6         MR. CAFFAS:  I'm going to object to the
7  form of the question as confusing, vague.
8         THE WITNESS:  I'm sorry, can I ask a
9  question, if I may?  Greg, just so I
10 understand, you represent?
11        MR. TANDY:  I'm here on behalf of
12 SunPath.
13        THE WITNESS:  Thank you.
14        MR. TANDY:  And I guess Paul Sporn is
15 with you, Taylor?
16        MR. SMITH:  No.
17        MR. CAFFAS:  Paul Sporn is representing
18 SunPath.
19        MR. TANDY:  Okay.  So a representative?
20        MR. CAFFAS:  I'm SunPath's attorney.
21        MR. SPORN:  Counsel, I'm the general
22 counselor of SunPath.
23        MR. TANDY:  Not a problem.  I apologize,
24 Mr. Sporn.  I hadn't asked until now, but as
25 long as we were identifying people, it seemed

Page 28

1  like an appropriate time.  My apologies.
2         MR. SPORN:  And my apologies for not
3  introducing myself properly, but Greg is
4  handling the deposition for us.  I'm merely
5  observing.
6         MR. TANDY:  All good.  Not a problem.
7  Thank you.
8  BY MR. SMITH:
9     Q.   So I will go back to my question and
10 repeat it.
11        Is SunPath involved in
12 American Protection's sales process?
13        MR. TANDY:  Again, note the objection.
14        MR. CAFFAS:  Object to the form.
15 BY MR. SMITH:
16    Q.   You can still answer the question.
17    A.   I'm not sure I understand the question.
18 It's a very general question.
19    Q.   Okay.  Why don't you tell me how
20 American Protection goes about selling vehicle
21 service contracts.
22    A.   Sure.  We receive a lead of an
23 interested prospect.  We contact that client, and
24 we make sure that they are qualified to receive
25 coverage based on the year, make, and model of the

Page 29

8 (Pages 26 - 29)

Page 30

1    vehicle, as well as the mileage.  Based on this
2    information, we can determine what is the best
3    coverage we can offer.
4        Q.   And then once you make that
5    determination, what happens next?
6        A.   Then we submit the sale to the -- to be
7    underwritten by SunPath.
8        Q.   And throughout that sales process, you
9    know, you get the lead, you contact the client,
10   you see what they're qualified for, you determine
11   what's best for them, and then you reach out to
12   SunPath.
13       Is that final step, reaching out to
14   SunPath, is that where contacting SunPath would
15   come in to play or would you have contacted them
16   at some point prior?
17       MR. TANDY:  Objection.
18       MR. CAFFAS:  Yeah.  Objection to form as
19   well.  It's a compound question.
20       MR. TANDY:  And I must object.  To the
21   extent that you're attempting to define the
22   term sales pathway, I object to that, or
23   process.  I'm sorry, Mr. Smith, but I do
24   think that's really compound.
25       MR. SMITH:  That's fine.

Page 31

1    BY MR. SMITH:
2        Q.   You can still answer.
3        A.   What was the question again?
4        Q.   I'm just trying to understand when the
5    first time throughout American Protection's sales
6    process they would contact SunPath about a
7    particular sale.  Is it in the end, or is it at
8    some point along the way, for example, when
9    they're trying to find out if a customer is
10   qualified for a product?
11       MR. TANDY:  Object to the form.  I'm
12   going to renew my objection to the compound
13   question.  And as well, I'm not sure that it
14   is accurately characterizing Mr. Chukran's
15   testimony to the extent you're suggesting
16   that they only use SunPath, which I believe
17   he has already said is not the case.  To the
18   extent you are testifying, Mr. Smith, I would
19   object to that.
20       MR. SMITH:  All right, Greg.
21   BY MR. SMITH:
22       Q.   You can answer the question.
23       A.   So we provide the specifications in
24   terms of what would qualify for specific coverage
25   based on a customer's vehicle information.

Page 32

1        Q.   Okay.  So let's walk through this.
2        You obtain leads from various sources;
3    is that correct?
4        A.   Yes.
5        Q.   Okay.  And then you're going to reach
6    out to those leads to potentially sell a vehicle
7    service contract, right?
8        A.   Yes.
9        Q.   Okay.  After you contact the potential
10   client, you're going to find out what they're
11   qualified for; is that fair to say?
12       A.   Well, in some cases, the customer
13   contacts us.
14       Q.   Okay.  Maybe they contact you; you
15   contact them.  Once you're in touch with the
16   potential customer, you determine what they're
17   qualified for?
18       A.   Yes.
19       Q.   Okay.  How do you go about doing that?
20       A.   Based on the customer's vehicle
21   characteristics, the year, make, model, and
22   mileage.
23       Q.   And then what do you do with that
24   information?
25       A.   We enter it into our CRM that allows us

Page 33

1    to determine what coverage the particular customer
2    qualifies for.
3        Q.   Okay.  And how does your CRM know which
4    product is best for the customer?  Let me rephrase
5    that question.  Sorry.  I will strike that
6    question.
7        What do you input into your CRM to
8    determine what customers will be best qualified
9    for?
10       A.   The year, make, model, and mileage
11   information of the vehicle.
12       Q.   All right.  From, let's say, SunPath, if
13   you're selling a SunPath product, what information
14   would be in your CRM to determine if they qualify
15   for that product?
16       A.   A product availability.
17       Q.   Okay.  While you're determining whether
18   o not they qualify for a product, do you ever
19   reach out to those service companies?
20       MR. TANDY:  Objection.
21       THE WITNESS:  I don't understand the
22   question.
23   BY MR. SMITH:
24       Q.   Okay.  Is it fair to say, if I say a
25   vehicle service company, I'm referring to SunPath

9 (Pages 30 - 33)

1 and the other parties who you sell their vehicle
2 services contracts?  Do you understand that?
3    A.  Yes.
4    Q.  Okay.  So when you're trying to
5 determine if a customer is qualified for a
6 particular plan, do you ever contact these
7 companies?
8    A.  No.
9    Q.  So American Protection would make that
10 determination, and then they would provide the
11 potential client with the best plan.
12       MR. TANDY:  I will object to the form
13    and, again, object to the extent that you're
14    characterizing Mr. Chukran's testimony
15    regarding whether or not American Protection
16    is making a determination.
17 BY MR. SMITH:
18    Q.  You can answer.
19    A.  Again, we provide the specifications,
20 plan specifications, by, in this case, SunPath
21 which allows us to determine what is the best plan
22 for the customer's needs.
23    Q.  Okay.  And once you determine what's the
24 best plan that customer is qualified for, then you
25 go back to the customer and provide them with that

1 plan?
2    A.  I'm sorry, repeat the question please.
3    Q.  Once you determine which plan a customer
4 is best qualified for, then you back to the
5 customer and provide them with the plan that you
6 believe best suits their needs?
7    A.  Yes.
8    Q.  Okay.  And then the customer can either
9 say, no, I don't want that plan, or, yes, I do?
10    A.  Yes.
11    Q.  Okay.  What happens if the customer
12 says, All right, I want to purchase that plan?
13       MR. TANDY:  Objection.  I'm not sure I
14    understood your question, Taylor.
15 BY MR. SMITH:
16    Q.  I'm just trying to understand how they
17 go about closing the sales process.  What happens
18 after a customer says, All right, I will purchase
19 that vehicle service plan?
20    A.  We receive information, and that
21 information is then submitted, in this case,
22 SunPath for fulfillment.
23    Q.  And would SunPath always accept that
24 contract, or would they sometimes decline it?
25       MR. TANDY:  Objection.

1       You can answer.  I'm objecting to the
2    form of the question.
3       THE WITNESS:  In some cases it would be
4    rejected.
5 BY MR. SMITH:
6    Q.  Can you tell me an example of why
7 SunPath would reject a particular contract?
8       MR. TANDY:  Objection, Taylor, to the
9    extent you're asking him to surmise why
10    another company rejected the a contract.  Or
11    are you only asking if he's ever been told
12    specific reasons?  Because the first way I'm
13    going to object that that's speculation.  But
14    if it's the second reason, then I would ask
15    you to ask that specific question.
16       Does that make sense?
17       MR. SMITH:  I understand what you're
18    saying.
19 BY MR. SMITH:
20    Q.  Would you ever receive a rationale for
21 why SunPath would have rejected one of
22 American Protection's sales contracts?
23    A.  Yes.
24    Q.  What would those rationales be?
25    A.  It could have been that the title of the

1 vehicle was rebuilt or rebranded.
2    Q.  Any other reasons?
3    A.  That's most of the -- that would be the
4 most.
5    Q.  Okay.  Let's say SunPath rejected one of
6 the contracts.  Would American Protection go about
7 trying to fix the issue with SunPath and submit it
8 again?
9    A.  No.  If the vehicle does not qualify for
10 coverage, there's really nothing we can do.
11    Q.  Okay.  And if SunPath rejects the
12 contract, would American Protection ever say, All
13 right, well, then we have these other options with
14 one of the other companies that you work with?
15    A.  No.
16    Q.  Okay.  You said you entered the payment
17 information and submit it to, in this case,
18 SunPath.
19       Where would you enter that payment
20 information?
21    A.  Into our CRM system.
22    Q.  The CRM.
23       And does SunPath have access to that CRM
24 system?
25    A.  I'm not sure.

1     Q.  How would SunPath receive that
2 information?
3     A.  They would receive a feed from the CRM
4 system.
5     Q.  A feed.
6      Okay.  So would that -- do you know if
7 that would communicate with one of SunPath's
8 systems?
9     A.  I assume.  I don't know.
10     Q.  Okay.
11     A.  I have never seen the operation.
12     Q.  Is the CRM -- did SunPath recommend that
13 you use this specific CRM?
14     A.  No.
15     Q.  Do you know the name of the CRM?
16     A.  Yes.
17     Q.  What is it?
18     A.  Inline CRM.
19     Q.  And when did you start using that?
20     A.  I believe around 2018.
21     Q.  Did you provide SunPath with access to
22 that CRM?
23     A.  No.
24     Q.  When you say they would receive a fee,
25 can you elaborate on that, what you mean by that?

Page 38

1     A.  I'm not sure of the technical process in
2 place, so I would -- I don't want to provide
3 inaccurate information.  I would assume that it's
4 some kind of feed that goes from the CRM to
5 SunPath's office.
6     Q.  Okay.
7     A.  It depends on what language or how it's
8 done.  I'm not sure.
9     Q.  Does SunPath have any systems that they
10 provided American Protection with access to?
11     A.  No.
12     Q.  Does SunPath provide any resources to
13 American Protection?
14     A.  No.
15     Q.  Okay.  Do they provide any oversight
16 over your business?
17     A.  We are appointed by SunPath in Florida
18 in terms of the agent of record.
19     Q.  What does that mean?
20     A.  That means that SunPath appoints us as
21 an agent of record in Florida in terms of
22 licensing or in terms of the ability to sell this
23 product.
24     Q.  Okay.  And when you say "appoints," is
25 this through a government database, or is this

Page 39

1 just --
2     A.  Yes, yes.
3     Q.  Okay.  Can you tell me what department
4 that you would be appointed with on behalf of
5 SunPath?
6     MR. TANDY:  Objection.
7     You can answer.
8     THE WITNESS:  The Florida department of
9 licenses.  I don't remember the exact name.
10 BY MR. SMITH:
11     Q.  Okay.
12     A.  It's something that SunPath handles.
13     Q.  Okay.  Do you know if
14 American Protection is SunPath's only agent in
15 Florida?
16     A.  We are not.
17     Q.  You're not.
18     Okay.  And did American Protection
19 receive a copy of documents reflecting this
20 appointment by SunPath?
21     A.  Yes.
22     Q.  Do you still have that document?
23     A.  Yes.
24     Q.  Does SunPath provide any other oversight
25 over American Protection's business?

