**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **RUTH SMITH**, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-00081-LMB-WEF |
| Plaintiff, | |
| v. | |
| **SUNPATH, LTD.**, a Massachusetts corporation, | |
| Defendant. | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO COUNT II OF HER COMPLAINT**

## I.    INTRODUCTION

Defendant SunPath, Ltd.'s ("Defendant" or "SunPath") Opposition to Plaintiff's Motion for Partial Summary Judgment largely mirror the arguments it set forth in its own motion for summary judgment, which, as Plaintiff explained in her response to that motion (dkt. 76), are either incorrect on the law, misrepresent the record, or both.

First, Defendant again argues that the calls at issue were made pursuant to an established business relationship ("EBR"), which supposedly means none of them constitute "telephone solicitations" under the Act. (Dkt. 81 at 2.) While true that Plaintiff placed an initial call to American Protection on May 26, 2020, this doesn't end the analysis. For one, that call wasn't answered by American Protection. Thus, whether the unanswered May 26, 2020 call constitutes an "inquiry" sufficient to establish an EBR is a yet-to-be-resolved question of law; Plaintiff contends that the EBR between herself and American Protection began on May 28, 2020, when she actually spoke at length with a representative regarding the products in question. Further, while it is undisputed that Plaintiff unambiguously demanded that the calls stop on June 11, 2020, the

1

applicability of the federal Telephone Consumer Protection Act's 30-day safe harbor rule to VTPPA claims is not supported by the text of the VTPPA, particularly where (as here) a stop request was never honored.  Even if the safe harbor were to apply here, as SunPath argues it should, Plaintiff still received fifty (50) calls made with the purpose of selling SunPath's products more than thirty days after her stop request. In other words, even if the Court finds that SunPath is correct that an EBR was established and correct that American Protection had 30 days after Smith said "stop" in which it could call her as often as it wanted without penalty, there are *still* fifty actionable calls which were made 31 or more days after the stop request and termination of the EBR.

Second, SunPath once again argues that it cannot be held jointly and severally liable under the VTPPA for calls made by American Protection. Though a dispute exists as to whether SunPath's name was mentioned on the calls, this inquiry is largely irrelevant. The undisputed facts support a finding that Defendant is a "seller" as defined in the statute and the purpose of the calls (which is central to the inquiry) was to sell Sunpath's products or services. And perhaps most importantly, there is no "clear and convincing" evidence to rebut the VTPPA's presumption that the calls were initiated on behalf or for the benefit of SunPath. In other words, under the VTPPA, it is *SunPath's* burden to prove that that it did not retain American Protection to make calls on its behalf or for its benefit *and* that the calls were made without SunPath's knowledge. SunPath hasn't come close to carrying its burden. To the contrary, SunPath and American Protection agreed to a contract, literally titled "Call Center Marketing Agreement," for the express purpose of retaining American Protection to make sales calls on its behalf and for its benefit.

Finally, SunPath claims that Plaintiff relies on inadmissible evidence, namely the Five9 call records. As fully explained in Plaintiff's responses to SunPath's motions in limine and to its motion to strike, the evidence is admissible. Moreover, there is nothing in the record to support

SunPath's assertion that the calls found therein "would not have been sales calls at all, but rather customer-service follow-up communications from American Protection." (Dkt. 81 at 3.) This argument does not pass the smell test. A telephone solicitation under the VTPPA means a call made "for the purpose of offering or advertising any property, goods, or services for sale, lease, license, or investment." As one court recently said, "the Court must also approach the purpose of the message with a measure of common sense. It is the purpose behind a call that controls, not what happened during the call. Except for encouraging the purchase of its products, it is hard to imagine why an insurance company would contact a consumer not already insured by it . . ." *Whittaker v. Freeway Ins. Servs. Am.*, LLC, 2023 WL 167040, at *2 (D. Ariz. Jan. 12, 2023). The Court should apply the same "common sense" test here. Smith was not a customer of SunPath or American Protection—American Protection didn't make over 100 "customer service" calls to a non-customer. It called her to sell her SunPath's product even after she told them to stop calling, and Plaintiff is entitled to summary judgment in her favor as a result.