Page 40

1     MR. TANDY:  Objection to form and to,
2 again, the fact that you're testifying for
3 Mr. Chukran suggesting that he has testified
4 that SunPath does provide oversight, which I
5 don't believe that is the testimony before
6 us.
7 BY MR. SMITH:
8     Q.  You can answer.
9     A.  What was the question again?  I'm sorry.
10     Q.  Yeah.  Does SunPath provide any other
11 oversight over American Protection's business?
12     MR. TANDY:  Objection.
13     You can answer, Kobi.
14     THE WITNESS:  I'm not really sure what
15 you mean in terms of oversight.
16 BY MR. SMITH:
17     Q.  All right.  Let's see.  Does SunPath
18 ever ask for information about your sales?
19     A.  They have -- they have a copy of our
20 sales, yes.
21     Q.  They have a copy of your sales.
22     How would they receive that copy?
23     A.  They receive a copy of our sales, of our
24 SunPath sales, yes.
25     Q.  Do they receive a report by the month,

Page 41

11 (Pages 38 - 41)

1 or how do they receive that?
2    A.  Via the same feed I was referring to
3 earlier.
4    Q.  Okay.  So they would receive a copy of
5 each sale; is that fair to say?
6    A.  Yes.
7    Q.  Does SunPath provide any operational
8 standards that American Protection has to abide
9 by?
10    MR. TANDY:  Objection.
11    MR. CAFFAS:  Can I also interject, not
12 to object as well, but to ask that, Aaron,
13 when you object, could you specify for the
14 record the basis for your objection just
15 so --
16    MR. TANDY:  Sure.  My basis for the
17 objection is form.  I don't think there's
18 been a definition of the term that Taylor was
19 using.  So I apologize.  I will try to do
20 that, Greg, more often.
21    MR. CAFFAS:  No problem.  I just want to
22 make sure I'm not chiming in for something
23 that you've chosen to object to.
24    MR. TANDY:  Sure.
25    THE WITNESS:  The only such oversight

1    would be highlighted in the Seller Agreement
2    between American Protection and SunPath.
3 BY MR. SMITH:
4    Q.  Okay.  Did SunPath ever provide any
5 guidance on telemarketing?
6    A.  Whatever is listed within the Seller
7 Agreement with SunPath.
8    Q.  Okay.  Nothing else?
9    A.  From time to time we would receive an
10 e-mail from Mr. Sporn with specific numbers that
11 have to be added to our internal DNC list.
12    Q.  How frequently would you receive those?
13    A.  I don't know if there was a particular
14 way to quantify that.
15    Q.  Okay.  Any other guidance?
16    A.  No.
17    Q.  Okay.  Did SunPath ever provide any
18 training to American Protection?
19    A.  No.
20    Q.  Does SunPath ever have any seminars,
21 gatherings, or meetings that they would invite
22 American Protection to?
23    A.  No.
24    Q.  Does SunPath provide any training on the
25 Telephone Consumer Protection Act?

1    A.  No.
2    Q.  Does SunPath provide any training on the
3 Virginia Telephone Privacy Act?
4    A.  No.
5    Q.  Does SunPath have any policies and
6 procedures that they require you to follow related
7 to telemarketing?
8    A.  If so, it would be the highlighted in
9 the Seller Agreement.
10    Q.  Okay.  Nothing beyond the Seller
11 Agreement?
12    A.  Not to my immediate knowledge.
13    Q.  Okay.  Does SunPath have any policies
14 and procedures that they require
15 American Protection to follow with respect to the
16 Telephone Consumer Protection Act?
17    A.  No, with the exception of asking to
18 remove some numbers from time to time.
19    Q.  Okay.  And does SunPath have any
20 policies and procedures that they require to you
21 follow related to the Virginia Telephone Privacy
22 Act?
23    A.  Not to my knowledge.
24    Q.  Does American Protection sell SunPath's
25 products throughout the U.S., or is it limited in

1 territorial scope?
2    A.  It is limited to the states SunPath
3 operates in.
4    Q.  And do you know those states?
5    A.  Not offhand.
6    Q.  Okay.  Does SunPath put any pressure on
7 American Protection to make a certain number of
8 sales each month?
9    A.  No.
10    Q.  Does SunPath require American Protection
11 to maintain a do-not-call list?
12    A.  No.
13    Q.  Does SunPath have a do-not-call list
14 that American Protection is required to adhere to?
15    A.  No.
16    Q.  Does SunPath permit American Protection
17 to use its name in marketing materials?
18    A.  I believe so, yes.
19    Q.  Does SunPath restrict how
20 American Protection can market?
21    A.  Everything would be highlighted in the
22 Seller Agreement.
23    Q.  But nothing beyond a Seller Agreement?
24    A.  Not to my knowledge.
25    Q.  Okay.  Can you tell me how SunPath would

1   compensate American Protection for the sale of one
2   of its vehicle service contracts?
3        MR. TANDY:  I'm going to object to the
4   extent of relevance, but I will leave that --
5   I don't know that it's protected by the
6   contract.
7        MR. CAFFAS:  I will also object to the
8   form in that it's leading, suggesting that
9   SunPath does pay American Protection at all,
10  which I don't believe that's in the
11  testimony, so I will object, again, to
12  leading, as I believe that's your testimony,
13  Mr. Smith.
14  BY MR. SMITH:
15      Q.  You can answer, Kobi.
16      A.  SunPath does not compensate us for the
17  sales.  We are -- we pay SunPath a cost for the
18  policy, and we then collect the payments from the
19  customer.
20      Q.  Okay.  So American Protection, would
21  they set the price of the vehicle service
22  contracts?
23      A.  Yes.
24      Q.  Okay.  And, then, a portion of that is
25  the cost of the contract.  Is that fair to say?

Page 46

1   June 29th, 2017; is that correct?
2        A.  Yes.
3        May I ask for a quick five-minute break?
4        MR. SMITH:  Of course.  Yeah, let's take
5   a break.
6        (A recess was taken.)
7        MR. SMITH:  Back on the record.
8   BY MR. SMITH:
9        Q.  And let me share my screen again.  All
10  right.  Kobi, again, I'm showing you what's been
11  marked as Exhibit 2.
12       You previously testified that this is an
13  agreement between SunPath and American Protection,
14  right?
15       A.  That seems to be.
16       Q.  It looks like it's dated June 29th,
17  2017, right?
18       A.  Yes.
19       Q.  Would that have been the date that your
20  relationship with SunPath began?
21       A.  Yes.
22       Q.  All right.  I will draw your attention
23  to the third "whereas" paragraph, where it says,
24  "Company desires to have CCM market the products
25  to customers for which CCM will be compensated as

Page 48

1        A.  Yes.
2        Q.  And that's the portion that
3   American Protection has to provide to SunPath?
4        A.  Yes.
5        Q.  Okay.  And then whatever amount above
6   that cost portion American Protection keeps
7   themselves?
8        A.  Yes.
9        Q.  Got it.
10       All right.  Let me put up my next
11  exhibit.  Give me a second.
12       (Exhibit No. 2 was marked for
13  identification.)
14  BY MR. TANDY:
15      Q.  All right.  I'm showing you what has
16  been marked as Exhibit 2.
17       Do you recognize this document?
18       A.  Yes.
19       Q.  Can you tell me what it is?
20       A.  I believe this is the Call Center
21  Marketing Agreement.
22       Q.  And that agreement is between SunPath
23  and American Protection; is that correct?
24       A.  Yes.
25       Q.  It looks like it was entered into on

Page 47

1   set forth below."
2        Do you see that?
3        A.  Yes.
4        Q.  Is it fair to say that SunPath entered
5   this agreement to have American Protection sell
6   its vehicle service plans?
7        A.  Yes.
8        Q.  All right.  And then underneath the
9   "general provisions," paragraph 1, it says, "The
10  company grants CCM authority to solicit customers
11  on a nonexclusive basis only in the territory
12  defined in Addendum B hereto."
13       Do you see that?
14       A.  Yes.
15       Q.  And if we scroll down to Addendum B,
16  which is on page 7 of this exhibit, it states,
17  "The geographic territory in which CCM may solicit
18  sales of products offered by the company shall be
19  exclusive and limited to all states in the
20  continental U.S. except TBD."
21       Do you see that?
22       A.  Yes.
23       Q.  So is this provisions just letting
24  American Protection market its products throughout
25  the U.S.?

Page 49

13 (Pages 46 - 49)

1    A. I'm sorry?
2    Q. Does this provision just let
3  American Protection market SunPath products
4  throughout the United States?
5    A. Not necessarily. And it says "TBD," to
6  be determined, from my understanding.
7    Q. Okay. Have you received anything
8  additional from SunPath that would have amended
9  this agreement?
10    A. Not that I specifically have at my
11  disposal at this moment.
12    Q. Okay. Is that a "yes," through?
13    A. I don't know.
14    Q. You don't know?
15    A. I don't know.
16    Q. All right. I will turn back to page 1
17  of your general provisions paragraph 2. It says,
18  "CCM shall at all times adhere to company's
19  written standards of conduct prescribed by company
20  from time to time and in its sole discretion."
21     Do you see that?
22    A. Yes.
23    Q. And then at the end of that paragraph,
24  it says, A copy of the standards of conduct is
25  attached hereto as Exhibit 1."

Page 50

1     Do you see that?
2    A. Yes.
3    Q. Let me scroll through it. On page 8, it
4  states, "Exhibit 1, standards of conduct," and it
5  says, "See attached."
6     Do you see that?
7    A. Yes.
8    Q. Do you know if there were additional
9  documents attached to this document?
10    A. I have provided all of the information,
11  all of the files that I have on file.
12    Q. You have provided everything you have on
13  file. Is that what you said?
14    A. I believe those two documents, this one
15  and there was a --
16    Q. Okay. It seems that there used to be
17  the standards of conduct attached to this
18  document; is that fair to say?
19     MR. TANDY: Objection.
20     THE WITNESS: I'm not sure. Again, this
21  is dating back to 2017.
22  BY MR. SMITH:
23    Q. Okay. Do you recall SunPath ever
24  providing any standards of conduct?
25    A. Again, I don't remember one way or the

Page 51

1  other.
2    Q. You don't remember one way or the other.
3     Did you do anything to search for those?
4    A. In my responses to the subpoena, I
5  provided what I have on file.
6    Q. Okay. When you say what you have on
7  file, what are you referring to "as on file"?
8     MR. TANDY: Objection.
9     You can answer.
10     THE WITNESS: I believe there were one
11  or two documents, the Call Center Marketing
12  Agreement and the Seller Agreement.
13  BY MR. SMITH:
14    Q. Okay. I'm trying to understand what
15  repositories were searched for responsive
16  documents.
17    A. My file.
18    Q. Is that a physical filing cabinet?
19    A. Yes.
20    Q. 0kay. And is that where
21  American Protection keeps all of its legal
22  documents?
23    A. Yes.
24    Q. Does it keep any virtual documents?
25    A. Yes.