## II.      STATEMENT OF UNDISPUTED FACTS

Despite its best efforts, SunPath cannot hide from the undisputed facts that form the basis of Plaintiff's Motion by relying on wordplay and editorializing. In fact, it is evident by both Parties' briefs that SunPath's cavils fall short of creating genuine disputes of material fact. Plaintiff's undisputed facts all arise from the content of deposition testimony and documents produced in discovery. Plaintiff therefore reasserts that there are no genuine material factual disputes, but responds to SunPath's quibbles below.

First, SunPath argues for several pages that the Five9 records are inadmissible. (Dkt. 81 at 3-7.) Plaintiff has responded in full to these arguments in her Response to Defendant's First Motion in Limine and does not wish to belabor the point. But, to recap, the Five9 records are admissible

for many reasons. First, both Plaintiff and SunPath became aware of Five9 at the exact same time and both Parties received the Five9 call records on the same day. Second, Five9 and its call records were made known to SunPath in discovery and SunPath concedes that it was aware of Five9 on November 9, 2022, a full month prior to the close of discovery, yet SunPath made no attempt to subpoena or question Five9 in any way. Third, the Five9 records are basic call records and no "specialized knowledge" is needed to understand them. It is not surprising that courts routinely find that reviewing and summarizing data or spreadsheets does not require expert testimony, including call records. Finally, despite SunPath's claim to the contrary, the records *have been* authenticated via a declaration from Five9.

As for SunPath's protestations about Plaintiff's undisputed facts, Plaintiff takes them in turn:

2.      The Parties do not actually dispute the nature of the relationship. The Call Center Marketing Agreement speaks for itself. Plaintiff understands and agrees that SunPath does not make calls on its own. Rather, it contracts with third parties to market SunPath VSCs.

3.      The deposition testimony SunPath cites proves the point that all SunPath's revenue is generated through telemarketing. That sales made through American Protection may have been a "very small" proportion of SunPath's overall revenue is beside the point. Nor does the fact that Smith made a single initial inbound call to American Protection change the fact that American Protection subsequently called her over 100 times.

5.      SunPath has simply reworded Plaintiff's statement of fact in a way that doesn't make a material difference.

6.      SunPath's protestation does not refute Plaintiff's sixth statement of fact. The CCMA speaks for itself.

7.      Again, the Call Center Marketing Agreement speaks for itself.

8.      Though SunPath consistently takes issue with the phrase "on behalf of", the underlying facts remain the same: American Protection engaged in soliciting the sale of SunPath's VSCs.

10.     Plaintiff doesn't dispute that American Protection testified that it employed subcontractors to engage in certain tasks. This does not make a material difference.

11.     This fact states "once a potential client is located, American Protection would gather necessary information from the potential client and submit the information for approval or rejection to SunPath". Nothing SunPath stated in its denial actually refutes this statement.

12-13.  SunPath's dispute is nonsensical. On the one hand, it claims it does not compensate American Protection in any way, but on the other it details how American Protection was compensated under the contract between SunPath and American Protection. Moreover, the Call Center Marketing Agreement speaks for itself.

14.     SunPath's "dispute" isn't actually a dispute. It admits that it filed a form with the Florida Department of Financial Services designating American Protection as a licensed seller of SunPath's products.

15.     Once again, SunPath's dispute isn't an actual dispute. It admits that it approved VSCs that were sold by American Protection.

16.     American Protection's testimony speaks for itself regarding its communications with SunPath and the frequency of such communications.

21.     Here, SunPath does not dispute what the Five9 records reveal. Rather, it disputes the admissibility of the Five9 records. As explained above and in Plaintiff's response to SunPath's motion in limine, the records are admissible and Smith has testified that they are an accurate

representation of the calls placed to her. SunPath protests that Smith never produced call records from AT&T, but SunPath never subpoenaed AT&T for these records. Moreover, despite SunPath's feigned ignorance about what a call with zero seconds in duration would signify, the answer is clear: those were just calls which were placed but not answered or connected. Plaintiff also notes that SunPath apparently did not require "specialized knowledge" to review and understand the Five9 records, since it was able to make this argument about the duration of certain calls placed to Smith. Finally, as explained herein, the purpose of the calls is common sense: to sell SunPath VSCs. American Protection had no other reason to call Smith.