Page 52

1    Q. Where would those be kept?
2    A. On my computer.
3    Q. Would it be in, like, Dropbox, or would
4  it be on your hard drive?
5    A. On the hard drive.
6    Q. Hard drive.
7     Okay. And did American Protection
8  search the computer hard drive for any responsive
9  documents?
10    A. Yes.
11    Q. Okay. Let's to back to page 1 of
12  Exhibit 2. Paragraph 3 under the "general
13  conditions," it says, "The company agrees to
14  provide CCM with product forms, promotional
15  materials, rates, and other materials (the
16  Promotional Materials) needed to properly secure
17  and service customers procured by CCM."
18     Do you see that?
19    A. Yes.
20    Q. Okay. Did SunPath ever provide any
21  professional materials to American Protection?
22     MR. TANDY: Objection. Asked and
23  answered.
24     THE WITNESS: No, I don't recall.
25  BY MR. SMITH:

Page 53

14 (Pages 50 - 53)

1      Q.  Did they provide any product forms?
2      A.  I don't recall.
3      Q.  Do they provide any rates or other
4   materials that would be responsive that would
5   relate to this paragraph?
6      A.  Yes.
7      Q.  What do they provide?
8      A.  The rates of their coverage claims.
9      Q.  Okay.  Paragraph 4 on page 1 says, "CCM
10   shall install or arrange for the installation of
11   the company's products in accordance with the
12   company's policies and procedures as changed
13   and/or updated from time to time."
14        Do you see that?
15      A.  Yes.
16      Q.  Can you tell me what that paragraph
17   means?
18      A.  I would assume this means the product
19   rates, product information.
20        MR. TANDY:  Taylor, I'm going to
21      instruct -- I don't think you want Kobi to
22      speculate or to guess, I assume, so I just
23      want to correct the instruction that says to
24      the extent that he doesn't know, then I don't
25      think you want, you know, I don't think you
                                            Page 54

1      want speculation.  So when I hear the word
2      "assume" I worry, so I just want to put that
3      on the record.
4        MR. SMITH:  This one is his
5      understanding, I believe.
6        MR. TANDY:  Okay.  If he knows it or has
7      an understanding.  I thought you said what it
8      means, and I think he said "I assume."  So,
9      again, I just want to make sure we're not
10      getting speculation on the record and you're
11      getting a clean record.
12   BY MR. SMITH:
13      Q.  All right.  Let's move to paragraph 5.
14   It says, "CCM agrees to actively market the
15   products."
16        Do you see that?
17      A.  Yes.  Let me just move this out of the
18   way.  Yes.
19      Q.  Okay.  Does that paragraph require
20   American Protection to actively market SunPath
21   vehicle service plans?
22      A.  Allow me to please read the paragraph.
23   Thank you.
24      Q.  Sure.
25      A.  What was the question again?
                                            Page 55

1      Q.  Does that paragraph require
2   American Protection to actively promote SunPath
3   vehicle service plans?
4      A.  Yes.
5      Q.  Okay.  Paragraph 6 says, "CCM shall
6   perform such other acts as are necessary for the
7   proper conduct of the business and for the
8   protection and safeguard of the interests of the
9   company in accordance with the company's policies
10   and procedures."
11        Do you see that?
12      A.  Yes.
13      Q.  Does that paragraph require
14   American Protection to carry out its business in a
15   way that will protect SunPath's interests?
16      A.  Again, I'm not sure.  I will have to
17   reread the entire document to provide a proper
18   answer for that.
19      Q.  Okay.  You previously testified that you
20   reviewed this document in preparation for this
21   deposition, right?
22      A.  Yes, yes.
23      Q.  I'm just asking about that paragraph.
24   I'm not asking about the entire document.  Can
25   you -- do you have an understanding of that
                                            Page 56

1   paragraph?
2        MR. TANDY:  Objection.
3        MR. CAFFAS:  Yeah.  I'm going to object
4      to form that I'm not quite sure what you're
5      asking about the agreement or the specific
6      paragraph at this point.  I think there are
7      multiple questions in there.
8   BY MR. SMITH:
9      Q.  Okay.  Can you tell me what your
10   understanding of paragraph 6 of this agreement is?
11      A.  Again, I'm not sure I understand the
12   question.  The a very broad question.
13      Q.  I'm just asking what your understanding
14   of paragraph 6 is.
15      A.  "Shall perform such other acts as are
16   necessary for the proper conduct of the business."
17   It's just the quality of the scan is a little hard
18   to view.  "And for the protection and safeguarding
19   of the interests of the company in accordance with
20   the company's policies and procedures."
21        I think it's just as it sounds.
22      Q.  Okay.  Paragraph 7 --
23        MR. CAFFAS:  At this stage, I'm going to
24      object to the extent this is redundant and
25      these questions, to the extent we're going to
                                            Page 57

15 (Pages 54 - 57)

1   walk through an entire agreement, largely are
2   asked and answered, because this, I believe,
3   began by asking if Mr. Chukran read and
4   agreed --
5       MR. SMITH: You're continuing to submit
6   speaking objection. You can object to the
7   code. There's nothing wrong with asking
8   questions about a document. This is my
9   deposition. I'm going to ask about
10  paragraphs of the agreement that
11  American Protection. Keep it to --
12      MR. CAFFAS: This leads to us being
13  prejudiced to who knows how much time we'll
14  have left at the end of today if we're going
15  to read through this line by line. I think
16  that would be my primary concern.
17      So I apologize if I'm submitting
18  speaking objections, but this is more just a
19  general note about how long we're going to be
20  here if he's going to read through a contract
21  that he's already stated that he's signed and
22  agreed to.
23      MR. SMITH: I believe it's limited to
24  seven hours, so we'll be out by seven years.
25      MR. CAFFAS: You may be. Again, I think

1   you may be prejudicing the other parties
2   sitting at this deposition.
3       MR. SMITH: SunPath is free to serve a
4   notice of deposition and subpoena and do
5   their own deposition as well.
6   BY MR. SMITH:
7       Q. All right. Kobi, paragraph 7, "CCM
8   shall provide continued maintenance and servicing
9   to customers in accordance with the company's
10  policies and procedures."
11      Do you see that?
12      A. Yes.
13      Q. What is this agreement referring to when
14  it's discussing maintenance?
15      A. I'm not sure.
16      Q. You don't know.
17      Did American Protection provide any
18  maintenance of existing clients for SunPath?
19      MR. TANDY: Objection.
20  BY MR. SMITH:
21      Q. Did American Protection provide any
22  maintenance of any existing clients on behalf of
23  SunPath?
24      MR. CAFFAS: I will object to vagueness.
25  He's already stated he doesn't know what

1   "maintenance" refers to. He's not clear what
2   "maintenance" refers to in this context.
3       THE WITNESS: I'm not clear as to what
4   "maintenance" refers to.
5   BY MR. SMITH:
6       Q. Okay. Once American Protection sells
7   one of SunPath's vehicle protection plans, is
8   there a continued relationship with that client
9   that American Protection has?
10      A. Yes.
11      Q. How long would that relationship be?
12      A. For the lifetime of the agreement.
13      Q. Okay. And what would
14  American Protection's responsibilities be through
15  the lifetime of that agreement?
16      A. The customer might ask us for the
17  numbers to the claims department or might call us
18  to find out if something in particular is covered
19  within the plan.
20      Q. Okay. And we previously discussed, when
21  a contract was sold, the division of moneys from
22  American Protection to SunPath, right?
23      A. Yes.
24      Q. Now, these contracts, they're on a
25  monthly basis, right? These customers pay a

1   certain amount each month?
2       A. Yes.
3       Q. Okay. Who do they pay that amount to?
4       A. To us.
5       Q. And then does a share of that each month
6   go to SunPath or does -- or how does that work?
7       A. No.
8       MR. CAFFAS: Objection. Asked and
9   answered.
10  BY MR. SMITH:
11      Q. Go ahead.
12      A. No. SunPath bills us for a policy.
13      Q. Okay. So after a policy is sold,
14  American Protection has to pay the cost of the
15  policy to SunPath; is that fair to say?
16      A. Yes.
17      Q. How soon do they have to pay that cost?
18      A. We've at various times have had to pay
19  for the cost.
20      Q. Can you give me an estimate on the
21  amount of time that you have?
22      A. Somewhere between some months and --
23  between 30 days and more.
24      Q. Okay. And then is it fair to say that
25  it's American Protection's responsibility to

1    collect each monthly payment from those clients?
2        A.  Yes.
3        Q.  Okay.  What happens if they cancel their
4    contract or stop paying?
5        A.  Then the plan --
6            MR. CAFFAS:  Object to the form.
7            THE WITNESS:  Then the contract is
8    cancelled.
9    BY MR. SMITH:
10       Q.  Does SunPath provide a refund of the
11   cost to American Protection then?
12       A.  Yes.
13       Q.  Okay.  I will scroll to page 2,
14   paragraph 10.  Give me one second.  All right.  So
15   it says, "All amounts constituting product seller
16   cost and/or net price which are received by CCM
17   shall be held in trust by CCM for the company's
18   sole benefit."
19           Do you see that?
20       A.  Yes.
21       Q.  Is product seller costs in this context,
22   is that the cost that you were referring to that
23   gets paid to SunPath?
24       A.  Yes.
25       Q.  And is net price in this context, is

Page 62

1    that the amount that American Protection gets to
2    keep for each sale?
3        A.  Yes.
4        Q.  Okay.  And so is it fair to say that
5    this paragraph requires American Protection to
6    hold SunPath's portion of the financials in trust
7    on behalf of SunPath?
8        A.  I'm sorry, can you repeat the question?
9        Q.  Yeah.
10           Is it fair to say that this paragraph
11   requires American Protection to hold SunPath's
12   portion of the financials for each sale in trust
13   on behalf of SunPath?
14           MR. CAFFAS:  I will object to the form.
15       I believe that's -- I think it's vague.  I
16       didn't understand the question, and to the
17       extent it's leading.
18   BY MR. SMITH:
19       Q.  You can answer.
20       A.  Yeah.  Again, I'm having a hard time
21   also understanding not only the question but also
22   the relevance to this topic at hand.
23       Q.  I'm trying to understand.  If I
24   understand this correctly, American Protection is
25   required to hold the product seller cost in trust

Page 63

1    on behalf of SunPath after they make the sale.
2            MR. CAFFAS:  Objection.  Form and
3        relevance.  We're not here for your
4        understanding.
5            THE WITNESS:  It is my understanding
6        that American Protection would submit the
7        cost of the product to SunPath.
8    BY MR. SMITH:
9        Q.  Okay.  Does this paragraph create a
10   fiduciary duty that American Protection owes to
11   SunPath?
12           MR. CAFFAS:  Objection.  Calls for
13       speculation.
14           MR. TANDY:  And I'm going to object that
15       the witness is not a lawyer.  And to the
16       extent that answering the question would
17       require him to explain some type of legal
18       relationship that will impinge on the
19       attorney-client privilege and any advice he
20       may have received from myself or others,
21       other attorneys, I'm instructing him not to
22       answer that question.
23           MR. SMITH:  You're instructing him not
24   to answer based on the --
25           MR. TANDY:  I'm instructing him not to

Page 64

1    answer the question as to whether or not
2    somebody has informed him with enough
3    information or legal advice to determine
4    whether or not some sort of fiduciary
5    relationship has occurred.  He's not a
6    lawyer.
7        And, Mr. Smith, I have let you go a long
8    time, but he's not a lawyer, and he's not
9    going to answer legal questions that are
10   determined down the road.
11           MR. SMITH:  You can certainly object to
12   a legal conclusion, but that's not a basis to
13   instruct a witness not to answer a question.
14           MR. TANDY:  No, no.  Wait.  I'm
15   instructing him that to the extent that he
16   was provided with legal advice from an
17   attorney that would need to be disclosed in
18   answering your question, I'm instructing him
19   not to answer that question for that purpose.
20       So if you want to ask him -- Mr. Smith,
21   if you want to ask him a "yes" or "no"
22   question, Did somebody tell you that
23   American Protection is a fiduciary for
24   SunPath? you can ask that "yes" or "no"
25   question.  But what you can't ask is how he

Page 65

17 (Pages 62 - 65)

1  the time you're placing calls.  So at the time
2  American Protection places a call, does it know
3  which company's vehicle service plans it will be
4  pitching on the call?
5      A.  No.
6      Q.  Okay.  Is that information determined
7  later based upon the potential client's vehicle's
8  make, model, and year?
9      A.  Yes.
10     Q.  Okay.  And can you tell me what portion
11 of your business is generated through
12 telemarketing?
13         MR. CAFFAS:  I will object as to vague.
14     I don't believe telemarketing has been
15     established definition-wise.
16         THE WITNESS:  I'm not sure what you mean
17     by "telemarketing," as well.
18 BY MR. SMITH:
19     Q.  When you place calls to potential
20 clients to sell products, that would be
21 telemarketing.  So I need to understand how much
22 of your business comes from telemarketing
23 activities.
24     A.  So if I send out the postcard to a
25 customer and they call us to request information,

Page 74

1  does that count as telemarketing?
2      Q.  No.  I'm specifically discussing
3  outbound calls.  Sorry.
4      A.  Okay.
5          MR. CAFFAS:  Before Mr. Chukran answers,
6      I will object to vague to make sure.  Maybe
7      it will help if you re-ask the question based
8      on --
9          MR. SMITH:  Yeah, that's fine.
10 BY MR. SMITH:
11     Q.  Can you tell me the difference between
12 the portion of your business that is generated via
13 mailings and via telemarketing outbound calls?
14         MR. CAFFAS:  Objection.
15         THE WITNESS:  As to what period of time?
16 BY MR. SMITH:
17     Q.  The relevant time period, which would be
18 January 26th, 2018, through the present.
19         MR. TANDY:  I'm going to object that
20     that's overbroad, unless you can make a
21     generalization over an almost six-year
22     period.
23         MR. SMITH:  It's four years.
24         MR. TANDY:  Four and a half, five.
25     Okay.  A four-and-a-half-year period.