22-23.  SunPath doesn't dispute the facts stated, it simply objects to Smith's declaration and the Five9 records, which Plaintiff has responded to both herein and more fully in her response to SunPath's motions in limine.

24.     SunPath is correct that SunPath's name did not appear until a link was clicked in the email which routed to SunPath's VSC, it was not in the body of the email itself. The email also speaks for itself.

26-27.  SunPath doesn't dispute the facts stated, it simply objects to Smith's declaration and the Five9 records, which Plaintiff has responded to both herein and more fully in her response to SunPath's motions in limine.

28.     SunPath does not actually dispute the facts stated. An alleged EBR is a separate matter from having prior express consent.

30.     Smith's testimony speaks for itself, as does the fact that shortly after one of American Protection's calls Smith was emailed a SunPath VSC by American Protection. (*See* May 28, 2020 Email and Link to American Protection Webpage, Dkt. 74-10.) Moreover, American Protection's own CRM system shows: (1) that Smith was pitched a SunPath VSC, and (2) that she

was not pitched a VSC provided by any other company. (*Compare* CRM Screenshots, Dkt. 74-13 pg. 1, *with* May 28, 2020 Email and Link to American Protection Webpage, Dkt. 74-10.) Thus, it is inaccurate to suggest that Smith wasn't solicited a SunPath VSC.

## III.    ARGUMENT

As an initial matter, Plaintiff does not object to SunPath's grouping of the calls into four groups. (*See* Dkt. 81 at 16.) However, SunPath's substantive arguments related to each group fail, for the reasons stated below.

### A.    Group 1 – Six Calls Placed Between May 26, 2020 and May 28, 2020

"Group 1" involves six calls placed between May 26, 2020 and May 28, 2020, calls which occurred after Plaintiff placed a call to American Protection which wasn't answered, and before she feigned interest in SunPath's VSC in order to figure out who was calling her. SunPath contends that the May 26, 2020 call placed by Smith created an EBR that permitted American Protection to call Smith and resolves SunPath of liability for these calls. (*Id.*) But there is no legal support for this position.

As defined in the VTPPA, in order to establish an EBR, an inquiry must be "regarding any property, good, or service" offered by the company, and Plaintiff's call was never answered. *See id.* § 59.1-510. Guidance on the federal TCPA is instructive on the establishment of an EBR: the term refers to a "prior or existing relationship formed by a *voluntary two-way communication* between a person or entity and a business" on the basis of an inquiry related to products or services. *E&G, Inc. v. Mount Vernon Mills, Inc.*, No. 6:17-CV-318-TMC, 2019 WL 4034951, at *3 (D.S.C. Aug. 22, 2019) (citing 47 C.F.R. § 64.1200 (f)(6)); *see also Charvat v. Southard Corp.*, No. 2:18-CV-190, 2019 WL 13128407, at *2 (S.D. Ohio Sept. 30, 2019) (same). The FCC further clarified that the inquiry must be such "to create an expectation on the part of the consumer that a particular company will call them"; this would not include, for example, inquiries related to a business's

hours or location. F.C.C., *Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991*, 68 FR 44144-01, 44159 (2003). Defendant has not produced and cannot produce any evidence to demonstrate the nature of Plaintiff's inquiry on May 26, 2020, because no such inquiry occurred. The call never connected, and thus there was no inquiry or even a "voluntary two-way communication" to support the establishment of an EBR. Thus, Plaintiff disputes the applicability of any EBR to the first six calls she received.

Plaintiff concedes that she established an EBR for the "Group 2" calls, when she spoke with American Protection on May 28, 2020 and feigned interest in the product in order to ascertain who was calling her, and as a result concedes that SunPath isn't liable for the Group 2 calls. But, as stated, above, the EBR was not formed on May 26, 2020 as SunPath contends, but rather on May 28, 2020, and Plaintiff is entitled to summary judgment as to the six "Group 1" calls placed between May 26, 2020 and May 28, 2020 before she feigned interest.