Page 75

1          THE WITNESS:  I don't recall exactly
2      back then.
3  BY MR. SMITH:
4      Q.  All right.  When did American Protection
5  start utilizing telemarketing to sell products?
6          MR. TANDY:  Objection.  Just so I'm
7      clear, Taylor, when you say the word
8      "telemarketing," for purposes of this
9      deposition, you're talking about outbound
10     calls that are not generated from the -- from
11     a prior contact?
12         MR. SMITH:  No.  I'm talking about any
13     outbound call.
14         MR. TANDY:  Okay.  But --
15         MR. SMITH:  Maybe we should talk about
16     mailing.
17         THE WITNESS:  Maybe that will help.
18 BY MR. SMITH:
19     Q.  Based on your responses before, it's my
20 understanding that American Protection mails out
21 postcards and letters to potential clients; is
22 that true?
23     A.  Yes.
24     Q.  Okay.  And then is the hope of that that
25 those potential clients will call

Page 76

1  American Protection to inquire about products or
2  services?
3      A.  Yes.
4      Q.  Okay.  And does -- sorry.  Strike that.
5          After those consumers call in, does
6  SunPath -- sorry.  Strike that.
7          After those consumers call in, does
8  American Protection sometimes place additional
9  calls to that individual to sell vehicle service
10 plans?
11     A.  Yes.
12     Q.  Okay.  Does American Protection ever
13 just place calls to consumers that they haven't
14 previously sent a mailer to?
15     A.  I'm sorry, repeat the question.
16     Q.  Yeah.
17         Does American Protection ever place
18 telemarketing calls to consumers that it hasn't
19 previously sent a mailer to?
20     A.  We only contact prospects that have
21 requested information about those services.  I
22 don't know if -- if you define that as
23 telemarketing or not, but that's the only -- we
24 have no interest in just contacting folks that
25 have no interest in our products.

Page 77

20 (Pages 74 - 77)

1    Q.  Sure.
2        When you say "requested information,"
3    what are you referring to?  Is it just via the
4    mail and postcard, or is it via other means?
5    A.  Via other means.
6    Q.  What other means?
7    A.  Websites.
8    Q.  So in that case, would
9    American Protection place outbound telemarketing
10   calls to consumers that this information they
11   obtained from those websites?
12   A.  Yes.
13   Q.  Okay.  Does American Protection ever
14   receive complaints regarding its telemarketing?
15       MR. TANDY:  Objection, again, to the
16   word "telemarketing."  I'm just trying to get
17   a sense, so just letting you know what my
18   form objection is.  I'm objecting to that
19   word.
20   BY MR. SMITH:
21   Q.  Okay.  You can answer, Kobi.
22   A.  Yes.
23   Q.  How frequently would you say
24   American Protection receives complaints?
25       MR. TANDY:  Object.

Page 78

1    THE WITNESS:  Very rarely.
2    BY MR. SMITH:
3    Q.  Can you give me an estimate?
4    A.  Maybe a few times a year.
5    Q.  Okay.  Who places telephone calls on
6    behalf of American Protection?
7        MR. CAFFAS:  Objection.  I'm going to
8    note that this calls for an improper lay
9    opinion and speculation.
10       THE WITNESS:  I don't understand the
11   question.
12   BY MR. SMITH:
13   Q.  Okay.  You previously testified that
14   American Protection does not have employees,
15   correct?
16   A.  Correct.
17   Q.  How does American Protection place
18   telephone calls to potential clients?
19   A.  You mean the system that we use or --
20   Q.  I mean, who specifically?
21   A.  Who?  We work with some subcontractors
22   that are -- that are speaking to the consumers.
23   Q.  Okay.  And how many subcontractors does
24   American Protection utilize?
25   A.  From time to time, one or two.

Page 79

1    Q.  And how many during the relevant time
2    period would you say American Protection utilized?
3        MR. TANDY:  Objection.
4        You can answer, if you know.
5        THE WITNESS:  I don't know exactly that
6    information.  Again, we are a small shop.
7    Maybe one or two.
8    BY MR. SMITH:
9    Q.  Do you know the names of those one or
10   two?
11   A.  Not at this time.
12   Q.  Not at this time.
13       Do you know the names of any of those
14   third parties?
15   A.  Yes.
16   Q.  Can you tell me what the name is?
17   A.  In this particular case, the name is on
18   the e-mail that we sent out.
19   Q.  Okay.  We will get to that.
20       All right.  Can you tell me if
21   American Protection has any policies related to
22   the telephone calls that it places for the
23   purposes of selling vehicle service contracts?
24       MR. TANDY:  Objection.  My objection is
25   to the inference that they place calls.  That

Page 80

1    misleads Mr. Chukran's testimony about calls.
2    That's it.
3        THE WITNESS:  Yes, we do.
4    BY MR. SMITH:
5    Q.  Are they written?
6    A.  Yes.
7    Q.  Where are they maintained?
8    A.  On my hard drive.
9    Q.  Can you tell me how many policies you
10   have?
11   A.  You were provided with the policies we
12   have.
13   Q.  Everything you've produced, that's all
14   your policies related to telephone calls; is that
15   fair?
16   A.  Yes.
17   Q.  Okay.  You don't have any other policies
18   and procedures to ensure compliance with the TCPA?
19       MR. TANDY:  Objection, to the extent
20   that you are making a supposition about
21   compliance with the TCPA and only those
22   policies and not something else, you can
23   answer the question.
24       THE WITNESS:  As it relates to this
25   particular case that we are gathered here

Page 81

21 (Pages 78 - 81)

1  today to discuss, this was a consumer that
2  received a mailer from us and called us to
3  receive information.  So there was no
4  telemarketing in this case and there was no
5  TCPA involved here.  The consumer requested
6  the information, so that that would not
7  fall --
8  BY MR. SMITH:
9      Q.  That's not what I'm asking.  I'm trying
10 to understand, other than the documents that you
11 have already produced, if you have any additional
12 policies that are in place to ensure compliance
13 with the TCPA.
14     A.  You were provided with everything we
15 have.
16     Q.  Okay.  So you also don't have any
17 additional policies and procedures in place to
18 ensure compliance with the Virginia Telephone
19 Privacy Act other than what was produced?
20     A.  Correct.
21     Q.  Okay.  And do you have any other --
22 sorry.  Strike that.
23         Do you have any other policies and
24 procedures in place to ensure compliance with the
25 federal National Do Not Call Registry rulings

*Page 82*

1  records of prior express consent from the
2  individuals that it places calls to?
3      A.  No.
4      Q.  How does American Express [sic] ensure
5  that the individuals that it's placing calls to
6  provided prior express consent?
7          MR. CAFFAS:  I will object to this as
8  vague.  I believe you just asked about
9  American Express.  I assume you're not
10 talking about the credit card company.
11         MR. SMITH:  Did I say American Express?
12         MR. CAFFAS:  Yes.
13         MR. SMITH:  Strike that.
14 BY MR. SMITH:
15     Q.  How does American Protection ensure that
16 individuals that it's placing calls to have
17 provided prior express consent?
18     A.  We review the method of which they
19 request information.
20     Q.  So can you say that again?
21     A.  We review the method of which they have
22 requested information.
23     Q.  What do you mean by that?
24     A.  I mean I review to make sure that the
25 proper opting language is present, that our name

*Page 84*

1  other than what was previously produced?
2      A.  No.
3      Q.  Okay.  Does American Protection ever
4  obtain a listing of numbers registered on the DNC
5  Registry?
6      A.  Yes.
7      Q.  How often does it obtain that list?
8      A.  That is provided to us by any lead
9  providers in this case.  So, in other words, if
10 we -- any kind of leads that we acquire are
11 cleansed and cleaned and suppressed against the
12 National Do Not Call List.
13     Q.  Okay.  After American Protection
14 receives those leads, does it take any steps to
15 ensure that it's not calling numbers that are in
16 those leads that are registered on the National Do
17 Not Call Registry?
18     A.  We run those against our internal DNC
19 lists.
20     Q.  Just your internal DNC list?
21     A.  Yes.
22     Q.  Not the National DNC List?
23     A.  Not -- no.  It's already done by the
24 lead providers.
25     Q.  Okay.  Does American Protection maintain

*Page 83*

1  is clearly stated, that the consumer understands
2  they will receive a call from us, and that it
3  authorizes us, to receive a call from us, from me
4  within the means we would be using.
5      Q.  Okay.  And do you review that for each
6  potential client?
7      A.  I don't understand the question when you
8  say "potential client."
9      Q.  You said you reviewed to ensure that the
10 disclosures are proper, right?
11     A.  Yes, I do, yes.
12     Q.  Okay.  Do you review that with each
13 potential lead that you receive?
14     A.  Yes.
15     Q.  Okay.  Do you ever have individuals that
16 request to no longer receive calls from
17 American Protection?
18     A.  Yes.
19     Q.  How frequently would you say that
20 happens?
21     A.  Multiple times per week.
22     Q.  What does American Protection do when
23 someone requests not to receive calls?
24     A.  They are marked as a do-not-call record
25 and then moved from any further contact.