### B.      Group 3 – 66 Calls Between June 11, 2020 and July 11, 2020

For Group 3, SunPath does not dispute that Plaintiff demanded that the calls stop on June 11, 2020. Rather, SunPath believes a 30-day safe harbor provision applies, which supposedly makes all calls placed within 30 days of a stop request (here, 66 calls) unactionable. (Dkt. 81 at 18-19.)  Not so. At the time of Smith's stop request on June 11, 2020, she affirmatively ended the EBR that was created on May 28, 2020, and the VTPPA's EBR exemption no longer applied to shield calls from liability. VA. CODE ANN. § 59.1-514(D); *see also Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1123 (W.D. Mo. 2020) (noting that a "seller-specific do-not-call request . . . terminates an EBR for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller") (citing 47 C.F.R. § 64.1200(f)(5)(i)).

The problem for SunPath is that the thirty-day safe harbor it contends exists does not appear in the VTPPA—it is pulled from the Code of Federal Regulations ("CFR") supporting an entirely

different statute, the federal Telephone Consumer Protection Act. Defendant encourages the implementation of this rule because: (1) "the VTPPA does not explicitly prescribe how long a company has to implement a do-not-call request" ; and (2) the statute elsewhere incorporates the CFR. (Dkt. 81 at 18.) Both of these assertions miss the mark.

First, the VTPPA *does* provide guidance regarding the timeframe for honoring a stop request: "Any such request not to receive telephone solicitation calls shall be honored *for at least 10 years from the time the request is made*." VA. CODE ANN. § 59.1-514(A) (emphasis added). Thus, by the plain language of the statute, Plaintiff's request should have been honored immediately (on June 11, 2020), and then until June 11, 2030. There is simply nothing in the statute to suggest that the period does not begin to run until 30 days after a stop request. Second, though the VTPPA does reference the CFR, it does so in the context of incorporating the DNC Registry. VA. CODE ANN. § 59.1-514(B). ("the National Do Not Call Registry maintained by the federal government pursuant to [47 C.F.R. § 64.1200]." This reference to the DNC list established by federal law does not amount to a wholesale adoption of everything contained in the CFR. Accordingly, Plaintiff disputes the applicability of the federal "thirty-day rule" as a safe harbor for the sixty-six (66) calls that were made to Plaintiff the first month after her stop request. The calls should have stopped immediately.

Nevertheless, even if the thirty-day rule and the CFR were applicable to this case, the CFR rule SunPath argues for states that telemarketers "must honor a residential subscriber's do-not-call request **within a reasonable time**—not [to] exceed thirty days from the date of such request." 47 C.F.R. § 64.1200(d)(3) (emphasis added). Thus, the rule does not *automatically* absolve telemarketers from liability for any calls made within 30 days of receiving a stop request, especially when the telemarketer fails to honor the stop request at all. Here, Defendant has not

9

proffered any evidence to suggest that Plaintiff's stop request was honored within any reasonable time, let alone thirty days. Indeed, the evidence suggests that American Protection *continued* calling Plaintiff even after the thirty-day period. (Dkt. 76-1; *see also* Dkt. 76-2 ¶ 8.) Thus, even if the thirty-day rule were operative in this case, it should not apply to any of the calls received by Plaintiff because her stop request was not honored within a reasonable time. Under SunPath interpretation, a company could call a consumer thousands of time a day after the consumer says "stop", so long as the calls stop on day 31. That is not "reasonable". Plaintiff was called 66 times in a 30-day period after demanding that the calls stop. They didn't stop, and SunPath should therefore not be allowed to hide behind a safe harbor.

### C.   Groups 3 and 4 – Admissibility Arguments

SunPath next argues that 116 calls that fall in Groups 3 and 4 are not actionable because supposedly "Plaintiff has no personal knowledge or admissible evidence of those calls". (Dkt. 81 at 19.) Both assertions fail.