*Page 85*

22 (Pages 82 - 85)

1       You haven't asked how the plaintiff
2   received -- how they got to the plaintiff.
3   If you want to ask that and then go from
4   there, maybe.  But this seems to be just an
5   open-ended "tell me about your business," and
6   at some point I'm going to put a stop to
7   that, because that's not what this is.
8       MR. SMITH:  It is the --
9       MR. TANDY:  At least that's not what I
10  understood this to be.
11      MR. CAFFAS:  I will add to Mr. Tandy's
12  objection to state that based on the notice
13  of deposition and the subject of your
14  subpoena, this doesn't seem to be relevant to
15  what you're seeking.  I believe the testimony
16  is that American Protection didn't call the
17  plaintiff.  So as it pertains to this
18  lawsuit, it seems like we're going far afield
19  here.
20      MR. SMITH:  No.  He told us he mailed --
21  they mailed a mailer to our client, so I'm
22  trying to understand what the source of the
23  information, where they obtained contact
24  information to mail those mailers are, so
25  that we can figure out which one of those

Page 98

1   are you able to figure out the source of that
2   contact information, where it came from?
3       A.  In some cases I could, and in some cases
4   I can't.
5       Q.  Okay.  What about in the plaintiff's
6   situation?
7       A.  What about it?
8       Q.  You previously said that
9   American Protection sent a mailing to her; is that
10  correct?
11      A.  Yes.
12      Q.  Do you know where it got her contact
13  information prior to sending that mailing?
14      A.  I do not, no.
15      Q.  Did you search for that information?
16      A.  Yes.
17      Q.  What repositories were searched?
18      A.  Our CRM.
19      Q.  CRM.
20      Does SunPath ever provide leads to
21  American Protection?
22      A.  No.
23      Q.  All right.  I will pull up my next
24  exhibit.
25      (Exhibit No. 7 was marked for

Page 100

1   sources the plaintiff came from.
2       MR. CAFFAS:  Right.  I understand that.
3   But I believe the --
4       MR. SMITH:  And also I want to
5   understand if he can identify which leads
6   came from where, because that's also very
7   important to this case.
8       MR. CAFFAS:  Right.  I understand.  But
9   I believe the testimony that's on record is
10  that to Mr. Chukran's knowledge, your client,
11  the plaintiff, made a call to
12  American Protection.
13      So to the extent that you're asking
14  about leads for outgoing telemarketing calls,
15  which I believe is what is on the record as
16  well, we're going far afield.  But I
17  understand you are entitled to ask, but I'm
18  just echoing Mr. Tandy's sentiments,
19  especially with regard to time considering
20  we're running close to lunch and Mr. Chukran
21  has other time conflicts.
22  BY MR. SMITH:
23      Q.  All right.  Are you able to tell which
24  individual's postcard or letter -- sorry.  For the
25  individuals that you sent postcards or letters to,

Page 99

1   identification.)
2   BY MR. SMITH:
3       Q.  All right.  Kobi, 'm showing what has
4   been marked as Exhibit 7.
5       Do you recognize this document?
6       A.  Yes.
7       Q.  Can you tell me what it is?
8       A.  This is my reply to your subpoena.
9       Q.  Okay.  Under No. 2 it says, "Leads are
10  generated via a number of methods including
11  affiliate websites such as...," and then it lists
12  websites.
13      Do you see that?
14      A.  Yes.
15      Q.  Is that a complete list of websites that
16  SunPath obtains leads from?
17      A.  About SunPath?  I'm sorry?  This is
18  not --
19      Q.  I'm sorry, that American Protection
20  obtains leads from.
21      A.  There might be others one.  Again, I'm
22  not sure for this particular time frame you're
23  referring to, but this is one of the lists.
24      Q.  Okay.
25      A.  Yes.  There are other lists.

Page 101

26 (Pages 98 - 101)

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    ALEXANDRIA DIVISION
 3                      CASE NO.:  1:22-cv-00081-LMB-WEF
 4     RUTH SMITH, individually and on behalf of all
       others similarly situated,
 5
 6          Plaintiff,