First, SunPath is incorrect when it claims that Plaintiff has no personal knowledge of these calls.   "[P]ersonal knowledge" means "'knowledge of a fact which a person has himself gained through his own senses and not from others or information supplied by others.'" *Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12CV97, 2016 WL 354751, at *3 (E.D. Va. Jan. 27, 2016). Personal knowledge can be gained by examining documents or data and forming an understanding "through his [or her] own senses." *Id.* This includes reviewing documents or data produced in discovery. *See id.* ("NBD's protests that Burtner lacks 'true' personal knowledge because he was unfamiliar with NBD's database prior to this litigation has no foundation in either the Federal Rules of Evidence or the interpreting jurisprudence."); *see also Ferrer v. Bayview Loan Servicing, LLC*, No. 15-20877-CIV, 2018 WL 582584, at *5 (S.D. Fla. Jan. 26, 2018) (finding that

a declarant had personal knowledge based on a "review of relevant business records and specific electronic information.").

Applied here, Plaintiff plainly has "personal knowledge" regarding the calls that she received. Plaintiff's declaration is not, as SunPath claims, based on the Five9 calling records. Rather, as her declaration states, her testimony is based on her own "personal knowledge" of the calls that she received after *reviewing* the Five9 records. (*See* Declaration of Ruth Smith, Dkt. 74-8 ¶¶ 1-2.) This is perfectly acceptable and common in litigation. *See Hopeman Bros., Inc. v. Cont'l Cas. Co.*, No. 4:16-CV-187, 2018 WL 4169282, at *6 (E.D. Va. Jan. 12, 2018) ("the need to rely on a document to verify a date or fact therein, as Van Epps requested in his personal deposition . . . does not mean that Van Epps lacks personal knowledge of a fact or a date."). In the end, Plaintiff was on the receiving end of every single call at issue and thus possesses sufficient "personal knowledge" to testify regarding her receipt of the calls. As in *Hopeman Bros., Inc.*, the fact that she needed to review the Five9 call records to clarify the total number of calls and the date/times she received the calls "does not mean that [she] lacks personal knowledge" regarding the calls.

SunPath is also incorrect that Plaintiff may not rely upon supposedly inadmissible evidence to formulate her recollection of the calls. Rather, witnesses can use a wide variety of documents to "revive[]" their "latent memory". *See United States v. Rydland*, 461 F. App'x 208, 210 (4th Cir. 2012) ("It is, of course, obvious from everyday experience that the latent memory of a witness may be revived by prior written statements which he or others may have made." (emphasis added)); *see also Mozingo v. Oil States Energy Servs., L.L.C.*, 341 F. Supp. 3d 534, 546 (W.D. Pa. 2018) ("'[w]itnesses may use any aid to refresh their recollections.' A witness may refresh his or her recollection using a document which is otherwise inadmissible."). This includes business records. *See Gunter v. S. Health Partners, Inc.*, No. 1:16CV262, 2021 WL 4255370, at *9 (M.D.N.C. Sept.

17, 2021) (permitting the use of pharmacy records to refresh a witness's recollection as to what medication he was taking).

SunPath is also wrong that the Five9 records, which evidence these 116 calls, is inadmissible. As detailed in Plaintiff's response to SunPath's First Motion in Limine, the records are admissible. Both Plaintiff and SunPath became aware of Five9 at the exact same time and both Parties received the Five9 call records on the same day. And the records have been authenticated via a declaration from Five9. The main reason SunPath wants the Five9 records excluded is that they are damning to its defense. This is not a valid reason to exclude evidence.

Thus, SunPath's arguments in this regard fail.

### D. With respect to Groups 1, 3, and 4, SunPath, as a "seller", is liable for American Protection's violations of the VTPPA.