       vs.
 7
       SUNPATH, LTD., a Massachusetts corporation,
 8
            Defendant.
 9
       _____/
10
                        -VOLUME 2-
11                    (PAGES 128-252)
12     CONTINUED
       VIDEOCONFERENCE
13     DEPOSITION OF:     KOBI CHUKRAN, CORPORATE REPRESENTATIVE
                          CHUKRAN MANAGEMENT GROUP, LLC, d/b/a
14                        AMERICAN PROTECTION CORP.
15     TAKEN BY:          COUNSEL FOR THE PLAINTIFF
16     DATE:              WEDNESDAY, NOVEMBER 9, 2022
17     TIME:              9:38 A.M. - 12:38 P.M.
18     LOCATION:          DAYTONA BEACH, FLORIDA  33437
19     VIA:               VERITEXT VIRTUAL ZOOM
20     STENOGRAPHICALLY
       REPORTED BY:       COURTNEY N. LANGHOFF, RMR, CRR, FPR-C
21                        ORANGE LEGAL/VERITEXT LEGAL SOLUTIONS
                          201 EAST KENNEDY BOULEVARD, SUITE 712
22                        TAMPA, FLORIDA  33602
23
24
25
                                         Page 128
```

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1   the comment.  I'm just putting that on the record
2   to --
3       MR. SMITH:  Okay.
4   BY MR. SMITH:
5       Q.  Kobi, can you tell me, between November 1st and
6   today -- so your last deposition and today -- did you do
7   anything to prepare for this deposition?
8       A.  We provided the information you -- you
9   requested.
10      Q.  Okay.  So you provided some additional
11  documents, right?
12      A.  Yes.
13      Q.  Okay.  Did you do anything else for this
14  deposition, specifically?
15      A.  No.
16      MR. TANDY:  The answer to that question, that's
17  other than having communications with me, Kobi,
18  because those would be privileged.  So I assume
19  that's the reason you answered no.
20      Because just for the record, Taylor, Kobi,
21  Mr. Chukran and I did have conversations, both to
22  respond to your request, and for certain topics.
23  Those would be privileged.
24      MR. SMITH:  Yeah, I agree.  Okay.
25  BY MR. SMITH:
                                          Page 137

1   of vehicle service contracts?
2       A.  No, we don't --
3       MR. CAFFAS:  Objection.  Speculation.
4   I'm sorry.
5       THE WITNESS:  I'm sorry.
6       MR. CAFFAS:  I --
7       MR. TANDY:  Greg was --
8   I'll do this, Greg, just so it's clear.
9       Greg is lodging an objection to Taylor's
10  question with regard to the form of the question.
11  You're still required to answer it.  You were about
12  to answer it, and thank you for waiting for Greg to
13  finish his objection before you started so the court
14  reporter can't -- can't take us all down at once.
15      So can you answer Taylor's question?
16      THE WITNESS:  Yes.
17      MR. TANDY:  Okay.  Please do.
18      THE WITNESS:  We return requests for contacts
19  from potential customers.  We don't just solicit
20  and -- and -- and call.  We have folks that are
21  calling and requesting information, and in some
22  cases, we reach out to people with requested
23  information.
24  BY MR. SMITH:
25      Q.  Okay.  I understand you're reaching out to
                                          Page 139

1       Q.  So other than talking to your attorney and
2   producing the documents, nothing else you did to prepare
3   for this deposition?
4       A.  No.
5       Q.  Okay.  All right.  I want to talk about
6   American Protection's calling practices and the calls
7   made to Plaintiff.
8       So, first, during your prior deposition, I was
9   reviewing the transcript, and you testified that
10  American Protection uses subcontractors to place
11  telemarketing calls; is that correct?
12      MR. TANDY:  Objection to the word
13  telemarketing.
14      You can answer.
15      THE WITNESS:  American Protection uses
16  subcontractors to -- to communicate with potential
17  clients and clients.
18  BY MR. SMITH:
19      Q.  Okay.  And you previously told me that you
20  worked with one or two subcontractors at any particular
21  time; is that accurate?
22      A.  Yes.
23      Q.  Okay.  Is it a fair character --
24  characterization to say that the subcontractors place
25  calls on behalf of American Protection to solicit sales
                                          Page 138

1   people that you say requested information.  I'm just
2   trying to make sure I understand that they're not doing
3   other activities, and I understand what they're doing.
4       Does that make sense?  So I just want to know,
5   is that what the subcontractors are doing, is placing
6   calls to individuals for the purpose of selling vehicle
7   service plans?
8       A.  Or receiving calls.
9       Q.  Or receiving calls?
10      A.  (Witness nodded head up and down.)
11      Q.  Did I hear that right?
12      A.  Yes.
13      Q.  Okay.  You also testified that
14  American Protection's Do Not Call list did not need to
15  be provided to subcontractors because the Do Not Call
16  list interfaces with the telephony system that's used by
17  the subcontractors.
18      Do you recall that?
19      A.  Yes.
20      Q.  Okay.  I kind of want to delve into this.
21      Can you explain what you mean by the telephony
22  system?
23      A.  You made a comment I do not understand.  I'm
24  sorry, Mr. Tandy -- Mr. Smith.
25      What did you say before that?
                                          Page 140

4 (Pages 137 - 140)

1    A.  What do you mean by "resources"?
2    Q.  Well, let's -- let's start with systems.  Okay?
3        Did she have access to the Inline CRM system?
4    A.  Yes.
5    Q.  Did she have access to Five9?
6    A.  If that's what -- if that's what was used at
7  the time, then yes.
8    Q.  Okay.  Does American Protection provide any
9  access to any other systems to its subcontractors?
10   A.  E-mail.
11   Q.  E-mail.  What e-mail service does
12  American Protection use?
13   A.  It's a company in Germany called "netcup."
14   Q.  Okay.  And for the systems that you just
15  testified you provided access to for Ms. Jaeger, is that
16  the same for all subcontractors?
17   A.  Yes.
18   Q.  Does American Protection provide its
19  subcontractors with a copy of its Do Not Call policy?
20   A.  Yes.
21   Q.  Okay.  Does it provide them with a copy of
22  their sales rules?
23   A.  Yes.
24   Q.  Does it provide them with a copy of the sales
25  script that we reviewed as Exhibit 4?
                                              Page 177

1    A.  Yes.
2        (Previously marked Deposition Exhibit 4 was
3    identified for the record.)
4  BY MR. SMITH:
5    Q.  Does American Protection provide any training
6  to its subcontractors?
7    A.  Yes.
8    Q.  Can you tell me what training it would provide?
9    A.  Sure.  Of how to utilize the Inline system.
10   Q.  And there's --
11   A.  And other basic -- other basic information,
12  such as the type of coverages that we offer, just basic
13  stuff.
14   Q.  Okay.  Does it ever provide any training
15  specific to placing telephone calls?
16       MR. CAFFAS:  Objection.  Vague.
17       THE WITNESS:  Yes.
18  BY MR. SMITH:
19   Q.  Can you tell me what training that would be?
20   A.  Sure.  We reviewed the DNC policy.  We want
21  to -- we want to make sure they understand how to put a
22  number on the DNC list, et cetera.
23   Q.  Okay.  Does it ever brought -- sorry.
24       Does American Protection ever provide any
25  training with respect to compliance with the
                                              Page 178

1  Telephone Consumer Protection Act?
2    A.  Within the scope of the DNC policy we provide.
3    Q.  Anything beyond that?
4    A.  No.
5    Q.  Okay.  So I just want to make sure I understand
6  this.
7        Does American Protection provide its
8  subcontractors with access to the leads it receives to
9  contact?
10   A.  No.
11   Q.  No.  Does it provide them with access to the
12  Five9 system that permits them to contact the leads that
13  it receives?
14   A.  Yes.  It's a limited -- limited access.
15   Q.  Okay.  I'm pulling up my next exhibit.
16       MR. SMITH:  Can we take a five-minute break,
17  actually?
18       MR. TANDY:  Certainly.
19       MR. CAFFAS:  That's fine.
20       MR. TANDY:  Kobi, go ahead and turn your camera
21  and microphone off, and we'll-- when we get back,
22  we'll ask you --
23       (Recess taken from 10:39 a.m. to 10:48 a.m.)
24       MR. SMITH:  Courtney, can we go back on the
25  record?
                                              Page 179

1        THE COURT REPORTER:  Yes, sir.  Thank you.
2  BY MR. SMITH:
3    Q.  Kobi, I'm going to play a recording that's been
4  produced in this litigation.
5        MR. SMITH:  It's going to be marked as
6  Exhibit 13 to this deposition.
7        (Deposition Exhibit 13 was marked.)
8        MR. SMITH:  For the record, this is a recording
9  produced by Plaintiff.  It's been produced in
10  litigation and marked as "SMITH000027."  I'm going
11  to play it in full.
12       (At this time the recorded voicemail was played
13  for the witness.)
14       MS. JAEGER:  Hi, Ruth.  This is Samantha
15  calling with America Protection.  I'm just calling
16  you to get the VIN number on your BMW to get your
17  coverage going for you.  I will be back in the
18  office in about an hour.  I'm going to lunch.
19       My number is 1-800-427-1806, extension 5005.
20       Talk to you soon.  Bye-bye.
21       (Recording concluded.)
22  BY MR. SMITH:
23   Q.  Do you recognize that voice at all?
24   A.  She's identified herself as Samantha.
25   Q.  Yeah.  So would this be Samantha Jaeger?
                                              Page 180

                              14 (Pages 177 - 180)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    A.  I believe so.
2    Q.  Okay.  And she starts this with saying, "This
3  is Samantha calling with American Protection."
4        Did you hear that?
5    A.  Yes.
6    Q.  Is that how subcontractors would typically
7  start a call?
8    A.  Typically, they will identify who they -- who
9  they are and who they're calling from.
10   Q.  But that's not -- I'm just trying to understand
11  if this call would be out of the ordinary.
12      Is that typically how a subcontractor would
13  identify themselves on behalf of American Protection?
14      MR. CAFFAS:  Objection.  Asked and answered.
15  Vague.
16      MR. TANDY:  Objection.
17      MR. CAFFAS:  And I think it's calling for
18  speculation and a legal conclusion, as to who
19  they're calling on behalf of.
20  BY MR. SMITH:
21   Q.  You can answer.
22   A.  They would usually -- they would usually have a
23  script, identify who they are and the company they're
24  calling from.
25   Q.  Okay.  So would you say that's typical or
Page 181

1    A.  Yes, it is.
2    Q.  Okay.  Do you know if the Five9 system keeps
3  recordings of calls?
4    A.  Yes, it does.
5    Q.  And could recordings of calls be downloaded?
6    A.  Yes.
7        MR. SMITH:  Give me a second.  I'm going to
8  move to my next exhibit.
9  BY MR. SMITH:
10   Q.  Okay.  I'm going to play another recording for
11  you.
12      MR. SMITH:  I'm going to mark it as Exhibit 14
13  to this deposition.
14      (Deposition Exhibit 14 was marked.)
15      MR. SMITH:  This is another recording produced
16  by Plaintiff, and it's been produced in the
17  litigation and marked as "SMITH000028," so I'm going
18  to play it in full.
19      (At this time the recorded voicemail was played
20  for the witness.)
21      MS. COLETTA:  Hi, good afternoon.  This message
22  is for Ruth.  This is Dawn with American Automotive
23  Protection Corp.  I was calling to follow up with
24  you from your policy with us.  I work here with
25  Samantha Jaeger.  She asked me to give you a call,
Page 183

1  that's out of the ordinary for how they would identify
2  themselves?
3      MR. CAFFAS:  Objection.  He's answered that
4  twice now.
5      THE WITNESS:  Again, I think that's how they
6  would -- they should.
7  BY MR. SMITH:
8    Q.  Got it.  She provides a telephone --
9      THE COURT REPORTER:  I'm sorry.
10      MR. SMITH:  Sorry.  Go ahead.
11      THE COURT REPORTER:  Could you state the
12  objection again?  You kind of cut out.
13      MR. CAFFAS:  I think I -- which -- which time?
14  The last time?
15      THE COURT REPORTER:  Correct.
16      MR. CAFFAS:  I just said objecting to asked and
17  answered twice now.
18      THE COURT REPORTER:  Thank you.  Sorry.
19      MR. CAFFAS:  Not a problem.
20      MR. SMITH:  Okay.
21  BY MR. SMITH:
22   Q.  Kobi, she provides a telephone number which is
23  800-427-1806.
24   A.  Yes.
25   Q.  Is that American Protection's telephone number?
Page 182

1  but please give us a call back at 800-427-1806.  I'm
2  at extension 1191.
3      And, again, this is regarding your policy with
4  us, but it's important that you give us a call back
5  so we can confirm your information for the file.
6  Thank you so much, and have a nice evening.
7      Bye-bye.
8      (Recording concluded.)
9  BY MR. SMITH:
10   Q.  Do you recognize that voice?
11   A.  Yes.
12   Q.  Can you tell me who that is?
13   A.  Her name is Dawn.
14   Q.  Do you know her last name?
15   A.  Coletta, C-o-l-e-t-t-a.
16   Q.  So what is Dawn's role?
17   A.  Dawn's role is in the back office, so --
18   Q.  Can you explain what that means?
19   A.  Yeah.  Assistance with if we need to obtain a
20  VIN number or a credit card.
21   Q.  Okay.  Is she an employee of
22  American Protection, or is she a subcontractor?
23   A.  She's a subcontractor.
24   Q.  Okay.  Is she still working with you?
25   A.  Yes.
Page 184

15 (Pages 181 - 184)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

| | |
|---|---|
| 1   Q.  Do you know how long she's worked with you? | 1   Q.  The second sentence of this e-mail says, "I |
| 2   A.  A few years. | 2  enjoyed speaking with you today about your vehicle and I |
| 3   Q.  Is there a difference between her role and | 3  wanted to provide you with the information below for |
| 4  Samantha Jaeger's role? | 4  your review." |
| 5   A.  Yes. | 5      Do you see that? |
| 6   Q.  Can you tell me that difference? | 6   A.  Yes. |
| 7   A.  Samantha was in sales, while Dawn is more of | 7   Q.  Is it fair to say this e-mail would have |
| 8  a -- again, of a back office or admin type of a role. | 8  followed a phone call? |
| 9   Q.  When we previously talked about subcontractors, | 9   A.  Yes. |
| 10  you told me you had about one to two at any particular | 10   Q.  Okay.  Is it common for American Protection to |
| 11  time. | 11  send follow-up e-mails to potential clients? |
| 12      Were you referring to sales subcontractors? | 12   A.  Yes. |
| 13   A.  Yes. | 13   Q.  You produced this document, correct? |