Defendant next claims that Plaintiff "fails to show that SunPath can be held jointly or severally liable for any VTPPA-violating telephone solicitation calls at issue". (Dkt. 81 at 19.)[1]

As an initial matter, SunPath misapplies its own burden. It is not Plaintiff's job to "show" that SunPath can be jointly or severally liable, it is SunPath's burden to show that it should not be. That is, the VTPPA creates a presumption that calls made offering or advertising a particular seller's product were made "on behalf of or for the benefit of" said seller, such that they may be held jointly and severally liable for the calls. VA. CODE ANN. § 59.1-514.1(B). This presumption can be rebutted:

> The presumption may be rebutted if it is shown by **clear and convincing evidence** that the seller **did not retain or request the telephone solicitor to make telephone solicitation calls** on the seller's behalf or for the seller's benefit **and** that the telephone solicitation calls offering or advertising the seller's property, goods, or services were made by the telephone solicitor **without the seller's knowledge or**

---

[1] SunPath implicitly concedes that its only defense to Group 4 calls is that it cannot be held jointly and severally liable.

**consent**.

*Id.* (emphasis added). So as an initial matter, Plaintiff could not "fail" to show, as SunPath claims, that liability should attach to SunPath because it was never her burden to make such a showing. The presumption is that SunPath is liable, and it is SunPath's burden to show otherwise. But even though it wasn't her burden, Smith has shown that SunPath should be held liable.

First, Defendant claims that it is not a "seller" as the term is defined in the VTPPA. (Dkt. 81 at 20–22.) SunPath claims that the calls attempting to solicit purchase of its VSCs were neither made on its behalf nor for its benefit. But the facts in this case show otherwise, and SunPath qualifies as a seller. The VTPPA defines a "seller" as "any person on whose behalf or for whose benefit a telephone solicitation call offering or advertising the person's property, goods, or services is made or initiated." VA. CODE ANN. § 59.1-510. In the context of the presumption established in Section 514.1, this definition is rendered redundant—the statute assigns joint and several liability to "seller[s] on whose behalf or for whose benefit a telephone solicitor makes or initiates a telephone solicitation call" in violation of the statute (*id.* § 59.1-514(A)), and likewise a call offering or advertising a seller's products "shall be presumed to have been made or initiated *on behalf of or for the benefit of a seller*." *Id.* § 59.1-514(B) (emphasis added). Thus, if Defendant's products or services were offered or advertised on the call, it is presumed that the calls were made on behalf of or for the benefit of SunPath, and SunPath is therefore presumed to be the seller as defined. It would make little sense to require a plaintiff to doubly prove that calls were made on behalf of or for the benefit of a particular company, especially when the statute applies a presumption to that particular fact.

And SunPath's products were offered on the calls. That was the purpose of the calls. Defendant relies heavily on the contention that Plaintiff did not hear the name "SunPath" on the

calls that she received. Even if Defendant's contention were true (it is not), this consideration does not impact the statute's application. Rather, the VTPPA's presumption applies to calls "offering or advertising a seller's property, goods, or services." VA. CODE ANN. § 59.1-514.1(B). The statute makes no mention of whether the seller must be identified by name on the call—only that the call must offer or advertise the seller's goods. *Id.*

Nevertheless, Smith testified that she recalled American Protection identifying SunPath as the company whose products were being pitched during the calls at issue. (Dkt. 74-12, at 53:12-21.) Her recollection is reinforced by the follow-up email she received on May 28, 2020, which contained a link soliciting purchase of a SunPath VSC. Further, American Protection's representative testified that, after identifying the best VSC plan for a given consumer, American Protection would exclusively solicit the purchase of that plan, and it would not later attempt to solicit the purchase of a VSC from a competing company if the first was rejected. (Dkt. 74-3, at 35:3-10, 37:11-15.) Given that American Protection's CRM system revealed that the only quote it created for Plaintiff was for a "Diamond 48/75,000" VSC plan—the same plan identified by email as SunPath's VSC—the only product that was offered to Plaintiff on the calls was Defendant's VSC. (*Compare* CRM Screenshots, Dkt. 74-13 pg. 1, *with* May 28, 2020 Email and Link to American Protection Webpage, Dkt. 74-10.)