| 14   Q.  Okay.  Do you have any other subcontractors | 14   A.  I believe the plaintiff did. |
| 15  that do back-end work besides Dawn? | 15   Q.  I think you produced the one we're going to |
| 16   A.  Yes. | 16  review next, not this one. |
| 17   Q.  Can you tell me their names? | 17      But in any regard, do you know which system |
| 18   A.  Matt Conway. | 18  this e-mail would have been sorted? |
| 19   Q.  Can you spell that as well? | 19   A.  Inline. |
| 20   A.  M-a-t-t C-o-n-w-a-y. | 20   Q.  Inline.  Okay. |
| 21   Q.  Anyone else? | 21      Do you know how far back American Protection |
| 22   A.  No. | 22  maintains records of e-mails? |
| 23   Q.  Give me a minute.  I'm pulling up another | 23   A.  No, I do not. |
| 24  exhibit. | 24   Q.  Would it be for the entire relevant time |
| 25      (Deposition Exhibit 15 was marked.) | 25  period? |
| Page 185 | Page 187 |
| 1  BY MR. SMITH: | 1      MR. TANDY:  Objection. |
| 2   Q.  All right, Kobi.  I'm showing you what's been | 2      MR. CAFFAS:  Can you say -- |
| 3  marked as Exhibit 15. | 3      THE WITNESS:  I'm not -- I'm not sure. |
| 4      Do you recognize this document? | 4      MR. TANDY:  What? |
| 5   A.  Yes. | 5      MR. CAFFAS:  Before Kobi answers, can you state |
| 6   Q.  Can you tell me what it is? | 6   the basis of your objection? |
| 7   A.  This is the e-mail that was sent out to | 7      MR. TANDY:  Sure.  My basis for the -- for the |
| 8  Ruth Smith. | 8   objection is he asked the question for the entire |
| 9   Q.  Okay.  That was sent on May 28th, 2020, at | 9   period, could he tell, and the answer was no, so |
| 10  3:30 p.m. Eastern; is that correct? | 10   the -- this question, right, it's a -- it's |
| 11   A.  Yes. | 11   basically asked and answered.  It seems to be the |
| 12   Q.  This was sent by Samantha Jaeger? | 12   same question in a -- in a different format. |
| 13   A.  Yes. | 13  BY MR. SMITH: |
| 14   Q.  Do you see, in the e-mail, it says, | 14   Q.  You can answer the question. |
| 15  "Customer Number," and it says, "617RC12986"? | 15   A.  Can you please repeat it?  I want to make sure |
| 16   A.  Yes. | 16  I am -- |
| 17   Q.  Do you know what that number is? | 17   Q.  Yeah.  Do you know if Inline CRM system |
| 18   A.  I believe that's assigned by Inline CRM. | 18  maintains records of e-mails throughout the entire |
| 19   Q.  Okay.  Would there be -- | 19  relevant time period? |
| 20      So would each lead within the system have a | 20   A.  I am not sure what is the policy of maintaining |
| 21  different customer number? | 21  e-mails.  Honestly -- |
| 22   A.  I believe so. | 22   Q.  That's -- |
| 23   Q.  Okay.  Is this e-mail following up regarding a | 23   A.  -- it's so long ago, but I'm not sure.  I'm not |
| 24  SunPath vehicle service contract plan? | 24  sure.  I cannot give you a -- |
| 25   A.  I think so. | 25   Q.  Okay.  That's fine.  Give me another minute. |
| Page 186 | Page 188 |

16 (Pages 185 - 188)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1 actively selling auto warranties for?
2    A. This is the two names of SunPath and Wesco.
3 I'm not sure why and who's Wesco. It could be just the
4 underwriting company that SunPath is working with.
5    Q. Okay. And then inactive appointments, there is
6 a list of companies.
7       Do you see that?
8    A. Yes.
9    Q. Are these companies that American Protection
10 used to sell auto warranties for?
11    A. Again, not all of them, but I believe some of
12 them pertain to the -- to the reinsurance company or the
13 underwriting company.
14    Q. Okay. All right. I think I'm -- if we take a
15 ten-minute break, I think I'm done asking questions, but
16 I'm sure Greg has some follow-up questions.
17       Is it fine if we take a ten-minute break and
18 then reconvene?
19       MR. CAFFAS: Yes, that's fine. So after ten
20 minutes --
21       THE WITNESS: I'm so sorry to interrupt. The
22 line just -- there's a storm going on outside, and
23 the light just flashed here I apologize, by the way,
24 Greg, to interrupt you.
25       I don't want to lose electricity again. I

Page 193

1 don't know. There's a hurricane looming here. If
2 you want to just continue, I'm available now. I
3 just don't want to have to lose power and then have
4 to reconvene. I just wanted to put it out there.
5       MR. SMITH: Okay.
6       MR. CAFFAS: That's fine.
7       THE WITNESS: The lights have flickered a few
8 times, so.
9       MR. SMITH: Can we go off the record for a
10 second?
11       MR. TANDY: Sure.
12       (Discussion held off the record.)
13       MR. SMITH: Are we ready?
14       THE COURT REPORTER: All set.
15       MR. CAFFAS: Yeah. So, Taylor, before we
16 begin, are you going to be continuing, and then I'll
17 be allowed to cross?
18       MR. SMITH: Yes. I have about three questions,
19 and then I'll turn it over.
20       MR. CAFFAS: Okay.
21       MR. SMITH: Okay.
22 BY MR. SMITH:
23    Q. Kobi, in response to the subpoena, did you
24 search the Five9 system for records of calls to
25 plaintiffs --

Page 194

1    A. Yes.
2    Q. -- to Plaintiff?
3    A. Yes.
4    Q. And when you stated that the Five9 system keeps
5 records for 30 to 60 days, was that an estimate or do
6 you know, for a fact, that's true?
7    A. I know, for a fact, that's true.
8    Q. Okay. And did you search the Five9 system for
9 records of any other calls that would be responsive to
10 the subpoena?
11    A. Yes.
12    Q. Okay. And there were no records?
13    A. None.
14       MR. SMITH: Okay. All right. Greg, you can
15 take over.
16             CROSS-EXAMINATION
17 BY MR. CAFFAS:
18    Q. Hi, Mr. Chukran. Thanks again for taking some
19 time to continue this deposition.
20       As we mentioned last time, my name's
21 Gregory Caffas. I am here as counsel for SunPath in
22 this case, so I'm just going to be asking you a few
23 questions in addition to what Mr. Smith has -- has given
24 to you today.
25       American Protection's business practices are

Page 195

1 only to call people who have opted in, correct?
2    A. Yes.
3    Q. And when you -- when you say "only to call
4 people who opted in" do you -- what do you mean by
5 "opted in"?
6    A. It's --
7       MR. SMITH: Objection. Asked and answered.
8       MR. TANDY: You -- you can answer, Kobi.
9       THE WITNESS: It means they requested -- they
10 requested to be contacted from us, specifically.
11 BY MR. CAFFAS:
12    Q. Okay. And that could be from --
13       Can you tell me what kind of methods they would
14 have been providing their request to be contacted by
15 American Protection, specifically?
16    A. As I --
17       MR. SMITH: Objection. Asked and answered.
18       THE WITNESS: As I -- as I replied in my
19 response, I provided this information either via
20 online, via a website, or via calling in.
21 BY MR. CAFFAS:
22    Q. Has American Protection, including through any
23 subcontractors, ever knowingly or willfully called
24 anyone who had specifically requested not to be called
25 by American Protection?

Page 196

18 (Pages 193 - 196)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    MR. SMITH:  Objection.

2    THE WITNESS:  No.

3    MR. SMITH:  Calls for speculation.

4 BY MR. CAFFAS:

5    Q.   Can you repeat your answer, Mr. Chukran?

6    A.   No.  Yes, I can repeat my question-- it

7 was -- and my answer, it was no.

8    Q.   Thank you.  I had -- I had heard you.  I'm just

9 continuing down my list.  Thank you.

10       There was a recording played to you a few

11 minutes ago on which someone named Dawn had left a

12 voicemail, presumably for Plaintiff.

13       Do you remember that recording?

14   A.   Yes.

15   Q.   And you had said that Dawn worked on the -- the

16 backend of American Protection.

17       Is that how you described her position?

18   A.   Yes.

19   Q.   And does that mean that Dawn would have only

20 been making calls to someone who was already a customer

21 or who had already expressed interest in purchasing a

22 product from American Protection?

23       MR. SMITH:  Objection.  Calls for speculation.

24       THE WITNESS:  Yes.

25 BY MR. CAFFAS:

Page 197

1    Q.   Would Dawn be making any kind of sales calls at

2 all?

3       MR. SMITH:  Objection.

4       THE WITNESS:  No.

5       MR. SMITH:  Calls for speculation.

6 BY MR. CAFFAS:

7    Q.   Would Dawn have been making any phone calls

8 using the same dialing system that someone calling to

9 make a solicitation call would have used?

10   A.   Yes.

11   Q.   Let me ask that in a different way.

12       So what -- what type of dialing system would

13 Dawn have been using to contact potentially Ms. Smith?

14   A.   The same -- the same one that Samantha Jaeger

15 was using.

16   Q.   Okay.  So she, Dawn, in this case, would have

17 had -- would she not have manually dialed the person who

18 had already expressed interest to call them back?

19       MR. SMITH:  Objection.  Calls for speculation.

20       Lacks foundation.

21       THE WITNESS:  Yes.

22 BY MR. CAFFAS:

23   Q.   "Yes," she would have been manually dialing?

24   A.   Yes.

25   Q.   Okay.  I'm just trying to rectify your answer

Page 198

1 here.

2       So it would seem that Ms. -- or Dawn would have

3 known that someone had already expressed interest, so

4 she would have used a telephone where she manually took

5 that customer's information and called them, in

6 particular, herself?

7       MR. SMITH:  Objection.  Calls for speculation.

8       Misstates the witness's testimony.

9       THE WITNESS:  Yes.

10 BY MR. CAFFAS:

11   Q.   Okay.  So do you --

12       Are you able to say, for a fact, whether that

13 was on a physical telephone, or would this be stored in

14 a computer system?

15   A.   No.  It was -- that was the same phone system

16 that would be virtual or via web browser.

17       In this case, the plaintiff gave us a credit

18 card number and agreed to the terms of the sale, so as

19 far as Dawn, she had written consent from a customer of

20 ours.

21   Q.   Uh-huh.  So my confusion, Mr. Chukran, is I

22 believe your testimony earlier was, when someone is

23 contacted as a potential -- to make a potential sale,

24 they are in a list, and they are being -- the

25 subcontractor of American Protection that is going to be

Page 199

1 making the sale, is waiting for them to be connected

2 with someone who picks up on a call, correct?

3    A.   Yes.

4    Q.   Whereas Dawn, who is calling once the consumer

5 has already expressed interest in a product, appears to

6 have known about this and is specifically calling them

7 back, in particular; is that correct?

8    A.   Yes.  She -- she manually dialed it, yes.

9    Q.   Okay.  So that system demands that it be

10 manually dialed on occasion, too?

11   A.   Yes.

12   Q.   I also want to clarify something you had said

13 about whatever dialing system the subcontractors for

14 American Protection are using.

15       You had said that it is just dialing from a

16 list of leads, correct?

17   A.   Yes.

18   Q.   And, again, this would only be a list of leads

19 that were uploaded to the system of people that had

20 already requested to be called specifically by

21 American Protection?

22       MR. SMITH:  Object to form.

23       THE WITNESS:  Yes.  Yes, or somebody that

24   called in on our toll-free number for information.

25 BY MR. CAFFAS:

Page 200

19 (Pages 197 - 200)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1 American Protection, then maybe that they left some
2 restrictions in place for them. That's the only
3 scenario I'm familiar with.
4 Q. Did that ever happen?
5 A. No.
6 Q. Did SunPath have any say over the number of
7 employees or independent contractors that
8 American Protection had on its staff?
9 A. No.
10 Q. To your knowledge, would SunPath even know the
11 names of any of American Protection's employees or
12 independent contractors, besides yourself?
13 A. No.
14 Q. Does SunPath have any kind of control over
15 whether American Protection uses subcontractors to
16 generate lead information?
17 A. No.
18 Q. Does SunPath control where or how
19 American Protection would purchase any kind of supplies
20 for its services, like computers or anything like that?
21 A. No.
22 Q. Did SunPath direct how American Protection was
23 going to perform any work at all?
24 A. Re -- can you please repeat the question?
25 Q. Did SunPass -- Path control how

Page 221

1 A. The various type of -- types of plans that are
2 available, what's covered, what's not.
3 Q. So the only type of training, if you could even
4 call it that, was making sure that American Protection
5 understood what SunPath's products were?
6 MR. SMITH: Objection. Misstates the witness's
7 testimony.
8 THE WITNESS: Yes.
9 BY MR. CAFFAS:
10 Q. And SunPath never trains any of
11 American Protection's subcontractors, right?
12 MR. SMITH: Object to form.
13 THE WITNESS: I'm not sure. I'm not sure of
14 that.
15 BY MR. CAFFAS:
16 Q. All right. You had -- you had said earlier
17 that SunPath wasn't even aware of who
18 American Protection's subcontractors were, right?
19 So that it didn't train these people that they
20 didn't know who they were obviously, right?
21 MR. SMITH: Objection. Argumentative. Asked
22 and answered. Mischaracterizes the witness's
23 testimony.
24 THE WITNESS: On occasion, some companies would
25 offer training that could be done, for example, via

Page 223

1 American Protection performed any of its work at all?
2 A. As I stated previously, SunPath would provide
3 us with numbers to be added to the Do Not Call list.
4 Q. And when SunPath did that, would you add them
5 to your internal Do Not Call list?
6 A. Yes.
7 Q. Other than providing American Protection with
8 numbers to be added to its own internal Do Not Call
9 list, did SunPath have any say over who
10 American Protection called at any time?
11 A. No.
12 Q. Did SunPath have any control over what type of
13 product was offered by American Protection or any of its
14 subcontractors to any customer?
15 A. Just within their own product offering.
16 Q. But if there was a --
17 It didn't restrict from selling the product of
18 a competitor even?
19 A. I don't believe so, no.
20 Q. Did SunPath provide any kind of training to
21 American Protection?
22 A. Any kind of what?
23 Q. Training.
24 A. Just in terms of product training.
25 Q. What do you mean by that?

Page 222

1 Zoom, and that would include some subcontractors
2 attending those, those trainings.
3 BY MR. CAFFAS:
4 Q. And did that include SunPath?
5 MR. SMITH: Objection. Asked and answered.
6 THE WITNESS: Possibly. I'm not sure of an
7 exact -- I don't have a time. I don't know exactly,
8 but SunPath does have a sales representative. His