At the end of the day, as stated above, it is the purpose of the calls which matters. *See Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040, at *2 (D. Ariz. Jan. 12, 2023) ("The Federal Communications Commission has noted, and the Ninth Circuit has agreed, that whether a call is a solicitation turns on the 'purpose of the message.' . . . The Court must also approach the purpose of the message 'with a measure of common sense.' **'[I]t is the purpose behind a call that controls, not what happened during the call.'**  Except for encouraging the purchase of its

14

products, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money, as did the recorded message in this case." (citations omitted) (emphasis added)). It is evident from the record that the purpose behind the calls was to market or solicit the sale of SunPath's VSCs. Thus, regardless of whether the name "SunPath" was spoken on some or all of the calls is irrelevant.

The facts here demonstrate that American Protection made calls on behalf of and for the benefit of SunPath. SunPath testified that it derives 100 percent of its revenue from third-party sales of its VSCs, and to sell its VSCs, SunPath contracts with third-parties like American Protection who offer the products to consumers in order to solicit sales. (Dkt. 74-2, at 71:12-19.) The Call Center Marketing Agreement also requires that American Protection collect payments from customers and hold SunPath's portion of the proceeds, or "net price", "in trust" for SunPath's benefit. (*See* Dkt. 74-1 at 2.)

These facts completely refute Defendant's contention that the calls made by third-party marketers like American Protection were not made on behalf of and for the benefit of SunPath—they account for all of SunPath's revenue, and given that SunPath does not sell directly to consumers, it must rely on others to make sales on its behalf. Defendant attempts to liken this relationship to that of a grocery store with items on its shelves or a bar with multiple beers on tap, simply because American Protection can market products for other companies as well. (Dkt. 81 at 24) (citing *Worsham v. Disc. Power, Inc.*, Civil Action No. RDB-20-0008, 2022 U.S. Dist. LEXIS 139580, at *21 (D. Md. Aug. 4, 2022). The analogy is of little use here due to the differences in industries and consumer choice. A customer can walk into a grocery store or bar and select the goods they want to purchase—it would be unusual for a brewery to contractually obligate a bar to engage in wide-scale telemarketing to "actively market" and solicit the purchase of a particular

beer. But that is what has occurred here: SunPath contracted with American Protection to "actively market" SunPath's products, and after determining which consumers it would market Defendant's products to, American Protection would not present alternate contracts or attempt to solicit the purchase of a competing product to any given consumer.

The factual record supports both the presumption and a direct finding that the calls at issue were made "on behalf of or for the benefit of" SunPath, thereby rendering Defendant a "seller" as defined in the VTPPA. Plaintiff is entitled to summary judgment.

> **E.    Despite SunPath's contentions otherwise, the factual record does not contain "clear and convincing" evidence to rebut the presumption that the calls were made on behalf of or for the benefit of SunPath.**

Finally, SunPath argues that the underlying facts in this case are sufficient to rebut the presumption that the calls were made on behalf of or for the benefit of SunPath. (Dkt. 81 at 25–29.) However, in order to rebut the presumption, the facts must show by clear and convincing evidence that Defendant did not retain or request American Protection to make solicitation calls and that the calls were made without the seller's knowledge. Such a showing is not supported by the factual record.

Once again, the VTPPA creates a presumption that calls made offering or advertising a particular seller's product were made "on behalf of or for the benefit of" said seller, such that they may be held jointly and severally liable for the calls. VA. CODE ANN. § 59.1-514.1(B). This presumption can be rebutted:

> The presumption may be rebutted if it is shown by **clear and convincing evidence** that the seller **did not retain or request the telephone solicitor to make telephone solicitation calls** on the seller's behalf or for the seller's benefit **and** that the telephone solicitation calls offering or advertising the seller's property, goods, or services were made by the telephone solicitor **without the seller's knowledge or consent**.

*Id.* (emphasis added). In other words, SunPath must demonstrate with "clear and convincing" evidence *both* that it did not retain American Protection to make solicitation calls for its benefit, *and* that the calls were made without its knowledge or consent. SunPath's "evidence" is insufficient to rebut this presumption.