9 name's Brian. It is my understanding his job is to
10 provide training.
11 I don't recall exactly if that was -- if that
12 happened or not, but yeah, potentially. Potentially
13 SunPath does provide training, yes.
14 BY MR. CAFFAS:
15 Q. And you had said already, though, that if it
16 was any kind of training, it would just be as to what
17 SunPath's products are?
18 MR. SMITH: Objection. Asked and answered.
19 THE WITNESS: In some cases, they would
20 offer -- and, again, I -- I don't have specific
21 incidents, but just in terms of industry, sometimes
22 they would offer some incentives of the highest
23 sales for the month, for example. They would offer
24 some kind of a cash incentive.
25 BY MR. CAFFAS:

Page 224

25 (Pages 221 - 224)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    Q.   But you are saying that this is just an
2    industry-wide thing; this isn't specifically SunPath,
3    right?
4         MR. SMITH:  Objection.  Mischaracterizes the
5    witness's testimony.
6         THE WITNESS:  Yes.
7         MR. CAFFAS:  I'm trying to get to -- sorry.
8    I'm just going to back up.
9    BY MR. CAFFAS:
10   Q.   And you're saying this is an industry-wide
11   testimony -- or an industry-wide practice, not
12   specifically SunPath, right?
13        MR. SMITH:  Same objection.
14        THE WITNESS:  I'm aware that a few different
15   companies provide the same type of incentives.
16   BY MR. CAFFAS:
17   Q.   Now, you don't know of any specific time when
18   any subcontractor would have taken any kind of classes
19   like that from SunPath?
20   A.   I don't recall.
21   Q.   Did SunPath ever pay for any of
22   American Protection's office space, for example?
23   A.   Can you please repeat the question?
24   Q.   Did SunPath pay for any office space used by
25   American Protection?

Page 225

1    A.   No.
2    Q.   Did SunPath ever reimburse you for any of --
3    any expenses associated with office space, travel
4    expenses, or office supplies?
5    A.   No.  I believe they may have provided some
6    stationeries, pens, and mouse pads and -- and -- and
7    table -- table -- or desk mats with their product name
8    on it and stuff.
9    Q.   So this would be like mouse pads and
10   advertising-type products?
11   A.   Yes.
12   Q.   But there was no reimbursement for
13   American Protection or any of its subcontractors like
14   providing office supplies, right?
15   A.   No, I don't believe so.
16   Q.   Who paid American Protection's subcontractors?
17   A.   We did.
18   Q.   Is it correct to say that American Protection's
19   subcontractors were not ever compensated directly by
20   SunPath?
21   A.   Yes.
22   Q.   All right.  Mr. Chukran, I'm sharing my screen
23   with you again.
24        Can you see what's listed -- or what's
25   displayed on my screen as a "Seller Agreement"?

Page 226

1    A.   Yes.
2    Q.   And --
3         MR. SMITH:  Greg, that's Exhibit 3.
4         MR. CAFFAS:  All right.
5         (Previously marked Deposition Exhibit 3 was
6    identified for the record.)
7    BY MR. CAFFAS:
8    Q.   All right.  And, as Mr. Smith has mentioned,
9    this has already been shown to you as Exhibit 3.
10        This is the agreement that American Protection
11   and Chukran Management had entered in to with SunPath,
12   correct?
13   A.   Yes.
14        MR. SMITH:  Objection.  Misstates the evidence.
15   BY MR. CAFFAS:
16   Q.   Sorry.  I'm scrolling down to the bottom, where
17   it --
18   A.   (Witness perused document.)
19   Q.   I apologize.  I appear to be missing a page.
20   Give me one second.  I'm going to stop sharing my screen
21   while I --
22        (Pause in the proceedings.)
23        MR. SMITH:  Greg, while you figure this out,
24   could we take a brief, two-minute break?
25        MR. CAFFAS:  Yes, sure.  Let's -- let's break

Page 227

1    for a couple minutes, and when I get back, I will
2    direct you to the correct place.
3         (Recess taken from 12:02 p.m. to 12:08 p.m.)
4         MR. CAFFAS:  Okay.  Are we back on the record?
5         THE COURT REPORTER:  Yes, sir.  Thank you.
6         MR. CAFFAS:  All right.  I am going to share my
7    screen one more time, and I have this on the screen
8    as the "Call Center Marketing Agreement," which I
9    believe is Exhibit 2, not Exhibit 4.
10        (Previously marked Deposition Exhibit 2 was
11   identified for the record.)
12        MR. CAFFAS:  Yeah.  I just wanted to correct
13   that mistake from last time.
14   BY MR. CAFFAS:
15   Q.   Do you see that on the screen, Mr. Chukran?
16   A.   Yes.
17   Q.   And you recognize that as what's already been
18   discussed as Exhibit 2?
19   A.   Yes.
20   Q.   Okay.  And so this is the Call Center Marketing
21   Agreement between Chukran Management or
22   American Protection and SunPath?
23   A.   Yes.
24   Q.   And do you see, on Page 2 -- or -- sorry.
25   Excuse me -- Paragraph 2, under the "General Provisions,"

Page 228

26 (Pages 225 - 228)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    A.  As a subcontractor, if they are varying from
2  that, it's -- potentially, it's possible, yes.
3    Q.  In what circumstances would that have happened?
4    A.  So if they decide to -- if they decide to share
5  information about the Powerball drawing or some small
6  talk, yes, it's possible.
7    Q.  Okay.  But, otherwise, the information really
8  is what they're selling and their introduction, was only
9  authorized to -- they're only authorized to use what's
10  in the script?
11        MR. SMITH: Objection.  Asked and answered.
12  BY MR. CAFFAS:
13    Q.  You can answer.
14    A.  Yeah.  Again, as a subcontractor, we can
15  provide them a guideline of -- of -- of a script.  At
16  the end of the day, they are their own subcontractor.
17    Q.  And did you ever advise any of your
18  subcontractors or employees that were using this script
19  to hide their identity when speaking to potential
20  customers?
21        MR. SMITH: Objection.
22        THE WITNESS:  Absolutely not.
23        MR. SMITH:  Asked and answered.
24  BY MR. CAFFAS:
25    Q.  Can you repeat your answer again?
                                          Page 233

1    Q.  Has SunPath ever directed American Protection
2  or any of its subcontractors to violate the Virginia
3  Telephone Privacy Protection Act?
4    A.  No.
5    Q.  Has American Protection ever knowingly called
6  the plaintiff, Ruth Smith, in violation of the Telephone
7  Consumer Protection Act?
8        MR. SMITH: Objection.  Calls for speculation.
9        THE WITNESS: No.
10  BY MR. CAFFAS:
11    Q.  I'll rephrase in case I said that incorrectly.
12        Had -- has American Protection ever
13  intentionally or knowingly called Ruth Smith in
14  violation of the Telephone Consumer Protection Act?
15        MR. SMITH: Objection.  Calls for speculation.
16        THE WITNESS: No.
17  BY MR. CAFFAS:
18    Q.  Has American Protection, including any of its
19  subcontractors, ever intentionally or knowingly called
20  Ruth Smith in violation of the Virginia Telephone
21  Privacy and Protection Act?
22        MR. SMITH: Objection.  Calls for speculation.
23        THE WITNESS: No.
24  BY MR. CAFFAS:
25    Q.  Has SunPath ever directed American Protection
                                          Page 235

1    A.  No.
2    Q.  Is it correct that, in this exhibit, as
3  written, SunPath's name isn't mentioned in the sales
4  script or on the -- the cover of the -- the script at
5  all?
6    A.  Correct.
7    Q.  Okay.  Has American Protection or any
8  subcontractors that it hired ever intentionally violated
9  the Telephone Consumer Protection Act, to your
10  knowledge?
11    A.  No.
12    Q.  Have you ever advised any of
13  American Protection's employees or subcontractors to
14  violate the Telephone Consumer Protection Act?
15    A.  No.
16    Q.  Has SunPath ever advised American Protection to
17  violate the Telephone Consumer Protection Act?
18    A.  No.
19    Q.  Has American Protection, including any of its
20  subcontractors, ever intentionally violated the Virginia
21  Telephone Privacy Protection Act?
22        MR. SMITH: Objection.
23        THE WITNESS: No.
24        MR. SMITH: Lacks foundation.
25  BY MR. CAFFAS:
                                          Page 234

1  or any of its subcontractors to intentionally or
2  knowingly violate the Virginia Telephone Privacy
3  Protection Act?
4    A.  No.
5    Q.  Has American Protection, including through any
6  of its subcontractors/employees, ever knowingly violated
7  any telemarketing laws?
8    A.  Can you please repeat the question?
9    Q.  Has American Protection, including through any
10  of its employees or subcontract -- subcontractors, ever
11  knowingly violated any telemarketing laws?
12    A.  No.
13    Q.  And has SunPath ever directed or controlled
14  American Protection, including through any of its
15  employees or subcontractors, to violate any kind of
16  telemarketing law?
17    A.  I'm sorry.  Can you repeat the question?
18    Q.  Has SunPath ever --
19    A.  I apologize.  I apologize.  Go ahead.
20    Q.  Has SunPath ever directed or controlled
21  American Protection, including through any kind of
22  employee or subcontract -- subcontractor, to violate any
23  kind of telemarketing law?
24    A.  I'm sorry.  Can you please repeat the question
25  again?  For the last time.
                                          Page 236

28 (Pages 233 - 236)

Kobi Chukran (Chukran Management Group) , Volume 2 - November 9, 2022

1    Q.  Has SunPath ever directed or controlled
2  American Protection, including through any kind of
3  subcontractor/employee, to violate any kind of
4  telemarketing law?
5    A.  No.
6        MR. CAFFAS:  Thank you.  That's all --
7        THE WITNESS:  I apologize, Greg.  By the way,
8  that was not intentional.  My apology.
9        MR. CAFFAS:  Not a problem.
10       That's all I have for you right now.
11       I reserve my right to -- to recross based on
12  anything Taylor might -- might ask you or anything I
13  might have missed, but I'll cede to Taylor again
14  right now.
15       MR. SMITH:  Okay.
16           REDIRECT EXAMINATION
17  BY MR. SMITH:
18    Q.  Kobi, I'll try to be quick so you can get out
19  of here.  I want to discuss Exhibit 4, which is the
20  sales script, and I'm happy to bring it up, if you want.
21  Just let me know.  The questions are pretty
22  straightforward, though.
23       You've just testified that, when a
24  subcontractor would utilize the sales agreement, they
25  would say hi, insert the name of the prospective client,

Page 237

1  and then say this is, first and last name of the
2  subcontractor, and then continue on.
3       Do you recall that?
4    A.  Yes.
5    Q.  What is your basis for saying that a
6  subcontractor would utilize their first and last name?
7        MR. TANDY:  Objection.
8        You may answer.
9        THE WITNESS:  I believe this came up in the
10  initial deposition time, and my answer back then and
11  today will be that there is -- there has not been
12  any specific instructions as to whether they should
13  use both first name and last name.
14       The instruction was just to identify themselves
15  with their true name, but there's not been any
16  instruction just to -- whether they should use both
17  names or first name or last name, first, et cetera.
18  BY MR. SMITH:
19    Q.  Got it.  And that's kind of why I'm asking.
20       Because if you recall the two recordings, so
21  Recording 13 -- and I'm happy to replay it.
22    A.  Okay.
23    Q.  Just let me know.
24    A.  Okay.
25    Q.  She says "Hi, this is Samantha."  She doesn't

Page 238

1  utilize her last name, correct?
2    A.  Correct.
3    Q.  And Exhibit 14, it begins with, "Hi, this is
4  Dawn."
5       She didn't utilize her last name, right?
6    A.  Right.
7    Q.  Okay.  So you can't necessarily say that, on
8  every occasion, your subcontractor identified themselves
9  by first and last name, correct?
10       MR. TANDY:  Objection.
11       You can answer.
12       THE WITNESS:  Again, there's no -- there's no
13  specific -- there's no specific instructions to
14  whether they should just use their first name or
15  both first and last names.
16  BY MR. SMITH:
17    Q.  Got it.  I just wanted to clarify that.
18       All right.  And then Greg also brought up some
19  questions regarding your statement that Plaintiff called
20  in after receiving a mailer.
21       Do you recall those or that discussion, at
22  least?
23    A.  I'm sorry.  Can you please repeat the question?
24    Q.  Yeah.  You just discussed with opposing counsel
25  how you believe Plaintiff called American Protection

Page 239

1  after receiving a mailer.
2    A.  Yes.
3    Q.  Do you remember that?
4    A.  Yes.
5    Q.  Okay.  And I think the exact words you used
6  were, "it looks to be that she called in," right?
7    A.  Yes.
8    Q.  And you're basing that on the -- the Inline CRM
9  screenshots?
10    A.  Yes.
11    Q.  I just want to be clear.
12       American Protection doesn't have any call
13  records reflecting an inbound call from Plaintiff; is
14  that correct?
15    A.  Correct.
16    Q.  Got it.  We discussed the Five9 system today.
17       Do you know if you have an account number
18  associated with the Five9 system?
19    A.  I don't, or I'm not sure if I do.
20    Q.  Then is that something that could be produced,
21  if you do have one?
22    A.  I can look.
23    Q.  Okay.  Do you have any documents that would
24  identify the Five9 system?
25    A.  There would have been an agreement between us.

Page 240

29 (Pages 237 - 240)

```
 1                    CERTIFICATE OF REPORTER

 2                      (VIA VIDEOCONFERENCE)

 3    STATE OF WISCONSIN:

 4    COUNTY OF WINNEBAGO:

 5

 6         I, COURTNEY N. LANGHOFF, RMR, CRR, FPR-C,

 7    Notary Public, State of Florida, certify that I was

 8    authorized to and did stenographically and remotely

 9    report the Zoom videoconference deposition of

10    KOBI CHUKRAN (CHUKRAN MANAGEMENT GROUP, LLC); that a

11    review of the transcript was requested; and that the

12    foregoing transcript, pages 134 through 248, is a true

13    and accurate record of my stenographic notes.

14         I further certify that I am not a relative,

15    employee, or attorney, or counsel of any of the parties,

16    nor am I a relative or employee of any of the parties'

17    attorneys or counsel connected with the action, nor am I

18    financially interested in the action.

19

20         DATED this 16th day of November, 2022.

21

22

23

           COURTNEY N. LANGHOFF, RMR, CRR, FPR-C

24

25
```

Page 250