Much of Defendant's argument is that, because the contract required that American Protection use "good faith and best efforts" to ensure compliance with applicable laws, any potentially unlawful call falls outside the scope of the contracted telemarketing activity. This argument is flawed for at least two reasons. First, it is unsurprising that SunPath would require American Protection to comply with the law because any contract authorizing a telemarketer to violate the TCPA or any state telemarketing law would be void *ab initio*. *See, e.g.*, *Meuse v. Henry*, 296 Va. 164, 183, 819 S.E.2d 220, 230 (2018). Taken to its logical end, SunPath's position would prevent any seller from being held liable for the unlawful actions of its third-party telemarketers—eviscerating the VTPPA's presumption and attachment of liability completely—so long as the seller told its downline agents not to break the law. Such a standard would immunize all sellers from liability under the Virginia law, which is designed specifically to attach liability to those sellers.

However, and secondly, the presumption must be rebutted by clear and convincing evidence as to *both* portions: (1) that the seller did not "retain or request" that the telemarketer make solicitation calls on its behalf or for its benefit; **AND** (2) that the calls were made without the seller's knowledge or consent. VA. CODE ANN. § 59.1-514.1(B) (emphasis added). The contract's "good faith" compliance provision could perhaps be evidence that any unlawful calls were made without SunPath's consent, but the evidence plainly demonstrates that Defendant retained American Protection for the purpose of making calls to sell its VSCs. SunPath expressly

17

contracted with American Protection to "actively market" SunPath's products, and it provided "Promotional Materials" to American Protection to enable it to do so. Further, the Call Center Marketing Agreement required American Protection to collect payments from customers and hold SunPath's portion of the proceeds "in trust" for SunPath's benefit, and, as stated above, third-party sales like the ones made by American Protection account for 100 percent of SunPath's revenue.

The evidence in this case does not, by a "clear and convincing" standard (or, frankly, any standard), suggest that Defendant did not retain American Protection for the purpose of making telemarketing calls to solicit the purchase of SunPath's products. Quite the opposite—the contract between SunPath and American Protection clearly demonstrates that Defendant retained American Protection for the purpose of "actively marketing" its products to consumers. Thus, even if the Court accepts Defendant's argument that it did not consent to any unlawful telemarketing calls made on its behalf, Defendant has failed to establish both prongs required to successfully rebut the presumption from which its liability arises.

At the end of the day, it is not Plaintiff's job to show that joint and several liability is appropriate here given that, under the VTPPA, it is presumed to be. But even though it is not her responsibility, the record in this case would be enough to cross the goal line even it was her burden. SunPath has fallen woefully short of rebutting the presumption, and Smith is entitled to summary judgment.

## IV.   CONCLUSION

For the reasons stated above and in Plaintiff's Motion for Summary Judgment, summary judgment should be granted in Plaintiff's favor for each call in Groups 1, 3, and 4. Accordingly, the Court should grant summary judgment in favor of Plaintiff and award such relief as it deems necessary and just.

Dated: January 25, 2023                          **RUTH SMITH**,


                                          By:  _/s/  Francis J. Driscoll, Jr._
                                                  One of Plaintiff's Attorneys

                                          Francis J. Driscoll, Jr.
                                          (frank@driscolllawoffice.com)
                                          4669 South Blvd., Suite 107
                                          Virginia Beach, VA 23452
                                          Telephone: 757-321-0054
                                          Facsimile: 757-321-4020

                                          Patrick H. Peluso (admitted *pro hac vice*)
                                          ppeluso@woodrowpeluso.com
                                          Taylor T. Smith (admitted *pro hac vice*)
                                          tsmith@woodrowpeluso.com
                                          Woodrow & Peluso, LLC
                                          3900 East Mexico Ave., Suite 300
                                          Denver, Colorado 80210
                                          Telephone: (720) 213-0675
                                          Facsimile: (303) 927-0809

                                          Attorneys for Plaintiff

19

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above titled document was served upon counsel of record by filing such papers via the Court's ECF system on January 25, 2023.

/s/ Francis J. Driscoll, Jr.